**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| DOUGLAS MARLAND, COSETTE RINAB, and ALEC CHAMBERS, | : | Case No. _____ |
|  | : |  |
| Plaintiffs, | : |  |
|  | : | **COMPLAINT FOR INJUNCTIVE** |
| -against- | : | **AND DECLARATORY RELIEF** |
|  | : |  |
| DONALD J. TRUMP, in his official capacity as President of the United States; WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce; and U.S. DEPARTMENT OF COMMERCE, | : |  |
|  | : |  |
| Defendants. | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs Douglas Marland, Cosette Rinab, and Alec Chambers allege the following

Complaint against Defendants Donald J. Trump, in his official capacity as President of the

United States; Wilbur L. Ross, Jr., in his official capacity as Secretary of Commerce; and the

United States Department of Commerce.

### NATURE OF THE ACTION

1.      Plaintiffs create and consume short-form videos published on the popular mobile

application TikTok.  This action challenges President Trump's Executive Order 13942

("Executive Order"), which bans "any transactions" with TikTok Inc.'s parent company and its

subsidiaries, as implemented by regulations published by the Department of Commerce on

September 18, 2020.  Effective September 20, 2020, the Executive Order and regulations would

shutter access to TikTok for new users and ban all users from installing updates to the TikTok

application. Effective November 12, 2020, TikTok itself would be barred from operating in the United States. Plaintiffs ask the Court to declare the Executive Order and regulations invalid because they violate the First and Fifth Amendments to the United States Constitution and exceed the President's authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1706.

2.      Plaintiffs are a comedian, fashion creator, and

3.      musician, each of whom has developed a significant following by creating and posting content on TikTok. TikTok allows users to create, post, view, and comment on videos between 15 and 60 seconds in length. Plaintiffs are representative of millions of TikTok creators who post content on TikTok hoping to reach an audience, build a career as a content creator, or earn a livelihood. Plaintiffs rely exclusively or principally on revenue they earn from their TikTok endeavors to make a living. The Executive Order has and continues to affect Plaintiffs' ability to continue this work.

4.      The Executive Order and implementing regulations violate the First Amendment because they are unconstitutionally overbroad and an impermissible prior restraint of speech. Purportedly issued to address national security concerns, the Executive Order approaches this alleged problem with a sledgehammer, not a scalpel, as the First Amendment requires. If in fact TikTok poses national security risks, the government must identify those risks and tailor the solution narrowly to address the risks, without unnecessarily trampling on Plaintiffs' constitutional rights. The Executive Order and regulations fail to do so.

5.      The Executive Order and regulations also violate the Due Process Clause of the Fifth Amendment because they deprive Plaintiffs of their liberty and property interests without adequate notice, an opportunity to be heard, or compensation. The Executive Order and

regulations deprive Plaintiffs of their property interest in their TikTok accounts, which have significant value as a result of the time and effort expended by Plaintiffs to create and publish their creative works. The Executive Order and regulations also violate Plaintiffs' liberty interest in receiving information through TikTok and their liberty interest in working in their chosen fields of occupation.

6.     In addition to violating the United States Constitution, the Executive Order and regulations violate IEEPA, the law under which the Executive Order was promulgated. IEEPA expressly prohibits the President from using the statute to "regulate or prohibit, directly or indirectly" "personal communications" that do "not involve a transfer of anything of value," or to ban the importation or exportation "any information or informational materials," such as publications and films. 50 U.S.C. § 1702(b)(3) & (1). Although Plaintiffs derive revenue from the reputations each has built by publishing content on TikTok, the vast majority of videos posted on TikTok involve no transfer of money or anything else of value. Prohibiting access to a forum for speech used broadly by millions of Americans prohibits both personal communications and the exchange of information, thereby violating IEEPA.

7.     Finally, the Executive Order and implementing regulations exceed the President's authority under IEEPA because its purported basis is not an "unusual and extraordinary threat with respect to which a national emergency has been declared." 50 U.S.C. § 1701(b). The declaration on which the Executive Order is based, Executive Order 13873, was designed to address purported national security concerns about certain telecommunications companies. But TikTok is a platform—like Facebook, Instagram and Twitter—on which creators post content and thereby communicate with other users, not a telecommunications company. Plainly, TikTok does not fall within Executive Order 13873's purview.

8. Plaintiffs ask the Court to declare the Executive Order and implementing regulations unlawful and unconstitutional, and to enjoin Defendants from enforcing them both.

