**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :

DOUGLAS MARLAND, COSETTE     :
RINAB, and ALEC CHAMBERS,     :     Civil Action No. 2:20-cv-04597 WB
                                        :

                Plaintiffs,   :
                                        :     **Oral Argument Requested**

         -against-       :
                                        :

DONALD J. TRUMP, in his official   :
capacity as President of the United States;  :
WILBUR L. ROSS, JR., in his official   :
capacity as Secretary of Commerce; and   :
U.S. DEPARTMENT OF COMMERCE,   :
                                        :

               Defendants.   :
                                        :
                                        :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 1

II.    BACKGROUND ................................................................... 3

    A.    TikTok Facilitates Communication Among Millions of Users. ............ 3

    B.    Plaintiffs Use TikTok to Create, Consume, and Share Content. ........... 5

    C.    President Trump's Executive Order and Department of Commerce Regulations Threaten to Shutter TikTok.................................... 6

III.    ARGUMENT ...................................................................... 9

    A.    Standards for a TRO or Preliminary Injunction.......................... 9

    B.    Plaintiffs Have a Strong Likelihood of Success on the Merits. ........... 10

        1.    The Executive Order and Regulations Are Unconstitutionally Overbroad .............................................................. 10

        2.    The Executive Order and Regulations Are An Unconstitutional Prior Restraint. ........................................................ 11

        3.    The Executive Order and Regulations Infringe Plaintiffs' Right to Receive Information under the First Amendment. ................... 14

        4.    The Executive Order and Regulations Infringe Plaintiffs' Due Process Rights. ........................................................ 16

            a.    Plaintiffs Will Be Deprived of the Property Interests in Their TikTok Accounts................................................ 17

            b.    Plaintiffs Will Be Deprived of Their Liberty Interests in Their Right to Information............................................ 18

            c.    Plaintiffs Will Be Deprived of Their Liberty Interest in Their Right to Their Chosen Occupation................................... 19

            d.    Plaintiffs Were Provided No Process Before the Executive Order and Regulations ............................................... 20

        5.    Plaintiffs Are Likely to Succeed on the Merits that the Executive Order Is *Ultra Vires* ................................................. 21

    C.    Plaintiffs and the Public Will Suffer Irreparable Harm if the Executive Order or Implementing Regulations Are Not Immediately Enjoined.................. 23

    D.    Granting Injunctive Relief Is In the Public Interest. ............................. 24

      E.      The Balance of Equities Strongly Favor Granting Injunctive Relief Here ........... 24

IV.     CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Abbott v. Latshaw*,
164 F.3d 141 (3d Cir. 1998).................................................................................20

*ACLU v. Ashcroft*,
322 F.3d 240 (3d Cir. 2003), *aff'd and remanded*, 542 U.S. 656 (2004) ...........9, 10

*ACLU v. City of Pittsburgh*,
586 F. Supp. 417 (W.D. Pa. 1984).................................................................12, 13

*ACLU v. Reno*,
217 F.3d 162 (3d Cir. 2000), *vacated on other grounds sub nom Ashcroft v.
ACLU,* 535 U.S. 564 (2002)...................................................................................9

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) .........................................................................18, 19

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002)...............................................................................................10

*Baca v. Moreno Valley Unif. Sch. Dist.*,
936 F. Supp. 719 (C.D. Cal. 1996) .....................................................................25

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982)...............................................................................................14

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972)...............................................................................................17

*Board. of Airport Commissioners of City of Los Angeles v. Jews for Jesus, Inc.*,
482 U.S. 569 (1987).........................................................................................10, 11

*Burns v. PA Dep't of Correction*,
544 F.3d 279 (3d Cir. 2008)..................................................................................16

*C.D.S., Inc. v. Zetler*,
298 F. Supp. 3d 727 (S.D.N.Y. 2018)..................................................................17

*Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .............................................................................21

*City of Lakewood v. Plain Dealer Publ'g. Co.*,
486 U.S. 750 (1988)...............................................................................................13

*Clover Farms Dairy v. Brumbaugh*,
    586 F. Supp. 1227 (M.D. Pa. 1984) ...............................................................24

*Doe #1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) ......................................................................21

*Elrod v. Burns*,
    427 U.S. 347 (1976)........................................................................................23

*EXL Labs., LLC v. Egolf*,
    2010 WL 5000835 (E.D. Pa. Dec. 7, 2010) ....................................................9

*Farm Journal, Inc. v. Johnson*,
    2019 WL 1795945 (W.D. Mo. Apr. 24, 2019) ...............................................17

*First Puerto Rican Festival of N.J., Inc. v. City of Vineland*,
    108 F. Supp. 2d 392 (D.N.J. 1998) ......................................................1, 12, 25

*Fitzgerald v. Mountain Laurel Racing, Inc.*,
    607 F.2d 589 (3d Cir. 1979)...........................................................................23

*Greene v. McElroy*,
    360 U.S. 474 (1959)..................................................................................19, 20

*In re CTLI, LLC*,
    528 B.R. 359 (Bankr. S.D. Tex. 2015) .....................................................17, 18

*Int'l Brotherhood of Teamsters Local 651 v. Philbeck*,
    --- F. Supp. 3d ---, 2020 WL 2950350 (E.D. Ky. June 3, 2020)....................17

*J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*,
    287 F.3d 267 (3d Cir. 2002)............................................................................9

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013)........................................................................23, 24

*Kalantari v. NITV, Inc.*,
    352 F.3d 1202 (9th Cir. 2003) ..................................................................22, 23

*Klein v. Califano*,
    685 F.2d 250 (3d Cir. 1978)........................................................16, 17, 20, 21

*Kreimer v. Bureau of Police*,
    958 F.2d 1242 (3d Cir. 1992).........................................................................14

*Krug v. Lutz*,
    329 F.3d 692 (9th Cir. 2003) .........................................................................18

*Lamont v. Postmaster Gen.*,
    381 U.S. 301 (1965)........................................................................15

*LCN Enters., Inc. v. City of Asbury Park*,
    197 F. Supp. 2d 141 (D.N.J. 2002) ..............................................9

*Martin v. City of Struthers, Ohio*,
    319 U.S. 141 (1943)........................................................................15

*Mastermind Involvement Mktg., Inc. v. Art Inst. of Atl., LLC*,
    389 F. Supp. 3d 1291 (N.D. Ga. 2019) .......................................17

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)..................................................................16, 20

*Miller v. Mitchell*,
    598 F.3d 139 (3d Cir. 2010)............................................................9

*Near v. State of Minnesota ex rel. Olson*,
    283 U.S. 697 (1931)........................................................................11