## THE PARTIES

9. Plaintiff Douglas Marland is a comedian who lives in Bucks County, Pennsylvania. He has created and posted comedic and parodic videos on TikTok since January 2019 and has about 2.7 million followers, that is, fans that are subscribed to his video feed. Because of his popularity on TikTok, Mr. Marland has several brand partnerships and sponsorships, including for the Almond Board of California.

10. Plaintiff Cosette Rinab is a fashion designer and student at the University of Southern California who lives in North Hollywood, California. She has created and posted on TikTok fashion and lifestyle videos since December 2018 and has 2.3 million followers. Ms. Rinab derives from her work on TikTok all her income, which she uses to pay living expenses. As a result of the popularity of her content on TikTok, she has worked with several sponsors and brands, including the fashion designers Dolce & Gabbana, Tory Burch, and Balmain.

11. Plaintiff Alec Chambers is a musician who lives in Shelton, Connecticut. He has used TikTok since November 2019 and has 1.8 million followers. Mr. Chambers uses TikTok to post music he composes himself along with covers of music by other artists. Because of his popularity on TikTok, Mr. Chambers has had the opportunity to work with record labels, creating promotional material, and to work with several prominent brands, including Extra chewing gum and Cinnamon Toast Crunch cereal.

12. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity. President Trump issued the Executive Order August 6, 2020, purportedly acting under authority of the National Emergencies Act ("NEA"), IEEPA, and 3 U.S.C. § 301.

13.     Defendant Wilbur T. Ross, Jr. is the Secretary of Commerce and is sued in his official capacity.

14.     The Department of Commerce is the cabinet-level department of the federal government responsible for implementing the Executive Order.  Pursuant to authority under the Executive Order, the Department of Commerce on September 18, 2020 published regulations purportedly identifying the transactions subject to the order.

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the United States Constitution and IEEPA, 50 U.S.C. §§ 1701–06.

16.     The Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; 5 U.S.C. § 702; and the Court's inherent equitable powers.

17.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because defendants are officers or employees of agencies of the United States acting in their official capacities and an agency of the United States, and because a substantial part of the events or omissions giving rise to this action occurred in this District.

18.     Venue is also proper in this District under 28 U.S.C. § 1391(e)(1) because defendants are officers or employees of agencies of the United States acting in their official capacities and an agency of the United States, and because Mr. Marland, a plaintiff, resides in this District.

## FACTUAL ALLEGATIONS

**A.      TikTok Facilitates the Exchange of Creative Content**

19.      TikTok is a global video-sharing application that allows users to create, share, and watch short-form videos.  TikTok's stated mission is to inspire creativity and bring joy.

20.      The TikTok application allows users to create and upload their own videos ranging from 15 to 60 seconds in length.  Users who create videos and share them on TikTok are referred to here as "creators," and the term "users" embraces both creators and consumers of content.  TikTok offers creators a variety of features, such as background music and augmented reality effects.  Creators control the content of their videos, including which features to pair with the content of their self-directed videos, such as the music.  TikTok permits users to "like" videos, comment on them, share videos, message the creator, and more.

21.      TikTok creators post videos on topics ranging from light-hearted to serious, including comedy, cooking, music and music performances, travel and tourism, politics, domestic and international current events, social issues, and environmental impact.  TikTok users span all walks of life, and several American politicians, news outlets, and journalists are TikTok users and creators.

22.      Users may also organize political and other causes using TikTok.  For example, TikTok creators and users claimed they coordinated the reservation of thousands of tickets for the President's re-election campaign rally in Tulsa, which inflated projected attendance.  Taylor Lorenz et al., *TikTok Teens and K-Pop Stans Say They Sank Trump Rally,* N.Y. Times (July 11, 2020), https://www.nytimes.com/2020/06/21/style/tiktoktrump-rally-tulsa.html.

23.      Users also rely on TikTok as a source of information, to amplify and respond to others' content, and to discuss issues with friends and acquaintances across the globe.  Through creators' engaging and short videos, TikTok users have learned about the "right way" to brush

their teeth; have picked up math, SAT, and finance tips; and have access to a "trove of do-it-yourself projects and creative ideas." *See* Dillon Thompson, *Internet users stunned by 'life-changing' tooth brushing video: 'This is the first I'm hearing of this?',* Yahoo! Sports (May 4, 2020), https://sports.yahoo.com/2020-05-04-tooth-brushing-hack-dental-hygiene-tiktok-video-24166985.html; Rachel E. Greenspan, *Math teachers are getting millions of views on TikTok by sharing SAT tips and data visualizations*, Business Insider (Apr. 2, 2020), https://www.businessinsider.com/math-tiktok-accounts-viral-sat-personal-finance-tips-2020-4; Stephanie Osmanski, *Bored This Summer? These 30 DIY Summer Projects Are Trending on TikTok*, Parade (July 27, 2020), https://parade.com/1065963/stephanieosmanski/diy-summer-projects-tiktok/. Even former President Barack Obama recently featured a TikTok video on baking bread in a voter drive video, stating that, "[o]ver the past few months, I've learned a thing or two from young people about how to quarantine successfully. You've taught me how to make a mean sourdough starter." Barack Obama, Twitter (Sept. 16, 2020) https://twitter.com/BarackObama/status/1306246499882369026.