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976)........................................................................11

*New York Times Co. v. United States*,
    403 U.S. 713 (1971)..................................................................11, 13

*Org. for a Better Austin v. Keefe*,
    402 U.S. 415 (1971)........................................................................12

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017)...................................................11, 14, 15, 24

*Ramsey v. City of Pittsburgh, Pa.*,
    764 F. Supp. 2d 728 (W.D. Pa. 2011).........................................24

*Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*,
    861 F. Supp. 2d 470 (M.D. Pa. 2012) .........................................19

*Runco Transp., Inc. v. Mid Valley Sch. Dist.*,
    2015 WL 672260 (M.D. Pa. Feb. 17, 2015) ...............................19

*Salonclick LLC v. SuperEgo Mgmt. LLC*,
    2017 WL 239379 (S.D.N.Y. Jan. 18, 2017) ...............................17

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975)........................................................................12

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020), *petition for cert. filed*, No. 20-138 ..........................21

*Stana v. Sch. Dist.*,
    775 F.2d 122 (3d Cir. 1985).........................................................................19

*Stanley v. Georgia*,
    394 U.S. 557 (1969)...............................................................................14, 15

*Stine v. Pa. State Police, Bureau of Liquor Control Enforcement*,
    2011 WL 2066529 (M.D. Pa. Apr. 19, 2011) ...............................................21

*Thomas v. Collins*,
    323 U.S. 516 (1945)...................................................................................16

*Thomas v. Indep. Tp.*,
    463 F.3d 285 (3d Cir. 2006).........................................................................19

*Umbenhauer v. Woog*,
    1993 WL 134761 (E.D. Pa. Apr. 28, 1993) ...................................................18

*United States v. Am. Library Ass'n, Inc.*,
    539 U.S. 194 (2003)...................................................................................15

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)...................................................................................21

**Federal Statutes**

50 U.S.C. § 1701..............................................................................................21, 22

50 U.S.C. § 1702..............................................................................................22, 23

**Regulations**

84 Fed. Reg. 22689 ................................................................................................6, 7

85 Fed. Reg. 48637 ...........................................................................................7, 8, 14

85 Fed. Reg. 51297 ................................................................................................11

**Constitutional Provisions**

U.S. Const., amend. I .......................................1, 2, 9, 10, 11, 13, 14, 15, 16, 18, 21, 22, 23, 24, 25

U.S. Const., amend. V.......................................................1, 2, 10, 16, 17, 18, 20, 21

U.S. Const., amend. XIV ......................................................................................16, 19

**Other Authorities**

Alex Sherman, *TikTok reveals detailed user numbers for the first time¸* CNBC
(Aug. 24, 2020 ..........................................................................................................4

Cecilia Kang and David E. Sanger, *Huawei Is a Target as Trump Moves to Ban
Foreign Telecom Gear*, The New York (May 15, 2019)..........................................7

Dillon Thompson, *Internet users stunned by 'life-changing' tooth brushing video:
'This is the first I'm hearing of this?',* Yahoo! Sports (May 4, 2020 .......................3

Olivia Gavoyannis, *TikTok is transforming the influence rulebook – we spoke to
the viral video-makes about mastering its elusive algorithm and why they
prefer it to Instagram* ...............................................................................................4

Rachel E. Greenspan, *Math teachers are getting millions of views on TikTok by
sharing SAT tips and data visualizations*..................................................................3

Stephanie Osmanski, *Bored This Summer? These 30 DIY Summer Projects Are
Trending on TikTok*...................................................................................................3

Sushmita Pathak, *'TikTok Changed My Life': India's Ban On Chinese App Leaves
Video Makers Stunned*, NPR (July 16, 2020) ..........................................................5

# I.     INTRODUCTION

Plaintiffs are a comedian, fashion creator, and musician, each of whom has developed a significant following by creating and posting content on TikTok, a popular mobile application that permits users to create, post, view, and comment on short-form videos.  Plaintiffs are among millions of creators who post content on TikTok hoping to reach a broad audience and build a career as a content creator.  Plaintiffs have achieved that and rely exclusively or principally on revenue they earn from their TikTok endeavors to make a living.  Under the President's Executive Order 13942 and implementing regulations published today, however, users will no longer be able to download or update the TikTok application starting September 20, and the application can no longer operate in the United States starting November 12, 2020.  Purportedly designed to address national security, the Executive Order and regulations violate Plaintiffs' rights under the First and Fifth Amendments to the U.S. Constitution, and exceed the President's authority under the International Emergency Economic Powers Act ("IEEPA").  Plaintiffs ask the Court to temporarily and preliminarily enjoin enforcement of the Order and regulations.

Plaintiffs are likely to prevail on their arguments that the Executive Order and regulations infringe their rights under the First and Fifth Amendments to the Constitution and are *ultra vires*.

***First***, the Executive Order and regulations shut down a forum whose entire purpose is to facilitate protected speech, in violation of Plaintiffs' First Amendment rights.  The Executive Order and regulations are impermissibly overbroad, in that they burden substantially more speech than is necessary to serve the government's asserted interests.  This is evident alone from the fact that the President has separately ordered the divestment of TikTok's U.S. assets—a measure that does not burden any speech.  Further, the Executive Order and regulations effect an

impermissible prior restraint on speech, infringe Plaintiffs' rights to receive information, and are not tailored to serve the government's asserted interest in national security.

*Second*, the Executive Order and regulations deprive Plaintiffs of protected liberty and property interests without due process. Plaintiffs have property interests in their TikTok accounts, the value of which derives from their creative efforts, and have liberty interests in their rights to receive information and pursue their chosen line of work. Under the Executive Order and regulations, Plaintiffs will be unable to access information on TikTok or post their creative content on TikTok, endeavors that supply them needed income. Because there was no notice of the Executive Order or regulations, there was no process at all, much less process sufficient to satisfy the Fifth Amendment's Due Process Clause.

*Third*, the Executive Order and regulations are *ultra vires*. Under IEEPA, the president may not prohibit or regulate personal communications. By banning an entire forum for speech, he has done just that, exceeding his authority.

The remaining factors required to sustain an injunction are present here. Absent relief, Plaintiffs will suffer irreparable injury, as it is well-established that First Amendment injuries necessarily cause irreparable harm. Granting relief will not cause greater harm to the government, as the government itself allowed the Department of Commerce forty-five days to issue implementing regulations, belying any assertion of urgency. Finally, the public interest favors such relief given the weighty constitutional concerns.