      24.     TikTok users can also comment on, like, and share creators' videos. The comment feature allows users to not only leave their impressions or reactions to a TikTok video, but also for back-and-forth discussions between users. TikTok also has a messaging feature that allows users to communicate with each other directly and privately.

      25.     TikTok allows creators to reach a global audience. TikTok has a community of about 700 million active monthly users globally. In the United States alone, TikTok has more than 90 million active monthly users and 50 million active daily users. The TikTok application has been downloaded more than 2 billion times. Alex Sherman, *TikTok reveals detailed user*

*numbers for the first time¸* CNBC (Aug. 24, 2020), https://www.cnbc.com/2020/08/24/tiktok-reveals-us-global-user-growth-numbers-for-first-time.html.

26. Creators also use TikTok because of its "organic reach"—a metric that measures the number of people who have seen a post. Creators attribute TikTok's organic reach to the fact that TikTok is designed to inspire users to explore and find new content and content creators with minimal effort, continuously providing users a curated stream of new videos on its "For You" page. As a result, any user's video can go "viral" regardless of the number of followers they have. Olivia Gavoyannis, *TikTok is transforming the influence rulebook – we spoke to the viral video-makes about mastering its elusive algorithm and why they prefer it to Instagram,* Business Insider (July 30, 2020), https://www.businessinsider.com/tiktok-influencers-brands-master-viral-algorithm-2020-7.

27. New creators benefit from TikTok's organic reach and unique algorithm, which allows people across the nation to be discovered because of their creativity, humor, or talent. As *The Athlantic* recently put it, "Getting famous on TikTok can happen very quickly … TikTok is unique in how its algorithm pulls oddities out of the blue and pushes them into a main feed seen by millions of people." Kaitlyn Tiffany, *How Quickly Can a Girl Go Viral on TikTok?,* The Atlantic (Sept. 16, 2020), https://www.theatlantic.com/technology/archive/2020/09/tiktok-teens-fandom-mooptopia/616371/. TikTok's ability to launch new creators into fame has been widely discussed and reported. *See* Natalie Jarvey, *TikTok Boom! How the Exploding Media App is Going Hollywood*, The Hollywood Reporter (May 6, 2020), https://www.hollywoodreporter.com/features/tiktok-boom-how-exploding-social-media-app-is-going-hollywood-1293505; Carina Chocano, *Not So Bored in the House*, Vanity Fair (July/Aug. 2020), https://www.vanityfair.com/style/2020/07/not-so-bored-in-the-house-with-tiktok;

Rebecca Jennings, *The not-so-secret life of a TikTok famous teen*, Vox (Oct. 2, 2019),

https://www.vox.com/the-goods/2019/10/2/20891915/tiktok-famous-teenagers-haley-sharpe-yodeling-karen.

28.     Because of TikTok's broad and organic reach, some creators have been able to garner a significant user following and use that following to earn income by creating and posting videos on TikTok.  For example, TikTok creators with a large fan base can earn revenue by advertising third-party products and services to TikTok users in videos.  TikTok creators can also advertise their own products and services using their accounts.

29.     Recently, TikTok launched a Creator Fund, which allows TikTok creators with a large following and who consistently post content to realize additional earnings on TikTok by monetizing their videos.  The Creator Fund was made to "further support creators" and "encourage those who dream of using their voices and creativity to spark inspirational careers." Vanessa Pappas, *Introducing the $200M TikTok Creator Fund*, TikTok (July 22, 2020),

https://newsroom.tiktok.com/en-us/introducing-the-200-million-tiktok-creator-fund.

30.     TikTok is an economic lifeline for many creators, giving rise to new, non-traditional social media celebrities—"many of them working-class folks . . . in villages far from [] cosmopolitan megacities"—and has become "a livelihood for some people," providing "fame, empowerment and even a path out of poverty."  Sushmita Pathak, *'TikTok Changed My Life': India's Ban On Chinese App Leaves Video Makers Stunned*, NPR (July 16, 2020),

https://www.npr.org/2020/07/16/890382893/tiktok-changed-my-life-india-s-ban-on-chinese-app-leavesvideo-makers-stunned.