For these reasons, Plaintiffs respectfully ask the Court to temporarily and preliminarily enjoin enforcement of the Executive Order and implementing regulations.

## II.    BACKGROUND

### A.    TikTok Facilitates Communication Among Millions of Users.

TikTok is a global video-sharing application that allows users to create, share, and watch short-form videos.  TikTok's stated mission is to inspire creativity and bring joy.  *See* www.tiktok.com/about?lang=en (visited September 18, 2020).

TikTok allows users to create and upload videos ranging from 15 to 60 seconds in length. Declaration of Cosette Rinab ("Rinab Decl.") ¶ 3.[1]  TikTok offers creators background music, augmented reality effects, and other features to help them edit videos.  *Id.*  Creators control the content of their videos, including which features to pair with the content, such as the music.  *Id.* TikTok permits users to "like" videos, comment on them, share videos, message the creator, and more.  *Id.*

Creators post videos on topics ranging from the light-hearted to serious, including comedy, cooking, music and music performances, travel and tourism, politics, domestic and international current events, social issues, and the environmental.  *See id.* ¶ 10.  Through creators' engaging and short videos, TikTok users have learned the "right way" to brush their teeth; picked up math, SAT, and finance tips; accessed a "trove of do-it-yourself projects and creative ideas."  *See* Declaration of Ambika K. Doran, ("Doran Decl.") Ex. C (Dillon Thompson, *Internet users stunned by 'life-changing' tooth brushing video: 'This is the first I'm hearing of this?',* Yahoo! Sports (May 4, 2020)); Ex. D (Rachel E. Greenspan, *Math teachers are getting millions of views on TikTok by sharing SAT tips and data visualizations*, Business Insider (Apr. 2, 2020); Ex. E (Stephanie Osmanski, *Bored This Summer? These 30 DIY Summer Projects Are*

---

[1] This brief refers to users who create videos and share them on TikTok as "creators," and to users who both create and consume content as "users."

*Trending on TikTok*, Parade (July 27, 2020)).  Even former President Barack Obama recently featured several TikTok videos, including a TikTok video on baking bread, in a voter drive video, stating that, "[o]ver the past few months, I've learned a thing or two from young people about how to quarantine successfully.  You've taught me how to make a mean sourdough starter."  Doran Decl. Ex. F (Barack Obama, Twitter (Sept. 16, 2020)).

TikTok allows creators to reach a global audience.  TikTok has a community of about 700 million active monthly users globally.  *Id*. Ex. G (Alex Sherman, *TikTok reveals detailed user numbers for the first time*¸ CNBC (Aug. 24, 2020).  In the United States alone, TikTok has more than 90 million active monthly users and 50 million active daily users.  *Id.*  The TikTok application has been downloaded more than 2 billion times.  *Id.*  These numbers continue to grow rapidly: For example, between June and August 2020, the number of users increased by more than 8 million, from 91.2 million to more than 100 million.  *Id.*

Creators also use TikTok because of its "organic reach"—a metric that measures the number of people who have seen a post.  Creators attribute TikTok's organic reach to the fact that TikTok is designed to inspire users to explore and find new content and content creators with minimal effort, continuously providing users a curated stream of new videos on its "For You" page.  Rinab Decl. ¶ 9; Declaration of Douglas Marland ("Marland Decl.") ¶ 10.  As a result, any user's video can go "viral" regardless of the number of followers they have.  Doran Decl. Ex. H (Olivia Gavoyannis, *TikTok is transforming the influence rulebook – we spoke to the viral video-makes about mastering its elusive algorithm and why they prefer it to Instagram,* Business Insider (July 30, 2020)); *see also id.* Ex. I (*How Quickly Can a Girl Go Viral on TikTok?,* The Atlantic (Sept. 16, 2020)).

TikTok is an economic lifeline for many creators, giving rise to new, non-traditional social media celebrities—"many of them working-class folks . . . in villages far from [] cosmopolitan megacities"—and has become "a livelihood for some people," providing "fame, empowerment and even a path out of poverty."  Doran Decl. Ex. J (Sushmita Pathak, *'TikTok Changed My Life': India's Ban On Chinese App Leaves Video Makers Stunned*, NPR (July 16, 2020)).

**B.     Plaintiffs Use TikTok to Create, Consume, and Share Content.**

Plaintiffs are TikTok users who have made a career creating and posting content, and who also use TikTok to consume content.

Plaintiff Douglas Marland, a Yardley, Pennsylvania resident, is a comedian who has been creating and posting comedy and parody videos on TikTok since January 2019.  Marland Decl. ¶ 5.  Mr. Marland garnered a significant TikTok following after posting a single comedic sketch featuring himself and his girlfriend.  *Id.*  Mr. Marland has about 2.7 million "followers" on TikTok, meaning that about 2.7 million people have subscribed to his video feed.  *Id.* ¶ 8.  He earns about $5,000 to $7,000 per month from the promotional and branding work he has attracted from his TiKTok videos.  *Id.* Mr. Marland relies entirely on this income to pay for his living expenses, such as food and rent.  *Id.*  Mr. Marland hopes to use his experiences on TikTok to continue his entertainment career, as an actor or as a producer of a podcast.  *Id.* ¶ 11.

Plaintiff Cosette Rinab is a fashion creator and student at the University of Southern California, where she is majoring in public relations.  Ms. Rinab began posting on TikTok during her sophomore year in December 2018.  Rinab Decl. ¶ 3.  Her TikTok posts quickly became popular after she posted a video of herself lip-synching a popular song.  *Id.* ¶ 4.  Ms. Rinab is passionate about creating videos, which gives her a creative outlet and a way to connect with

other people directly.  *Id.* ¶ 8.  Ms. Rinab earns about $7,000 to $10,000 from TikTok-related

work and relies solely on that income to pay her living expenses while she is a student.  *Id.*

Because of TikTok, Ms. Rinab is able to focus on creating content, rather than working several

jobs, as she has done in the past.  *Id.* ¶¶ 2, 8.  Ms. Rinab also watches educational videos on

TikTok.  *Id.* ¶ 10.  For example, she learned what a Roth IRA is from a TikTok video and opened

her own Roth IRA.  *Id.*  She also viewed a video about presidential candidate Joe Biden, which

made her more informed about Biden's proposed policies.  *Id.*

Plaintiff Alec Chambers is a musician who has created and posted videos on TikTok

since November 2019.  Declaration of Alec Chambers ("Chambers Decl.") ¶ 3.  Mr. Chambers,

who has always wanted to be a musician, had a hard time starting his career.  *Id.* ¶ 2.  But one

video Mr. Chambers created and posted on TikTok—a cover of the pop song "Without Me" by

the singer Halsey—changed all of that.  *Id.* ¶ 3.  Immediately upon posting the video to TikTok,

he saw a dramatic increase in revenue from streams of this song on the music-streaming service

Spotify.  *Id.*  Mr. Chambers was able to use that money to stop his job driving passengers for

ride-sharing service Uber, as he had the financial freedom to pursue his passion.  *Id.*  Mr.