31.     TikTok is sometimes compared to Instagram or other social media platforms, because, like those platforms, TikTok allows users to create and share content.  However,

TikTok differs from other platforms in several ways. TikTok exclusively hosts short-form videos of no more than 60 seconds in length. Unlike Instagram or Facebook, TikTok does not have a feed for photos, long-form videos, or "stories," which are temporary picture and video posts that self-delete 24 hours after they are posted. For that reason, creators' short-form videos receive undivided attention from users on TikTok.

32.     TikTok is also known for its community. Unlike other platforms, TikTok was created for users to explore new content and is not based on "following" friends, family, or popular celebrities and influencers. TikTok allows users to collaborate with other users and be part of trends, which helps create a supportive environment. Unlike other large platforms, TikTok's "For You" page also allows creators to reach new audiences on TikTok outside of their known network of friends and followers. TikTok "encourages users to jump from audience to audience, trend to trend, creating something like simulated temporary friend groups, who get together to do friend-group things: to share an inside joke; to riff on a song; to talk idly and aimlessly about whatever is in front of you." John Herrman, *How TikTok Is Rewriting the World*¸ The New York Times (March 10, 2019), [https://www.nytimes.com/2019/03/10/style/what-is-tik-tok.html](https://www.nytimes.com/2019/03/10/style/what-is-tik-tok.html).

33.     All of these videos—whether informative or entertaining—demonstrate that TikTok is fundamentally a conduit for communications that are fully protected by the First Amendment and a marketplace of ideas for people from all walks of life and all parts of the nation, and indeed, the globe.

### B. President Trump's Executive Orders

#### 1. Executive Order 13873

34. On May 15, 2019, President Trump issued Executive Order 13873, titled "Securing the Information and Communications Technology Services Supply Chain." Executive Order 13873 declares a national emergency with respect to the threat posed by unidentified "vulnerabilities in information and communications technology and services" and provides that "the unrestricted acquisition or use in the United States of information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries augments the ability of foreign adversaries to create and exploit vulnerabilities in information and communications technology or services, with potentially catastrophic effects, and thereby constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

35. Executive Order 13873 does not identify any countries or companies that pose a national security threat. But statements by the Trump administration make clear that the purpose of Executive Order 13873 was to target Chinese-owned telecommunications companies.

36. On May 13, 2020, President Trump extended for one year the national emergency declared in Executive Order 13873.

#### 2. Executive Order 13942 ("Executive Order")

37. On August 6, 2020, without notice to TikTok's creators or users, President Trump issued the Executive Order.

38. Entitled "Addressing the Threat Posed by TikTok" and purportedly authorized by IEEPA, the NEA, and 3 U.S.C. § 301, the Executive Order states that "additional steps must be taken to deal with the national emergency with respect to the information and communications

technology and services supply chain" declared in Executive Order 13873. The order provides that beginning forty-five days later, "any transaction by any person, or with respect to any property, subject to the jurisdiction of the United States, with ByteDance Ltd. (a.k.a. Zìjié Tiàodòng), Beijing, China, or its subsidiaries, in which any such company has any interest, as identified by the Secretary of Commerce" will be prohibited. 85 Fed. Reg. 48637-38.

39. Although the Executive Order states that it is necessary to "address the threat posed by . . . TikTok," it does not identify any actual threats posed by TikTok or individual creators and users transactions on the TikTok application. Instead, it relies on a speculative and conclusory list of possible threats, including that TikTok Inc. uses data collection practices that "***potentially*** allow[] China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage," "***reportedly*** censors content that the Chinese Communist Party deems politically sensitive," and "***may*** be used for disinformation campaigns." 85 Fed. Reg. 48637 (emphasis added).

### 3. Regulations

40. On September 18, 2020, the forty-third day, the Department of Commerce published regulations identifying the transactions to which the Executive Order applies.

41. Effective September 20, 2020, the regulations prohibit transactions with ByteDance Ltd. or its subsidiaries, including TikTok Inc. "involving… [a]ny provision of services to distribute or maintain the TikTok mobile application, constituent code, or application updates through an online mobile application store, or any online marketplace where mobile users within the land or maritime borders of the United States and its territories may download or update applications for use on their mobile devices." In other words, the regulations will stop users from downloading or updating TikTok effective September 20, 2020.