Chambers earns on average at least $4,500 per month from his TikTok-related work.  *Id.*

### C.  President Trump's Executive Order and Department of Commerce Regulations Threaten to Shutter TikTok.

On May 15, 2019, President Trump issued Executive Order 13873, titled "Securing the

Information and Communications Technology Services Supply Chain."  84 Fed. Reg. 22689.

Executive Order 13873 declares a national emergency with respect to the threat posed by

"vulnerabilities in information and communications technology and services" and provides that

"the unrestricted acquisition or use in the United States of information and communications

technology or services designed, developed, manufactured, or supplied by persons owned by,

controlled by, or subject to the jurisdiction or direction of foreign adversaries augments the ability of foreign adversaries to create and exploit vulnerabilities in information and communications technology or services, with potentially catastrophic effects, and thereby constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *Id.* Executive Order 13873 does not identify any countries or companies that pose a national security threat. But statements by the Trump administration make clear that the purpose of Executive Order 13873 was to target Chinese-owned telecommunications companies. Doran Decl. Ex. K (Cecilia Kang and David E. Sanger, *Huawei Is a Target as Trump Moves to Ban Foreign Telecom Gear*, The New York (May 15, 2019) Timeshttps://www.nytimes.com/2019/05/15/business/huawei-ban-trump.html). On May 13, 2020, President Trump extended by one year the national emergency.

On August 6, 2020, without notice to TikTok's creators or users, President Trump issued Executive Order 13942 ("Executive Order"). Entitled "Addressing the Threat Posed by TikTok," the Executive Order states that "additional steps must be taken to deal with the national emergency with respect to the information and communications technology and services supply chain" declared in Executive Order 13873. The Executive Order provides that beginning forty-five days later, "any transaction by any person, or with respect to any property, subject to the jurisdiction of the United States, with ByteDance Ltd. (a.k.a. Zìjié Tiàodòng), Beijing, China, or its subsidiaries, in which any such company has any interest, as identified by the Secretary of Commerce" will be prohibited. 85 Fed. Reg. 48637-38.

Although the Executive Order states that it is necessary to "address the threat posed by . . . TikTok," it does not identify any actual threats posed by TikTok or individual creators' and users' transactions on the TikTok application. Instead, it relies on a conclusory list of possible

threats, including that TikTok Inc. uses data collection practices that "***potentially*** allow[] China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage," "***reportedly*** censors content that the Chinese Communist Party deems politically sensitive," and "***may*** be used for disinformation campaigns." 85 Fed. Reg. 48637 (emphasis added).

On September 18, 2020, the forty-third day after the Executive Order, the Department of Commerce published regulations identifying the transactions to which the Executive Order applies. Doran Decl. Ex. A (regulations). Effective September 20, 2020, the regulations prohibit transactions with ByteDance Ltd. or its subsidiaries, including TikTok Inc. "involving… [a]ny provision of services to distribute or maintain the TikTok mobile application, constituent code, or application updates through an online mobile application store, or any online marketplace where mobile users within the land or maritime borders of the United States and its territories may download or update applications for use on their mobile devices." *Id.* In other words, the regulations will stop users from downloading or updating TikTok effective September 20, 2020.

Effective November 12, 2020, the regulations also prohibit other actions that "enable the functioning or optimization of the TikTok mobile application within the land and maritime borders of the United States and its territories." *Id.* In other words, effective November 12, 2020, TikTok will no longer be available in the United States. The regulations contain exceptions, including an exception for "[t]he exchange between or among TikTok mobile application users of personal or business information using the TikTok mobile application." *Id.*

The consequences of the Executive Order and regulations are dire. Mr. Marland, Ms. Rinab, and Mr. Chambers, like myriad other creators, rely on TikTok as a creative outlet as well as a method of earning income. Marland Decl. ¶ 8; Rinab Decl. ¶ 8; Chambers Decl. ¶ 3. All of

them have tried but failed to develop large followings on platforms other than TikTok. Marland Decl. ¶ 10; Rinab Decl. ¶ 9; Chambers Decl. ¶ 2. And the Executive Order is already having an effect. Even before the regulations were promulgated, Mr. Marland was told that he would not receive as much revenue for a video because of the uncertainty created by the Executive Order. Marland Decl. ¶ 9. This harm will only worsen, as the Executive Order and regulations will—by prohibiting anyone from providing services to help TikTok function—bar the use of the application in the United States effective November 12. Doran Decl. Ex. A.

### III.    ARGUMENT

#### A.    Standards for a TRO or Preliminary Injunction

The purpose of a temporary restraining order is "preservation of the status quo while the merits of the cause are explored through litigation." *J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.,* 287 F.3d 267, 273 (3d Cir. 2002) (internal quotation omitted). The standards for issuing a TRO are the same as for a preliminary injunction: "(1) a likelihood of success on the merits; (2) [the plaintiff] will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." *Miller v. Mitchell,* 598 F.3d 139, 147 (3d Cir. 2010) (preliminary injunction); *EXL Labs., LLC v. Egolf*, 2010 WL 5000835, at *3 (E.D. Pa. Dec. 7, 2010) (TRO). "In a First Amendment challenge, a plaintiff who meets the first prong of the test for a preliminary injunction will almost certainly meet the second, since irreparable injury normally arises out of the deprivation of speech rights." *ACLU v. Reno,* 217 F.3d 162, 180 (3d Cir. 2000) (citation omitted), *vacated on other grounds sub nom Ashcroft v. ACLU,* 535 U.S. 564 (2002); *accord ACLU v. Ashcroft,* 322 F.3d 240, 250-51 (3d Cir. 2003), *aff'd and remanded*, 542 U.S. 656 (2004) (in a First Amendment challenge, "[t]he most significant and, indeed, the dispositive prong of the

preliminary injunction analysis is … reasonable probability of succeeding on the merits"); *LCN Enters., Inc. v. City of Asbury Park*, 197 F. Supp. 2d 141, 153 (D.N.J. 2002).

Here, Plaintiffs have satisfied all four factors.