42.    Effective November 12, 2020, the regulations also prohibit a host of other actions that would "enable the functioning or optimization of the TikTok mobile application within the land and maritime borders of the United States and its territories."   In other words, effective November 12, 2020, TikTok will no longer be available in the United States.

43.    The regulations contain exceptions, including an exception for "[t]he exchange between or among TikTok mobile application users of personal or business information using the TikTok mobile application."  This exception has no practical effect because the regulations effectively ban TikTok in the United States.

### C.    The President's Authority Under IEEPA

44.    IEEPA grants the President limited emergency powers to regulate certain international economic transactions. Those powers "may be exercised to deal with an[] unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).  IEEPA further provides that "[t]he authorities granted to the President . . . may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose" and that "[a]ny exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat." 50 U.S.C. § 1701(b).

45.    In 1988 and in 1994, Congress amended IEEPA to address concerns that regulations under IEEPA infringed First Amendment rights.

46.    IEEPA now provides several important carve-outs to the President's authority. Under IEEPA, "[t]he authority granted to the President . . . does not include the authority to

regulate or prohibit, directly or indirectly . . . any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value" or "the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds," except for specifically enumerated export controls, none of which are present here. 50 U.S.C. §§ 1702(b)(1), 1702(b)(3).

47.     The purpose of these provisions is to protect against the President's infringement of First Amendment rights under the guise of national security. As the legislative history to the 1994 amendment provides, "[t]hese provisions . . . established that no embargo may prohibit or restrict directly or indirectly the import or export of information that is protected under the First Amendment to the U.S. Constitution" and "[t]he language was explicitly intended, by including the words 'directly or indirectly,' to have a broad scope." H.R. CONF. REP. 103-482, 239-40. Congress intended these provisions to "facilitate transactions and activities incident to the flow of information and informational materials without regard to the type of information, its format, or means of transmission, and electronically transmitted information, transactions for which must normally be entered into in advance of the information's creation." *Id.*

48.     The Executive Order plainly exceeds the President's limited authority under IEEPA.

49.     First, the Executive Order is missing an essential predicate: "an unusual and extraordinary threat with respect to which a national emergency has been declared," as required by 50 U.S.C. § 1701(b). Although the Executive Order purports to address the national

emergency declared in Executive Order 13873, that national emergency arose from security concerns relating to foreign telecommunications providers—of which TikTok Inc. is not one. TikTok operates a social media platform that enables users across the United States to create and express their constitutionally protected ideas and opinions in short-form video. Executive Order 13873 therefore does not support the actions outlined in the Executive Order.

50.     The Executive Order does not itself declare a national emergency that provides the necessary predicate to regulating or prohibiting any transactions with TikTok Inc.  The Executive Order does not identify a single, documented national security threat.  Instead, it relies solely on a list of speculative concerns, including that TikTok Inc. purportedly engages in data collection practices that "***potentially*** allow[] China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage," "***reportedly*** censors content that the Chinese Communist Party deems politically sensitive," and "***may*** be used for disinformation campaigns."

51.     In other words, the Executive Order does not address "an unusual and extraordinary threat with respect to which a national emergency has been declared," and as a result, the Executive Order and any regulations issued under the Order, are *ultra vires*.

52.     Second, the Executive Order exceeds the limitations in 50 U.S.C. §§ 1702(b)(1), 1702(b)(3). The content created and shared on TikTok—short-form videos expressing individual users' views on everything ranging from cats to the presidential election—constitute personal communications and informational materials within IEEPA's meaning. The Executive Order impermissibly restricts these personal communications, exceeding the President's authority under IEEPA.

### D. Plaintiffs' First and Fifth Amendment Rights

53.     Plaintiffs use TikTok to express themselves, showcase their creativity, and share their thoughts and opinions.  For example, Ms. Rinab uses TikTok to share do-it-yourself and fashion tips, Mr. Marland parodies users and trends, and Mr. Chambers shares his music. Plaintiffs have worked countless hours to record, edit, and post videos on TikTok.  They have also worked tirelessly to build their TikTok audience, each of them having between 1.3 and 2.7 million followers.  To achieve this success, Plaintiffs had to consistently create popular content, follow trends, and listen to their followers, requiring a significant investment of effort and time.

54.     Plaintiffs also rely on TikTok for entertainment and information about other content creators, trends, and their followers.  For example, Ms. Rinab uses TikTok for financial tips and educational material, and Mr. Chambers watches self-help and comedic videos.  Absent TikTok, Plaintiffs' ability to obtain this information in this form will be greatly diminished.