**B.      Plaintiffs Have a Strong Likelihood of Success on the Merits.**

The Executive Order and regulations will shutter TikTok, a platform Plaintiffs use to create, publish, consume, and share content.  Without it, Plaintiffs cannot do any of these as effectively, and will lose a valuable source of income.  Issued without any notice or opportunity to be heard, the Executive Order and regulations infringe Plaintiffs' First Amendment and Fifth Amendment rights, and exceed the President's authority under IEEPA.

**1.      The Executive Order and Regulations Are Unconstitutionally Overbroad**

The Constitution "gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002).  A law is "unconstitutional on its face if it prohibits a substantial amount of protected expression."  *Id.*  The overbreadth analysis is "akin to the portion of the strict scrutiny analysis" measuring whether the statutes are narrowly tailored.  *ACLU v. Ashcroft*, 322 F.3d at 266 (3d Cir. 2003).  "Overbreadth analysis—like the question whether a statute is narrowly tailored to serve a compelling governmental interest—examines whether a statute encroaches upon speech in a constitutionally overinclusive manner." *Id.*

For example, in *Board. of Airport Commissioners of City of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 574 (1987), the Supreme Court invalidated a regulation prohibiting "First Amendment activities" within the Central Terminal Area of Los Angeles International Airport.  *Id.*  In striking down the rule, the Court noted that "[t]he resolution does not merely regulate expressive activity . . . that might create problems such as congestion or the disruption

of the activities of those who use LAX[;] . . . it prohibits even talking and reading, or the wearing of campaign buttons or symbolic clothing." *Id.* at 574-75. "We think it obvious that such a [sweeping] ban cannot be justified . . . because no conceivable governmental interest would justify such an absolute prohibition of speech." *Id.* at 575. Relying on *Jews for Jesus*, the Supreme Court in *Packingham v. North Carolina*, 137 S. Ct. 1730, 1738 (2017), held that "[i]f a law prohibiting 'all protected expression' at a single airport is not constitutional,… it follows with even greater force that the State may not enact this complete bar to the exercise of First Amendment rights on websites integral to the fabric of our modern society and culture."

Here, as in *Jews for Jesus* and *Packingham*, the Executive Order and regulations are overbroad on their face—effectively shuttering TikTok starting November 12, 2020—and contain no saving or narrowing construction that would limit their reach to protected First Amendment activities. Although obvious, this conclusion is demonstrated by the President's August 14, 2020, Executive Order, "Regarding the Acquisition of Musical.ly by ByteDance Ltd.," which ordered TikTok's parent company, ByteDance, to divest its interest in its U.S. operations. 85 Fed. Reg. 51297-99. Although the August 14, 2020 Executive Order is likely legally flawed for other reasons, it represents a less-restrictive alternative to the Executive Order—one that does not affect speech on TikTok at all. The Executive Order and regulations burden far more speech than necessary and are unconstitutionally overbroad.

### 2. The Executive Order and Regulations Are An Unconstitutional Prior Restraint.

Rigorous constitutional scrutiny applies here for the independent reason that the restriction is an impermissible prior restraint under the First Amendment—"the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *see also New York Times Co. v. United States* ("*Pentagon Papers*"), 403

U.S. 713, 714 (1971).  As the Supreme Court has recognized, "it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication."  *Near v. State of Minnesota ex rel. Olson,* 283 U.S. 697, 713 (1931).  For this reason, "[a]ny prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity."  *Org. for a Better Austin v. Keefe,* 402 U.S. 415, 419 (1971) (citations omitted).  In fact, the presumption against prior restraints "is heavier—and the degree of protection broader"—than that against criminal penalties on expression.  *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) ("Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand.").

Here, the Executive Order and regulations immediately stop new users from downloading TikTok, and then ban the TikTok application in the United States altogether.  Both these actions necessarily stop a wide range of protected speech and expressive activity.  The Executive Order and regulations prohibit Plaintiffs from obtaining and disseminating information on TikTok, including posting, viewing, and/or commenting on content.  And they preemptively close down a major online speech platform used by the Plaintiffs and millions of other users.  Thus, the Executive Order and regulations come to this Court "with a 'heavy presumption' against its constitutional validity," *Org. for a Better Austin,* 402 U.S. at 419 (1971).

Prior restraints are permissible only in "the most exigent circumstances," *ACLU v. City of Pittsburgh,* 586 F. Supp. 417, 423 (W.D. Pa. 1984) (citing *Near*, 283 U.S. at 697), if they (1) "fit within one of the narrowly defined exceptions to the prohibition against prior restraints," ***and*** (2) the government provides requisite "procedural safeguards that reduce the danger of suppressing

constitutionally-protected speech," *Se. Promotions*, 420 U.S. at 559 (1975). The Executive Order and regulations flunk this test.

**First**, the Executive Order does not fit within any of the narrowly defined exceptions of prior restraints. Defendants are not seeking "to reasonably regulate the time, place or manner of a facility, "[n]or is there a need to balance competing equities because the rights of others may be infringed," "[t]his is not a captive audience case," and this is not a "case of a mere temporary bar of one's First Amendment rights pending necessary judicial proceedings." *ACLU v. Pittsburgh*, 586 F. Supp. at 423. Further, this is not a case where disclosure of the protected speech at issue would pose a national security threat. In *Pentagon Papers*, 403 U.S. at 714, for example, the Supreme Court's *per curiam* opinion held that the United States could not constitutionally enjoin the publication of classified material in the interests of national security. In a concurring opinion, Justice Stewart, joined by Justice White, explained that the government may constitutionally restrict speech only when the government can demonstrate that "disclosure . . . will surely result in direct, immediate, and irreparable damage to our Nation or its people." 403 U.S. at 730 (Stewart, J., joined by White, J., concurring).[2] *Pentagon Papers* makes clear, therefore, that prior restraints on speech are subject to rigorous judicial scrutiny, regardless of whether the government claims that the prior restraint is necessary for national security.

**Second**, the Executive Order and regulations contain no procedural safeguards. In fact, the Executive Order defers **all** authority to the Secretary of Commerce to "identify the transactions subject" to the Executive Order. Placing this "unbridled discretion in the hands of a

---

[2] This was the most government-friendly standard that any member of the majority proposed to determine the constitutionality of designating material "classified" and thus not subject to disclosure. *See also* 403 U.S. at 714–19 (Black, J., concurring) (prior restraints on core speech are never constitutional); *id.* at 719–24 (Douglas, J., concurring) (same); *id.* at 726 (Brennan, J., concurring) (prior restraints might be permissible during wartime).

government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g. Co.*, 486 U.S. 750, 757 (1988).