55.     For Plaintiffs, TikTok is not only a creative outlet and source of entertainment and information, it is also a source of income and livelihood.  Third-party companies have contracted with Plaintiffs to advertise their products and services in Plaintiffs' TikTok videos.  These companies have contacted Plaintiffs directly because they like Plaintiffs' content and because Plaintiffs have a large following.  TikTok representatives have also helped Plaintiffs by connecting companies with Plaintiffs for sponsorship and branding opportunities.  The payment terms of branded deals and sponsorship contracts are often dictated, at least in part, by the number of people who have followed Plaintiffs and viewed Plaintiffs' videos.

56.     For Plaintiffs, branded deals and sponsorships have become their main source—if not the sole source—of income.  Ms. Rinab, for example, has been able to earn enough money from her work on TikTok that TikTok is her exclusive source of income.  Ms. Rinab uses that income to pay for her living expenses.

57.     Plaintiffs also use their TikTok accounts to further their endeavors off the TikTok application.  For example, Mr. Chambers uses TikTok to introduce followers to his music, which is available for streaming on Spotify.  Similarly, Mr. Marland links to merchandise on TikTok that he sells on other websites, such as Teespring.  Plaintiffs were able to achieve this success because each has built a loyal TikTok following.

58.     Each Plaintiff learned of the Executive Order and the regulations at or near the time they were issued and have suffered harm as a result of the sweeping prohibition of "any transaction" with TikTok Inc.  Effective almost immediately, the regulations prohibit downloads of TikTok, halting Plaintiffs' access to growing audiences.  Effective November 12, the regulations prohibit the provision of services to facilitate the use of TikTok by users in the United States and its territories.  As a result, the Executive Order, as implemented by the regulations, limits a substantial amount of constitutionally protected expression and speech.

59.     The Executive Order and regulations purport to prohibit dissemination of all speech on TikTok, even speech that has not occurred, creating an unconstitutional prior restraint. It does so with no justification and regardless whether publication of the content could pose a national security risk.  Indeed, the Executive Order indisputably fails to identify **any speech** on TikTok that poses such a risk.  Rather, the justification for the Executive Order relates solely to the users' personal data.

60.     The Executive Order and regulations burden significantly more speech than necessary because less restrictive means are available to address the President's national security concerns.  For example, on August 14, 2020, the President issued an Executive Order entitled "Regarding the Acquisition of Musical.ly by ByteDance Ltd." ("August 14 Executive Order"), in which he ordered ByteDance to divest its interest in its U.S. operations.  Although the August 14,

2020 Executive Order is likely legally flawed for other reasons, it represents a less-restrictive alternative to the Executive Order, demonstrating the Executive Order's patent infirmity.

61. Plaintiffs are concerned the Executive Order and regulations will limit their ability to create and share content, limit their ability to communicate with established and new audiences, and cause them to lose their accounts, each of which has millions of followers. Plaintiffs fear they will not be able to obtain the same number of followers or reach the same number of people on other platforms, and without their following on TikTok, they will not be able to obtain sponsors or branded deals or advertise their own work or business. Although Plaintiffs have accounts on other social media platforms, those platforms do not have the same capabilities as TikTok and Plaintiffs have not achieved nearly the same success using those platforms.

**FIRST CLAIM FOR RELIEF**
**United States Constitution, First Amendment**

62. Plaintiffs reallege and reincorporate by reference each and every prior allegation as though fully set forth herein.

63. By purporting to ban TikTok in the United States, the Executive Order and regulations violate Plaintiffs' First Amendment rights guaranteed by the United States Constitution.

    a. The Executive Order and implementing regulations prohibit services that enable TikTok to operate in the United States and its territories, even though TikTok facilitates a wide range of speech and expressive activity protected under the First Amendment. Consequently, the Executive Order and regulations prohibit Plaintiffs from obtaining and disseminating information on TikTok, including posting, viewing, and/or commenting on content. The Executive Order and

regulations preemptively close down a major online speech platform used by the Plaintiffs and millions of other users, thus disrupting their ability to post and receive information. "[N]o conceivable governmental interest would justify such an absolute prohibition of speech." *Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 575 (1987).

b. The Executive Order and regulations are substantially overbroad because they limit the speech of all TikTok users in ways that bear no relationship to its purported justifications. To prevent the speculative possibility that TikTok Inc. or its parent could collect data on federal employees or contractors, they effectively ban *everyone* in the United States from using TikTok. And to forestall the prospect that the Chinese Communist Party might censor some content or engage in "disinformation campaigns," the Executive Order and regulations effectively ban *all* speech by *all* users. The Executive Order and regulations thus exhibit substantial overbreadth.

c. The Executive Order and regulations effectively prohibit Plaintiffs from engaging in any protected speech on TikTok and therefore effectuates an impermissible prior restraint on speech.

d. The Executive Order and regulations effectively prohibit Plaintiffs from receiving and disseminating information on TikTok, including posting, viewing, and/or commenting on content. The right to receive information is a "necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982).