Accordingly, the government's attempt to restrict Plaintiffs' speech on TikTok can be upheld only upon a showing that the interest is the prevention of "direct, immediate and irreparable damage" to national security and there are proper procedural safeguards. The government has not and cannot make this showing. Instead, the Executive Order says only that TikTok uses data collection practices that "***potentially*** allow[] China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage," "***reportedly*** censors content that the Chinese Communist Party deems politically sensitive," and "***may*** . . . be used for disinformation campaigns." 85 Fed. Reg. 48637. The regulations do not add anything to this. Doran Decl. Ex. A. This is insufficient.

### 3. The Executive Order and Regulations Infringe Plaintiffs' Right to Receive Information under the First Amendment.

The right to receive information is a "necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982). The "right to receive information and ideas, regardless of their social worth, . . . is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 563 (1969) (citations omitted); *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1255 (3d Cir. 1992) ("[T]he First Amendment does not merely prohibit the government from enacting laws that censor information, but additionally encompasses the positive right of public access to information and ideas.")

As a result, the Supreme Court has upheld individuals' constitutional right to information in a "variety of contexts." *Bd. Of Educ.*, 457 U.S. at 866-67; *e.g.*, *Stanley*, 394 U.S. at 568 (individual has the First Amendment right to read obscene materials in his own home). Indeed,

the Supreme Court recently recognized this right extends to social media platforms, stating that "[w]hile in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular." *Packingham*, 137 S. Ct. at 1735 (citation omitted); *id.* at 1737 (social media sites are "for many the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge"). "[S]ocial media users employ these websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 1732 (citation omitted). "To foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 1737.

Accordingly, any statute that restricts the receipt of information on TikTok targets core First Amendment activity and must survive the strictest scrutiny. *See United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 216 (2003) (Breyer, J., concurring) (quoting *Stanley* and arguing for heightened scrutiny where a statute "directly restricts the public's receipt of information"). For example, in *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 149 (1943), the Supreme Court invalidated an ordinance that prohibited door-to-door solicitation and distribution of literature because the ordinance did not "safeguard" "the constitutional rights of those desiring to ***distribute*** literature ***and those desiring to receive it***." (Emphasis added).

Here, too, the Executive Order and its implementing regulations infringe Plaintiffs' constitutional right to distribute or receive information. In fact, as of September 20, 2020, the regulations prohibit hundreds of millions of Americans from downloading TikTok so they may obtain and share information. Further, after November 12, 2020, TikTok cannot operate in the

United States, prohibiting everyone, including Plaintiffs, from using TikTok to distribute or obtain information. Such a prohibition on the "right to receive information and ideas" cannot be squared with the First Amendment, *Stanley*, 394 U.S. at 564, and courts have routinely held that similar bans are unconstitutional. *See Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965) (statute placed unjustifiable burden on addressee's First Amendment right to receive information by permitting government to hold communist political propaganda arriving in the mails from abroad unless the addressee requested in writing that it be delivered to him); *Thomas v. Collins*, 323 U.S. 516 (1945) (holding that a worker has the right to listen to a union organizer's speech). Similarly, here, the government's outright ban is outright unconstitutional.

4.      **The Executive Order and Regulations Infringe Plaintiffs' Due Process Rights.**

"The due process clause mandates procedural safeguards against Government deprivation of an individual's property interests" or liberty interests. *Klein v. Califano*, 685 F.2d 250, 257 (3d Cir. 1978); *accord Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."). The Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived" of a property or liberty interest. *Mathews*, 424 U.S. at 333; *Klein*, 685 F.2d at 260. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333.

Thus, to establish a claim under the Due Process Clause, a plaintiff must show (1) the deprivation of a protected liberty or property interest; (2) without the process due under the Fifth Amendment. *See Burns v. PA Dep't of Correction*, 544 F.3d 279, 285 (3d Cir. 2008). Here, the

Executive Orders and regulations deprive three protected liberty and property interests—the property rights in their TikTok accounts, their right to receive information, and their right to pursue their chosen occupation—without any process whatsoever. Plaintiffs are therefore likely to succeed on the merits of their due process claims.

### a. Plaintiffs Will Be Deprived of the Property Interests in Their TikTok Accounts

"The due process clause does not create protected property interests. Rather, the Constitution protects property interests that are 'created and . . . defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Klein*, 586 F.2d at 257 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 576 (1972)). In other words, federal courts look to state law and other sources independent of the Due Process Clause to determine whether a plaintiff holds a "property interest" subject to the Fifth Amendment's protections. *Id.*

Plaintiffs' TikTok accounts constitute "property interests" within the meaning of the Fifth Amendment. In particular, courts have recognized that a social media account is a property interest for the purpose of bringing a state law conversion claim, *Farm Journal, Inc. v. Johnson*, 2019 WL 1795945, at *5-6 & n.1 (W.D. Mo. Apr. 24, 2019) (conversion claim stated based on misappropriation of Twitter account); *Salonclick LLC v. SuperEgo Mgmt. LLC*, 2017 WL 239379, at *2-4 (S.D.N.Y. Jan. 18, 2017) (conversion claims stated based on misappropriation of Twitter account, Facebook page, and domain names),[3] and for administering bankruptcy estates,

---

[3] *Accord C.D.S., Inc. v. Zetler*, 298 F. Supp. 3d 727, 750 (S.D.N.Y. 2018) (issuing judgment on conversion claim based on misappropriation of social media accounts); *Int'l Brotherhood of Teamsters Local 651 v. Philbeck*, --- F. Supp. 3d ---, 2020 WL 2950350, at *5 (E.D. Ky. June 3, 2020) (granting plaintiff's summary judgment on conversion claim premised on interference with social media accounts); *see Mastermind Involvement Mktg., Inc. v. Art Inst. of Atl., LLC*, 389 F. Supp. 3d 1291, 1294 (N.D. Ga. 2019) (finding substantial likelihood of

*e.g.*, *In re CTLI, LLC*, 528 B.R. 359, 366-367 (Bankr. S.D. Tex. 2015) (recognizing that social media accounts are property of the bankruptcy estate).  Indeed, Plaintiffs' accounts have significant value as a result of Plaintiffs' time and effort in creating and publishing creative works.  For example, as a result of their popularity on TikTok and the number of followers they each have, each of whom has amassed over 2 million followers, Plaintiffs have obtained numerous brand and sponsorship deals.  Rinab Decl. ¶¶ 6-7; Marland Decl. ¶¶ 6-7; Chambers Decl. ¶ 4.  This is a feat that Plaintiffs would not be able to accomplish on any other platform.