64.     Plaintiffs have been and will continue to be chilled and burdened in the exercise of their First Amendment rights because of the threat to shut down the TikTok app.

*65.*     The Executive Order and implementing regulations are broader than necessary to serve any governmental interest because the release of the vast majority of TikTok videos could not reasonably be construed in any way to pose a threat to national security.  President Trump has demonstrated that less restrictive means to address the government's interest are available by issuing the August 14, 2020 Executive Order.  In fact, the Department of Commerce acknowledges that the prohibitions "may be lifted" if "the national security concerns posed by TikTok" are "resolved" by November 12, 2020.  *See* Wilbur Ross, *Commerce Department Prohibits WeChat and TikTok Transactions to Protect the National Security of the United States* (September 18, 2010), https://www.commerce.gov/news/press-releases/2020/09/commerce-department-prohibits-wechat-and-tiktok-transactions-protect.

66.     Defendants' violation of Plaintiffs' First Amendment rights will cause ongoing irreparable harm to Plaintiffs.

## SECOND CLAIM FOR RELIEF
### United States Constitution, Due Process Clause of the Fifth Amendment

67.     Plaintiffs reallege and reincorporate by reference each and every prior allegation as though fully set forth herein.

68.     The Fifth Amendment to the U.S. Constitution provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law[.]"  The Due Process Clause of the Fifth Amendment requires that parties deprived of constitutionally protected property or liberty interests receive adequate notice and an opportunity to be heard.

69.     By purporting to ban "transactions" with TikTok Inc. and bar any services that would allow TikTok to operate in the United States and its territories, the Executive Order and regulations deprive Plaintiffs of their property and liberty rights:

    a.  The Executive Order and regulations deprive Plaintiffs of their property interest in their TikTok accounts.

    b.  The Executive Order and regulations deprive Plaintiffs of their liberty interest in obtaining information from others on TikTok.

    c.  The Executive Order and regulations deprive one or more Plaintiffs of their liberty interest in working in their chosen field of occupation.

70.     Plaintiffs have received no notice or opportunity to respond to the deprivation contemplated in the Executive Order and implementing regulations.

71.     The Executive Order and regulations are unconstitutional because they deprive Plaintiffs of their constitutionally protected property and liberty rights without adequate due process.

72.     These due process violations will cause ongoing irreparable harm to Plaintiff.

**THIRD CLAIM FOR RELIEF**
**IEEPA: Regulation of Exchange of Personal Communications and Informational Materials in Violation of 50 U.S.C. §§ 1702(b)(1), (3)**

73.     Plaintiffs reallege and reincorporate by reference each and every prior allegation as though fully set forth herein.

74.     Under IEEPA, the President's authority "does not include the authority to regulate or prohibit, directly or indirectly . . . any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value." 50 U.S.C. § 1702(b)(1).

75.     IEEPA further provides that the President does not have the authority "to regulate or prohibit, directly or indirectly . . . the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds" so long as the materials are not independently controlled for export through operation of specified regulations. 50 U.S.C. § 1702(b)(3).

76.     The TikTok application allows individual users to create and share informational and creative content in the form of short-form videos and thus stores and transmits personal communications and informational materials within the meaning of IEEPA.

77.     The Executive Order and implementing regulations, by prohibiting services that enable the use of TikTok in the United States and its territories, effectively bans TikTok in the United States, prohibiting the transmission of personal communications and informational materials on TikTok and exceeding the President's authority under IEEPA.  The exception in the regulations for an "exchange between or among TikTok mobile application users of personal or business information using the TikTok mobile application" does not cure this problem.

78.     Accordingly, the Executive Order and the regulations are *ultra vires*.

79.     Defendants' *ultra vires* actions will cause ongoing irreparable harm to Plaintiffs.

**FOURTH CLAIM FOR RELIEF**
**IEEPA: No Unusual and Extraordinary Threat with Respect to Which a National Emergency Has Been Declared**

80.     Plaintiffs reallege and reincorporate by reference each and every prior allegation as though fully set forth herein.