Indeed, Plaintiffs' TikTok accounts are no different from a customer list, as the accounts give Plaintiffs access to potential customers.  Courts have held that customer lists are property interests for due process purposes.  *See In re CTLI*, 528 B.R. at 367 ("Like subscriber lists, business social media accounts provide valuable access to customers and potential customers"); *Umbenhauer v. Woog*, 1993 WL 134761, at *3 (E.D. Pa. Apr. 28, 1993) ("customer lists . . . , although intangible, are clearly within the purview of recognized property interests in Pennsylvania").  Plaintiffs therefore have a property interest in their TikTok accounts.

### b.    Plaintiffs Will Be Deprived of Their Liberty Interests in Their Right to Information

For the reasons stated above, the Executive Order and regulations affect Plaintiffs' rights to receive information.  This right is a protected liberty interest, the deprivation of which triggers Fifth Amendment procedural due process protections.  *See Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) ("plaintiffs have a liberty interest grounded in their First Amendment right to receive information") (citation omitted); *Krug v. Lutz*, 329 F.3d 692, 696-97 (9th Cir. 2003)

---

success on conversion claim based on misappropriation of social media accounts and login information).

(inmate, challenging the review of incoming materials excluded as obscene, had liberty interest in receiving subscription mailings sufficient to trigger procedural due process guarantees).

Plaintiffs use the TikTok platform as a source of information on a vast array of topics—ranging from financial advice to political content to self-help videos. Rinab Decl. ¶ 10; Chambers Decl. ¶ 5. The Executive Order, by effectively barring TikTok in the United States, will deprive Plaintiffs of their protected liberty interests in the right to information through this social media platform. *See Arce*, 793 F.3d at 988.

### c. Plaintiffs Will Be Deprived of Their Liberty Interest in Their Right to Their Chosen Occupation

"[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment[.]" *Greene v. McElroy*, 360 U.S. 474, 492 (1959) (citing cases); *see Thomas v. Indep. Tp.*, 463 F.3d 285, 297 (3d Cir. 2006) ("[T]he liberty to pursue a calling or occupation . . . is secured by the Fourteenth Amendment"). Accordingly, before the government deprives an individual of his or her right to a chosen occupation, the individual is entitled to procedural due process. *See Greene*, 360 U.S. at 492; *see also Stana v. Sch. Dist.*, 775 F.2d 122, 125 n.1 (3d Cir. 1985) ("[T]he Supreme Court has repeatedly held [that the "liberty interest in following a chosen profession"] can be denied only after the individual has been afforded the core content of procedural due process").

Such deprivation occurs when the government substantially interferes with an individual's ability to work in his or her chosen profession. *See, e.g.*, *Greene*, 360 U.S. at 492-508 (government's denial of security clearance, which "severely limited" plaintiff's "work opportunities," deprived plaintiff of liberty interest in occupation); *Thomas*, 463 F.3d at 297 (government defendants' "campaign of defamation, harassment, and intimidation" interfered

with plaintiff's ability to run business, thereby depriving plaintiff of liberty interest in pursuing occupation without due process); *Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, 861 F. Supp. 2d 470, 486-87 (M.D. Pa. 2012) (nightclub owner was deprived of "liberty right in pursuing his occupation," because government actors' "harassment made it financially impossible [] to operate the nightclub more than sporadically"); *Runco Transp., Inc. v. Mid Valley Sch. Dist.*, 2015 WL 672260, at *10-11 (M.D. Pa. Feb. 17, 2015) (finding deprivation of right to pursue occupation where government actors' harassing conduct ultimately forced plaintiff's transportation company out of business).

That is precisely the deprivation Plaintiffs will suffer here. Ms. Rinab, for example, works as a fashion and lifestyle influencer on TikTok. Rinab Decl. ¶ 8. Ms. Rinab earns a living through her TikTok-related endeavors, and could not pay her living expenses without that income, nor is there an adequate substitute platform. *Id.* Mr. Marland is a comedian who also relies on TikTok as his sole source of income, which he uses to pay his living expenses. Marland Decl. ¶ 8; Chambers Decl. ¶ 3. Although they have tried, neither Mr. Marland nor Ms. Rinab have found a suitable alternative to TikTok. Rinab Decl. ¶ 9; Marland Decl. ¶ 10; Chambers Decl. ¶ 3.

Accordingly, the Executive Order and regulations, by closing down TikTok, will deprive Plaintiffs from pursuing their chosen occupations as TikTok influencers, entitling them to Fifth Amendment procedural due process protections. *See Greene*, 360 U.S. at 492; *Piecknick*, 36 F.3d at 1259.

### d. Plaintiffs Were Provided No Process Before the Executive Order and Regulations

Because the Executive Order and regulations will deprive Plaintiffs of their constitutionally protected liberty and property interests, each is entitled sufficient due process

before the deprivation—at the very least, notice and an opportunity to be heard.  *Mathews*, 424

U.S. at 333; *Klein*, 685 F.2d at 260; *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998) ("At the

core of procedural due process jurisprudence is the right to advance notice of significant

deprivations of liberty or property and to a meaningful opportunity to be heard.").  Yet

Defendants provided Plaintiffs no process at all.  This unquestionably constitutes inadequate

process under the Fifth Amendment.  *See Klein*, 586 F.2d at 260-61 (process insufficient where

plaintiffs had no "opportunity to be heard" prior to deprivation; affirming order enjoining

government action); *see also Stine v. Pa. State Police, Bureau of Liquor Control Enforcement*,

2011 WL 2066529, at *7 (M.D. Pa. Apr. 19, 2011) ("Because deprivation of his liberty or

property interests required that he be afforded 'some kind of hearing' but plaintiff alleges that he

was afforded nothing, the complaint pleads a violation of due process").

        In sum, Plaintiffs have a strong likelihood of success on each of their due process

claims—any of which alone is sufficient to grant temporary injunctive relief.

        **5.      Plaintiffs Are Likely to Succeed on the Merits that the Executive
                Order Is *Ultra Vires***

        The President's authority to issue an executive order "must stem either from an act of

Congress or from the Constitution itself."  *Doe #1 v. Trump*, 957 F.3d 1050, 1062 (9th Cir. 2020)

(quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)).  Where neither a

congressional statute nor the U.S. Constitution authorizes the President's action, an injured

plaintiff may bring an equitable *ultra vires* action to enjoin the President's unlawful conduct.

*See, e.g.*, *Sierra Club v. Trump*, 963 F.3d 874, 890-92 (9th Cir. 2020), *petition for cert. filed*, No.

20-138; *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996).  Here, the

President's Executive Order exceeds the scope of his authority under IEEPA.