81.     IEEPA grants the President authority to regulate various international economic transactions "to deal with an unusual and extraordinary threat with respect to which has been declared." 50 U.S.C. § 1701(b).  IEEPA expressly provides that the President's authority "may not be exercised for any other purpose" and that "[a]ny exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat." *Id.*

82.     On May 15, 2019, President Trump issued Executive Order 13873, declaring that "the unrestricted acquisition or use in the United States of information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries augments the ability of foreign adversaries to create and exploit vulnerabilities in information and communications technology or services, with potentially catastrophic effects, and thereby constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

83.     On August 6, 2020, President Trump issued the Executive Order declaring that a ban on TikTok Inc. transactions was necessary to address the national emergency declared in Executive Order 13873.  The Executive Order does not cite any other national emergency.

84.     Executive Order 13873 does not support the actions in the Executive Order. Executive Order 13873 declared a national emergency solely with respect to telecommunications technology and services designed or developed by foreign adversaries. The only national security threats identified in Executive Order 13873 are "information and communications technology and services" that "store and communicate vast amounts of sensitive information, facilitate the digital economy, and support critical infrastructure and vital emergency services, in order to

commit malicious cyber-enabled actions, including economic and industrial espionage against the United States and its people." But TikTok is a social media platform on which creators express their constitutionally protected ideas and opinions in short-form videos and users consume, comment upon and share those ideas and opinions.

85.     Executive Order 13873 does not mention TikTok and does not identify TikTok as a potential threat to the national security of the United States.

86.     The Executive Order does not otherwise declare a national emergency that would provide the necessary predicate to regulating or prohibiting any transactions with TikTok Inc. under IEEPA. Indeed, the Executive Order does not identify any actual threat that TikTok, the platform, or transactions with TikTok Inc. or its parent company ByteDance Ltd., pose to the national security of the United States. Instead, the Executive Order, in conclusory fashion, states that TikTok Inc. engages in data collection practices that "***potentially*** allow[] China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage," "***reportedly*** censors content that the Chinese Communist Party deems politically sensitive," and "***may*** be used for disinformation campaigns." These are speculative assertions, made without any evidentiary foundation to support them.

87.     The regulations issued on September 18, 2020 provide no additional information regarding any purported national security threat.

88.     Accordingly, the Executive Order and implementing regulations are not based on "an unusual and extraordinary threat with respect to which a national emergency has been declared," 50 U.S.C. § 1701(b), and thus are *ultra vires*.

89.     Defendants' *ultra vires* actions will cause ongoing irreparable harm to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

(A)     Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the Executive Order and implementing regulations violate the Plaintiffs' rights under the First Amendment to the U.S. Constitution;

(B)     Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the Executive Order, and implementing regulations violate the Plaintiffs' rights under the Fifth Amendment to the U.S. Constitution;

(C)     Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the Executive Order and implementing regulations are unlawful because it exceeds the President's authority under IEEPA;

(D)     Issue an order invalidating the Executive Order and implementing regulations preliminarily and permanently enjoining Defendants from implementing or enforcing the Executive Order or the regulations, and preserving the *status quo*; and

(E)     Grant any other and further relief that this Court may deem just and proper.


Dated: September 18, 2020              HANGLEY ARONCHICK SEGAL PUDLIN &
                                       SCHILLER

                                       _/s/ Bonnie M. Hoffman_____
                                       Bonnie M. Hoffman (PA Bar # 201140)
                                       Jason A. Levine (PA Bar # 306446)
                                       One Logan Square, 27th Floor
                                       Philadelphia, PA 19103
                                       Phone:  (215) 568-6200
                                       Fax:  (215) 568-0300
                                       Email: bhoffman@hangley.com
                                              jlevine@hangley.com

DAVIS WRIGHT TREMAINE LLP
Ambika K. Doran (*pro hac vice* application forthcoming)
920 5th Avenue, Suite 3300
Seattle, WA 98104
Phone: (206) 622-3150
Fax: (206) 757-7700
Email: ambikadoran@dwt.com

Diana Palacios (*pro hac vice* application forthcoming)
Heather F. Canner (*pro hac vice* application forthcoming)
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017
Phone: (213) 633-6800
Fax: (213) 633-6899
Email: dianapalacios@dwt.com
        heathercanner@dwt.com

Robert Corn-Revere (*pro hac vice* application forthcoming)
1301 K Street NW, Suite 500 East
Washington D.C. 20005
202-973-4200
Email:  bobcornrevere@dwt.com

*Counsel for Plaintiffs Douglas Marland, Cosette Rinab, and Alec Chambers*