IEEPA grants the President limited emergency powers to regulate certain international transactions, but the President's power is circumscribed to avoid infringements of the First Amendment. Under IEEPA, the President's powers "may be exercised to deal with an[] unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). IEEPA further provides that "[t]he authorities granted to the President . . . may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose" and that "[a]ny exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat." 50 U.S.C. § 1701(b).

In 1988 and in 1994, Congress amended IEEPA to address concerns that regulations under IEEPA infringed First Amendment rights. Thus, IEEPA now provides several important carve-outs to the President's authority. Under IEEPA, "[t]he authority granted to the President . . . does not include the authority to regulate or prohibit, directly or indirectly . . . any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value" or "the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds," except for specifically enumerated export controls, none of which are present here. 50 U.S.C. §§ 1702(b)(1), 1702(b)(3).

The purpose of these provisions is to protect against the President's infringement of First Amendment rights under the guise of national security. *See Kalantari v. NITV, Inc.,* 352 F.3d 1202, 1205 (9th Cir. 2003) (exceptions added "to prevent the executive branch from restricting the international flow of materials protected by the First Amendment"). As the legislative history to the 1994 amendment states, "[t]hese provisions . . . established that no embargo may prohibit or restrict directly or indirectly the import or export of information that is protected under the First Amendment to the U.S. Constitution" and "[t]he language was explicitly intended, by including the words 'directly or indirectly,' to have a broad scope." H.R. CONF. REP. 103-482, 239-40. Congress intended these provisions to "facilitate transactions and activities incident to the flow of information and informational materials without regard to the type of information, its format, or means of transmission, and electronically transmitted information, transactions for which must normally be entered into in advance of the information's creation." *Id.*

Here, the content created and shared on TikTok by Plaintiffs—short-form expressive videos—constitute personal communications and informational materials within IEEPA's meaning. *See* 50 U.S.C. §§ 1702(b)(1)-(b)(3); *see also Kalantari*, 352 F.3d at 1207 (IEEPA exemption applied to purchase of Iranian movies despite Iranian embargo). The Executive Order and regulations, by shutting down the entire TikTok app, prohibit these protected uses.

### C. Plaintiffs and the Public Will Suffer Irreparable Harm if the Executive Order or Implementing Regulations Are Not Immediately Enjoined

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *accord K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.,* 710 F.3d 99, 113 (3d Cir. 2013) (same). Thus, the Court may presume Plaintiffs will suffer irreparable harm absent an injunction. And indeed,

Plaintiffs have already suffered such injury—with Mr. Marland unable to create videos that feature content from a record label with whom he has done business.  Marland Decl. ¶ 9.

In any event, Plaintiffs also face irreparable harm from the due process violations that they will suffer, which cannot be sufficiently remedied by monetary damages.  *See Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 601 (3d Cir. 1979) (irreparable injury where horse trainer and driver was evicted from a track without procedural due process, where racer obtained "large part" of his income from track and eviction "had the effect of denying him the right to pursue his license to drive and train horses"); *Clover Farms Dairy v. Brumbaugh*, 586 F. Supp. 1227, 1229 (M.D. Pa. 1984) (milk seller suffered irreparable injury from deprivation of property interest in statutory milk pricing structure without due process, as structure could not "be reinstated without much dislocation in the [] industry," there are "no parties from whom damages might be collected," and damages "would not be subject to simple calculation").

### D. Granting Injunctive Relief Is In the Public Interest.

"The Court of Appeals for the Third Circuit has determined that '[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.'"  *Ramsey v. City of Pittsburgh, Pa.*, 764 F. Supp. 2d 728, 734–35 (W.D. Pa. 2011) (citation omitted).  That is the case here.  Moreover, the public interest lies in upholding the First Amendment and other constitutional rights because the "enforcement of an unconstitutional law vindicates no public interest."  *K.A. ex rel. Ayers,* 710 F.3d at 114 (citation omitted).

### E. The Balance of Equities Strongly Favor Granting Injunctive Relief Here

Finally, the balance of equities tilts sharply in favor of injunctive relief.  On one hand, the government cannot possibly show that the status quo will be inequitable.  Although the

Executive Order and regulations are purportedly justified by national security concerns, the

Executive Order permitted 45 days to elapse before taking effect, mitigating the allegedly urgent

nature.  On the other hand, the Executive Order and regulations will prohibit the protected

speech of Plaintiffs and millions of TikTok users nationwide, and deny many others access to a

vital source of information on a far-reaching range of topics—a social media platform "integral

to the fabric of our modern society and culture."  *See Packingham*, 137 S. Ct. at 1738.[4]

### IV.    CONCLUSION

For these reasons, Plaintiffs respectfully ask the Court to temporarily and preliminarily

enjoin enforcement of the Executive Order and its implementing regulations.


Dated: September 18, 2020

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

 */s/ Bonnie M. Hoffman*
Bonnie M. Hoffman (PA Bar # 201140)
Jason A. Levine (PA Bar # 306446)
One Logan Square, 27th Floor
Philadelphia, PA 19103
Phone: (215) 568-6200
Fax: (215) 568-0300
Email: bhoffman@hangley.com
        jlevine@hangley.com

---

[4] No bond should be required to support the injunction, or, alternatively, any bond amount should be nominal.  Defendants cannot point to any economic loss they would suffer if the Executive Order and Regulations are not enforced and the status quo is preserved.  Moreover, courts regularly do not require bonds for injunctions based on constitutional challenges.  *E.g.*, *First Puerto Rican Festival of N.J., Inc. v. City of Vineland*, 108 F. Supp. 2d 392, 396 (D.N.J. 1998) (waiving bond where injunction required to "vindicate  . . . First Amendment rights, and the threat that protected speech may be quashed"); *Baca v. Moreno Valley Unif. Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996).

DAVIS WRIGHT TREMAINE LLP

Ambika K. Doran (*pro hac vice* pending)
920 5th Avenue, Suite 3300
Seattle, WA 98104
Phone: (206) 622-3150
Fax: (206) 757-7700
Email: ambikadoran@dwt.com

Diana Palacios (*pro hac vice* pending)
Heather F. Canner (*pro hac vice* pending)
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017
Phone: (213) 633-6800
Fax: (213) 633-6899
Email: dianapalacios@dwt.com
        heathercanner@dwt.com

Robert Corn-Revere (*pro hac vice* pending)
1301 K Street NW, Suite 500 East
Washington D.C. 20005
202-973-4200
Email:  bobcornrevere@dwt.com

*Counsel for Plaintiffs Douglas Marland, Cosette Rinab, and Alec Chambers*