**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PHILADELPHIA**

—————————————————————————————
                                                )
DOUGLAS MARLAND, *et al.*,                       )
                                                )
                          Plaintiffs,            )
                                                )
                    v.                           )         Civil Action No. 2:20-cv-4597-WB
                                                )
DONALD J. TRUMP, in his official capacity as     )
President of the United States, *et al.*,        )
                                                )
                          Defendants.            )
—————————————————————————————)

**<u>ORDER</u>**


        AND   NOW,   this   _____   day   of   _____,   2020,   on

consideration of Plaintiffs' motion for a temporary restraining order, the entire record in this matter,

including the written briefing and arguments presented orally, it is ORDERED that the Motion is

DENIED.

        The parties are hereby directed to meet-and-confer regarding whether Plaintiffs intend to

file a motion for preliminary injunction, and if so a proposed briefing schedule for such motion.

The parties shall file a joint document setting forth their joint proposed briefing schedule, or

separate proposed schedules if necessary, within three days of entry of this Order.



                                        BY THE COURT:



                                        _____

                                        The Hon. Wendy Beetlestone
                                        United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PHILADELPHIA

DOUGLAS MARLAND, *et al.*,                )
                                          )
            Plaintiffs,             )
                                          )
            v.                     )      Civil Action No. 2:20-cv-4597-WB
                                          )
DONALD J. TRUMP, in his official capacity as )
President of the United States, *et al.*,  )
                                          )
            Defendants.             )
                                          )

## **<u>DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Background ................................................................................................................ 2

I.  Statutory Framework ......................................................................................... 2

    A.  The International Emergency Economic Powers Act ............................................. 2

    B.  The National Emergencies Act ............................................................................ 3

II.  Factual Background ........................................................................................... 4

    A.  Congress and the Executive Branch Identify Chinese Technology Companies as a Significant and Growing National Security Threat ..................... 4

    B.  Researchers and Members of Congress Identify TikTok as a Growing Threat ...................................................................................................................... 6

    C.  The President Issues Executive Order 13873 and Reports to Congress under the NDAA ........................................................................................................ 7

    D.  The President Takes Action Relating to TikTok ...................................................... 7

    E.  The Department of Commerce's Restrictions ......................................................... 9

III.  Procedural History ............................................................................................ 10

Standard of Review .................................................................................................... 10

Discussion .................................................................................................................. 11

I.  Plaintiffs Have Not Established a Likelihood of Success on the Merits ......................... 11

    A.  Plaintiffs Have Not Demonstrated that Their Claims are Justiciable .................. 11

    B.  The Government's Actions Do Not Violate the First Amendment ...................... 12

        1.  The Challenged Restrictions Are Not Subject to First Amendment Scrutiny Because They Are Directed at Business Transactions ............... 12

        2.  Even If the First Amendment Applied, the Government's Actions Are Valid "Time, Place, or Manner" Regulations ..................................... 13

        3.  Plaintiffs' First Amendment Theories Are Meritless ............................... 16

    C.  The Challenged Actions Do Not Violate Procedural Due Process ...................... 19

D.    The President's Actions Are Consistent with IEEPA ............................................ 22

      1.    Neither Claim Can Proceed Because Plaintiffs Have Not Identified a Private Cause of Action Allowing Private Citizens to Enforce IEEPA ................................................................................................. 22

      2.    The Restrictions are Consistent with IEEPA's Berman Amendment ....... 23

      3.    The TikTok Executive Order Plainly Falls Within the Prior Declaration of Emergency ...................................................................... 24

II.    Plaintiffs Have Not Proven Immediate, Urgent Irreparable Harm Justifying a Temporary Restraining Order ............................................................................. 25

III.   The Balance of the Equities and Public Interest Strongly Favor the Government .......... 27

IV.    Any Relief Should Be Appropriately Limited, and Require Posting of a Bond ............... 28

Conclusion ..................................................................................................... 30

# TABLE OF AUTHORITIES

**CASES**

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000) ...................................................................................... 11, 25, 26

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........................................................................................................ 22

*Alexander v. United States*,
509 U.S. 544 (1993) ........................................................................................................ 19

*Anderson v. Davila*,
125 F.3d 148 (3d Cir. 1997) ........................................................................................... 25

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986) ................................................................................................... 12, 13

*Benner v. Wolf*,
No. 20-CV-775, 2020 WL 2564920 (M.D. Pa. May 21, 2020) .......................................... 25, 26

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
239 U.S. 441 (1915) ........................................................................................................ 21

*Board of Airport Commissioners of City of Los Angeles v. Jews for Jesus, Inc.*,
482 U.S. 569 (1987) ........................................................................................................ 18

*Bohm v. Straw*,
No. CIV.A. 12-16J, 2013 WL 85273 (W.D. Pa. Jan. 8, 2013) ................................................. 20

*Brunner v. Ohio Republican Party*,
555 U.S. 5 (2008) ............................................................................................................ 22

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ........................................................................................... 29

*California v. Trump*,
407 F. Supp. 3d 869 (N.D. Cal. 2019) ............................................................................ 24, 25

*CASA de Maryland, Inc. v. Trump*,
971 F.3d 220 (4th Cir. 2020) ....................................................................................... 28, 29

*Christian Legal Soc. v. Martinez*,
561 U.S. 661 (2010) ........................................................................................................ 16

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............................................................................................... 11, 12, 26

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984) ...................................................................................... 14, 15, 16

*Cohen v. Cowles Media Co.*,
    501 U.S. 663 (1991) .................................................................................................. 13

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) .................................................................................................... 2

*DHS v. New York*,
    140 S. Ct. 599 (2020) ............................................................................................... 28

*Doe ex rel. Doe v. Governor of N.J.*,
    783 F.3d 150 (3d Cir. 2015) ..................................................................................... 19

*Elmore v. Cleary*,
    399 F.3d 279 (3d Cir. 2005) ..................................................................................... 20

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) .................................................................................................. 23

*Free Speech Coal., Inc. v. Att'y Gen.*, No. 18-3188,
    2020 WL 5200685 (3d Cir. Sept. 1, 2020) ......................................................... 17, 29

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) .............................................................................................. 28

*Glickman v. Wileman Bros. & Elliott, Inc.*,
    521 U.S. 457 (1997) .................................................................................................. 12

*Globus Med., Inc. v. Vortex Spine, LLC*,
    605 F. App'x 126 (3d Cir. 2015) .............................................................................. 30

*Haig v. Agee*,
    453 U.S. 280 (1981) .................................................................................................. 14

*Hohe v. Casey*,
    868 F.2d 69 (3d. Cir. 1989) ...................................................................................... 25

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .......................................................................................... 14, 15, 28

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) .......... 21, 27

*Hoxworth v. Blinder, Robinson & Co.*,
    903 F.2d 186 (3d Cir. 1990) ..................................................................................... 30

*Ingraham v. Wright,*
   430 U.S. 651 (1977) .................................................................................................... 21

*Kovacs v. Cooper,*
   336 U.S. 77 (1949) ...................................................................................................... 16

*L.A. Police Dep't v. United Reporting Publ'g Corp.,*
   528 U.S. 32 (1999) ...................................................................................................... 17

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) .................................................................................................... 28

*Matter of Subpoena 2018R00776,*
   947 F.3d 148 (3d Cir. 2020) ...................................................................................... 19

*Metromedia, Inc. v. City of San Diego,*
   453 U.S. 490 (1981) .................................................................................................... 15

*Milena Ship Mgmt. Co. v. Newcomb,*
   804 F. Supp. 846 (E.D. La. 1992) ............................................................................ 27

*Minn. State Bd. for Cmty. Colls. v. Knight,*
   465 U.S. 271 (1984) .................................................................................................... 21

*Mississippi v. Johnson,*
   71 U.S. 475 (1866) ...................................................................................................... 23

*Morrissey v. Brewer,*
   408 U.S. 471 (1972) .................................................................................................... 21

*Munaf v. Geren,*
   553 U.S. 674 (2008) .................................................................................................... 10

*Nixon v. Fitzgerald,*
   457 U.S. 731 (1982) .................................................................................................... 23

*Nken v. Holder,*
   556 U.S. 418 (2009) .................................................................................................... 11

*O'Bannon v. Town Ct. Nursing Ctr.,*
   447 U.S. 773 (1980) .................................................................................................... 20

*Packingham v. North Carolina,*
   137 S. Ct. 1730 (2017) ............................................................................................... 18

*Pennsylvania v. Trump*,
  351 F. Supp. 3d 791 (E.D. Pa.), *aff'd*, 930 F.3d 543 (3d Cir. 2019), *as amended* (July 18,
  2019), *and rev'd and remanded sub nom. Little Sisters of the Poor Saints Peter & Paul
  Home v. Pa.*,140 S. Ct. 2367 (2020) ...................................................................... 29

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)................................................................................................ 14

*Regan v. Wald*,
  468 U.S. 222 (1984)............................................................................................. 2, 6

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999)................................................................................................ 15

*Shaw v. Temple Univ.*,
  357 F. Supp. 3d 461 (E.D. Pa. 2019) .................................................................... 21

*Student Roe by Roe v. Com. of Pa.*,
  638 F. Supp. 929 (E.D. Pa. 1986), *aff'd sub nom*,
  *Roe v. Com. of Pa.*, 813 F.2dd 398 (3d Cir. 1987) .............................................. 20

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)................................................................................................ 27

*Texas v. Johnson*,
  491 U.S. 397 (1989)................................................................................................ 17

*Texas v. United States*,
  523 U.S. 296 (1998)................................................................................................ 11

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018)............................................................................... 16, 28, 30

*United States v. Albertini*,
  472 U.S. 675 (1985)................................................................................... 13, 14, 16

*United States v. Amirnazmi*,
  645 F.3d 564 (3d Cir. 2011) .................................................................................. 23

*United States v. O'Brien*,
  391 U.S. 367 (1968)................................................................................................ 13

*United States v. Shenandoah*,
  595 F.3d 151 (3d Cir. 2010), *abrogated on other grounds by Reynolds v. United States*,
  565 U.S. 432 (2012)................................................................................................ 21

*United States v. Stevens*,
  559 U.S. 460 (2010)................................................................................................ 17

*Virginia v. Hicks,*
  539 U.S. 113 (2003) ............................................................................. 13, 18

*Virginian Ry. Co. v. Sys. Fed'n No. 40,*
  300 U.S. 515 (1937) ..................................................................................... 27

*Winter v. NRDC,*
  555 U.S. 7 (2008) .................................................................................. 10, 27

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017) ................................................................................. 22

**STATUTES**

18 U.S.C. § 793 ................................................................................................ 24

18 U.S.C. § 794 ................................................................................................ 24

50 U.S.C. § 1621 ............................................................................................... 3

50 U.S.C. § 1622 ........................................................................................... 4, 22

50 U.S.C. § 1641 ............................................................................................... 4

50 U.S.C. § 1701 ............................................................................................... 3

50 U.S.C. § 1702 ................................................................................ 3, 12, 22, 23

50 U.S.C. § 4305 ............................................................................................... 2

Pub. L. No. 94-412, 90 Stat. 1255 (1976) ......................................................... 3

Pub. L. No. 95-223, 91 Stat. 1625 (1977) ......................................................... 2

Pub. L. No. 115-232, 132 Stat. 1636 (2018) .................................................. 5, 6

**RULES**

Fed. R. Civ. P. 65 ............................................................................................ 30

**REGULATIONS**

*Continuation of the National Emergency With Respect to Securing the Information and Communications Technology and Services Supply Chain,*
  85 Fed. Reg. 29321 (May 13, 2020) ............................................................... 7

Exec. Order 13873, *Securing the Information and Communications Technology and Services Supply Chain,*
  84 Fed. Reg. 22689 ......................................................................... 7, 13, 24

Exec. Order 13942, *Addressing the Threat Posed by TikTok, and Taking Additional Steps To Address the National Emergency With Respect to the Information and Communications Technology and Services Supply Chain*, 85 Fed. Reg. 48637 (Aug. 6, 2020) ....................................................................... *passim*

*Order of August 14, 2020 Regarding the Acquisition of Musical.ly by ByteDance Ltd.*, 85 Fed. Reg. 51297 (Aug. 14, 2020) ............................................................................. 8

## OTHER AUTHORITIES

Georgia Wells and Aaron Tilley, *Oracle Will Review TikTok Source Code to Watch for Chinese Access*, Wall Street Journal (Sept. 16, 2020) ....................................... 8, 9

*Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Governmental Relations*, 94th Cong. 27 (March 6, 1975) ................................................................................. 3

S. Rep. No. 94-922 (1976) ............................................................................................. 3

# INTRODUCTION

Federal government officials from both political parties have long expressed concern about the Chinese government's ability to acquire Americans' private data through its control over Chinese companies that collect information from Americans.  It is well-recognized that large Chinese technology firms are not purely private, but in fact are intertwined with and subject to the control and influence of the Chinese Communist Party ("CCP") and the government of the People's Republic of China ("PRC").  Moreover, Chinese law imposes broad obligations on citizens and companies to cooperate with the PRC by providing data and technological support to security and intelligence agencies and the military.

ByteDance Ltd. is a Chinese firm of particular concern for U.S. government leaders.  ByteDance is headquartered in Beijing, subject to PRC intelligence laws, contains internal CCP committees, and its founder and CEO has publicly affirmed that the company is committed to promoting the agenda and messaging of the CCP.[1]  One of ByteDance's assets is the social media application TikTok, which is capable of collecting vast quantities of data from its users.  When users submit to TikTok's Terms of Service and Privacy Policy, they agree that their data may flow to ByteDance and (as such) may be turned over to the PRC.[2]  The President determined that the PRC's ability to control this data presented an unacceptable threat to the United States' national security and foreign policy.  Accordingly, he exercised his authority under federal law to block certain business-to-business transactions involving ByteDance.

Plaintiffs here are not a party to any of the transactions blocked through the President's Order, nor do they allege any exposure to criminal or civil liability because of the President's

---

[1] *See* ASPI, *TikTok and WeChat: Curating and Controlling Global Information Flows*, Policy Brief, Report No. 37 (Sept. 2020), Ex. 1 at 2.

[2] *See* TikTok Terms of Service, Ex. 2 at 2; TikTok Privacy Policy, Ex. 3 at 1-6.

action.  Instead, they contend that the actions of the President and the Secretary of Commerce will have downstream effects on them that violate their rights.  They seek a nationwide injunction against the federal government's actions, overturning the national security and foreign affairs judgment of the President.

Plaintiffs' request should be rejected.  Plaintiffs' claims are both premature and meritless. And Plaintiffs have not proven the most bedrock requirement of emergency relief—irreparable harm—particularly as to the first set of restrictions now scheduled to go into effect September 27, which are the only restrictions that could plausibly provide the basis for an emergency temporary restraining order.  Plaintiffs' requested relief would necessarily infringe on the President's authority to block business-to-business economic transactions with a foreign entity in the midst of a declared national-security emergency, and their request for such intrusive relief should be denied.

## BACKGROUND

### I. Statutory Framework

#### A. The International Emergency Economic Powers Act

For nearly its entire history, the United States has used economic sanctions as a critical means to protect national security and achieve foreign policy goals.  During most of the twentieth century, U.S. sanctions programs were governed by the Trading With the Enemy Act (TWEA), which granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies.  *See* 50 U.S.C. § 4305(b)(1); *see also Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981).

In 1977, Congress enacted the International Emergency Economic Powers Act (IEEPA). *See* Pub. L. No. 95-223.  IEEPA limited TWEA to periods of declared wars, but also extended the President's authority to periods of declared national emergencies.  *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984).  The broad powers granted to the President under IEEPA are essentially the

same as those under TWEA, but IEEPA provides authority for the President to exercise those powers during peacetime, "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Once a national emergency relating to such a threat is declared, IEEPA empowers the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States[.]

*Id.* § 1702(a)(1)(B).

### B.    The National Emergencies Act

Congress enacted the National Emergencies Act (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601-1651), to "establish procedural guidelines for the handling of future emergencies with provision for regular Congressional review." S. Rep. No. 94-922, at 1 (1976). The statute prescribes rules for Presidential declarations of national emergencies with respect to statutes "authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a). Congress did not define the term "national emergency" or place any conditions on the President's ability to declare a national emergency. Instead, Congress committed this determination to the President as "it would be wrong to try to circumscribe with words with what conditions a President might be confronted." *Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Governmental Relations*, 94th Cong. 27 (March 6, 1975) (statement of Sen. Mathias); *id.* at 27 (statement of Sen. Church).

Congress gave itself the exclusive oversight authority over a President's national emergency declaration. For instance, declarations of national emergencies must "immediately be transmitted to the Congress," 50 U.S.C. § 1621(a), and the President must comply with extensive

congressional reporting requirements pertaining to that declaration, *id.* § 1641(a)-(c).  Congress may terminate a national emergency through a joint resolution that is subject to fast track procedures, and Congress must meet "[n]ot later than six months after a national emergency is declared, and [every six months thereafter]," to consider whether the emergency shall be terminated.  *Id.* § 1622(a)-(c).

## II.  Factual Background

### A.  Congress and the Executive Branch Identify Chinese Technology Companies as a Significant and Growing National Security Threat

In 2012, the House Permanent Select Committee on Intelligence ("HPSCI") launched an investigation that, although focused on Chinese telecom firms Huawei and ZTE, was premised on the broader concern that, if allowed unfettered access to United States markets, Chinese companies with suspected ties to the PRC could provide opportunities for cyber-attacks and cyber-espionage by China, a nation-state already well-known for perpetrating such activities against the United States.  *See* HPSCI, *Investigative Rep. on the U.S. Nat'l Sec. Issues Posed by Chinese Telecomms. Cos. Huawei and ZTE* (Oct. 8, 2012) ("HPSCI Rep."), Ex. 4 at 2-4.[3]  At the same time, a Congressional commission reported that "[n]ational security concerns have accompanied the dramatic growth of China's telecom sector" and that "large Chinese companies"—particularly those prominent in China's "strategy of overseas expansion—are directly subject to direction by the [CCP], to include support for PRC state policies and goals."  U.S.-China Economic and Security Review Comm'n, 112th Cong., *The Nat'l Sec. Implications of Invs. and Products from*

---

[3] The materials cited herein are for background purposes as they underscore the concerns identified by the President in the challenged Executive Order.  For clarity, however, the cited materials do not constitute the administrative record of the Secretary of Commerce's challenged action.  The Government does not believe an administrative record is necessary to the adjudication of Plaintiffs' motion.  To the extent the Court believes further factual information from the Government is necessary, however, the Government could endeavor to make some of the decisional materials available to the Court, but was not able to do so in connection with this filing given the timeframe.

*the People's Republic of China in the Telecomms. Sector* (2011), Ex. 5 at 9.

Over the following years, intelligence officials repeatedly concluded that China poses one of the "greatest cyber threats to the United States."  *See* Daniel R. Coats, Dir. of Nat'l Intelligence ("DNI"), *Stmt. for the Record: Worldwide Threat Assessment of the U.S. Intelligence Cmty.* (2018), Ex. 6 at 5.  The FBI Director underscored that the FBI is "deeply concerned about the risks of allowing any company or entity that is beholden to foreign governments that don't share our values to gain positions of power inside our telecommunications networks."  *Open Hearing on Worldwide Threats Before the SSCI*, 115th Cong., Ex. 7 at 64-65.  And in 2019, the DNI stated that "China remains the most active strategic competitor responsible for cyber espionage against the US Government, corporations, and allies," and expressed concern "about the potential for Chinese intelligence and security services to use Chinese information technology firms as routine and systemic espionage platforms against the United States and allies."  Daniel R. Coats, DNI, *Stmt. for the Record: Worldwide Threat Assessment of the U.S. Intelligence Cmty.* (2019), Ex. 8 at 5.

Congress has responded to these growing concerns, including recently in the defense appropriations bill for fiscal year 2019.  That law prohibited, *inter alia*, government agencies from buying or contracting with entities that use certain equipment or services produced by any "entity that the Secretary of Defense . . . reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of [the PRC]."  McCain National Defense Authorization Act, Pub. L. No. 115-232 § 889(f)(3)(D), 132 Stat. 1636, 1918 (2018).  Congress also directed the President to assess and formulate strategies to address the threat posed by China, including the CCP's "use of political influence, information operations, censorship, and propaganda to undermine democratic institutions[,]" and the "use of economic tools, including market access and investment to gain access to sensitive United States industries."  *Id.* § 1261(b)(2)(A), § 1260(5).

Congress also directed the Secretary of Commerce to provide detailed reporting "on foreign direct investment transactions made by entities of the [PRC] in the United States." *Id.* § 1719(b)(1).

### B.       Researchers and Members of Congress Identify TikTok as a Growing Threat

On October 23, 2019, Senators Schumer and Cotton jointly asked U.S. intelligence officials to determine whether TikTok poses "national security risks." *See* Ex. 9.  The Senators were concerned that "while the company has stated that [it] does not operate [or store U.S. user data] in China[,] . . . ByteDance is still required to adhere to the laws of China." *Id.*  Those laws include the Chinese National Intelligence Law, which "obliges individuals, organizations, and institutions to assist Public Security and State Security officials in carrying out a wide array of 'intelligence' work."  Murray Scot Tanner, *Beijing's New National Intelligence Law: From Defense to Offense*, Lawfare, July 20, 2017, Ex. 10.  Senators Schumer and Cotton emphasized that China lacks an "independent judiciary to review requests made by the Chinese government for data or other actions, [so] there is no legal mechanism for Chinese companies to appeal if they disagree with a request." Ex. 9.  Senator Rubio had earlier expressed a related concern, that the PRC government is using TikTok to advance its "foreign policy and globally suppress freedom of speech, expression, and other freedoms[.]" *See* Ex. 11.

These concerns echoed those of private researchers, who have reported that ByteDance is "uniquely susceptible to other problems that come with its closeness to the censorship and surveillance apparatus of the CCP-led state." *See* ASPI, *Mapping More of China's Tech Giants*, Issue Paper, Report No. 15 (Nov. 2019), Ex. 12 at 9.  Specifically, while the CCP has long used Chinese-language media as a propaganda platform, "TikTok now puts the CCP in a position where it can attempt to do the same on a largely non-Chinese speaking platform—with the help of an advanced AI-powered algorithm." *Id.*  And TikTok itself has stated it can share data with third parties and government entities. *See Class-Action Lawsuit Claims TikTok Steals Kids' Data And*

*Sends It To China*, NPR, Aug. 4, 2020, Ex. 13; *see also* TikTok Privacy Policy, Ex. 3.

### C. The President Issues Executive Order 13873 and Reports to Congress under the NDAA

On May 15, 2019, the President issued Executive Order 13873, *Securing the Information and Communications Technology and Services Supply Chain*, 84 Fed. Reg. 22689, 22689 (the "ICTS Order"). The President explained "that the unrestricted acquisition or use in the United States of information and communications technology or services . . . supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries augments the ability of foreign adversaries to create and exploit vulnerabilities in information and communications technology or services, with potentially catastrophic effects, and thereby constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *Id.*

In light of these findings, the President invoked his authority under the Constitution and the laws of the United States, including IEEPA and the NEA, to declare a national emergency with respect to this threat, and to prohibit certain transactions with foreign countries or foreign nationals that pose risks to the United States' national security. *Id.* at 22690. On May 13, 2020, the President renewed the declaration of emergency set forth in the ICTS Order. *See* 85 Fed. Reg. 29321. Shortly thereafter, he presented a report to Congress, in accordance with the NDAA, outlining strategies in relation to the country's foreign policy with China. *Id.*

### D. The President Takes Action Relating to TikTok

On August 6, 2020, the President invoked the national emergency declared in the ICTS Order and determined that additional steps were necessary with respect to TikTok given its foreign ownership. *See* Exec. Order 13942, *Addressing the Threat Posed by TikTok, and Taking Additional Steps To Address the National Emergency With Respect to the Information and Communications*

*Technology and Services Supply Chain*, 85 Fed. Reg. 48637 (Aug. 6, 2020) ("TikTok Order").  In particular, the President explained that TikTok "automatically captures vast swaths of information from its users, including internet and other network activity information such as location data and browsing and search histories."  *Id.*, pmbl.

The President assessed that this data collection poses several distinct risks.  First, there is a risk the CCP will gain "access to Americans' personal and proprietary information—potentially allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage."  *Id.*  In addition, the President highlighted concerns regarding TikTok's "reported[] censors[ship] [of] content that the [CCP] deems politically sensitive," *id.*, as well as concerns regarding the ways in which TikTok "may also be used for disinformation campaigns that benefit the [CCP], such as when TikTok videos spread debunked conspiracy theories about the origins of the 2019 Novel Coronavirus."  *Id.*  Finally, the President noted that other countries had taken action against TikTok.  *Id.*  The President concluded that it is time for the country to "take aggressive action against the owners of TikTok to protect our national security."  *Id.*  Accordingly, the President provided that certain transactions with ByteDance or its subsidiaries would be prohibited and directed the Secretary of Commerce to identify the prohibited transactions within 45 days of the order.  *Id.* § 1

In addition to the Executive Order challenged here, in August the President also ordered ByteDance to divest the U.S. operations and assets of TikTok, and all data on U.S. users of TikTok.  *See Order of August 14, 2020 Regarding the Acquisition of Musical.ly by ByteDance Ltd.*, 85 Fed. Reg. 51297 (Aug. 14, 2020).  Based on this action, there are ongoing discussions related to a possible corporate restructuring of TikTok and its U.S.-based activities, to provide greater ownership and control by U.S. businesses.  *See, e.g.*, Georgia Wells and Aaron Tilley, *Oracle Will*

*Review TikTok Source Code to Watch for Chinese Access*, Wall Street Journal (Sept. 16, 2020).

### E.     The Department of Commerce's Restrictions

Consistent with the President's Executive Order, on September 18, 2020, the Secretary of Commerce published a list of five transactions that will be prohibited with respect to ByteDance and its operations within the United States:

> 1. Any provision of services to distribute or maintain the TikTok mobile application, constituent code, or application updates through an online mobile application store[;]
>
> 2. Any provision of internet hosting services enabling the functioning or optimization of the TikTok mobile application[;]
>
> 3. Any provision of content delivery network services enabling the functioning or optimization of the TikTok mobile application[;]
>
> 4. Any provision of directly contracted or arranged internet transit or peering services enabling the functioning or optimization of the TikTok mobile application[;]
>
> 5. Any utilization of the TikTok mobile application's constituent code, functions, or services in the functioning of software or services developed and/or accessible within the land and maritime borders of the United States and its territories[.]

*Identification of Prohibited Transactions to Implement Executive Order 13942 and Address the Threat Posed by TikTok and the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain* (Sept. 18, 2020), *see* ECF No. 7-6.

The Secretary identified phased implementation dates for the prohibited transactions. Specifically, "[t]ransactions identified in paragraph 1 above will be prohibited immediately upon the effective date of September 20, 2020," and the prohibitions in paragraphs 2-5 will be "the subject of a second phase, beginning on November 12, 2020[.]" *Id.*

Importantly, the Secretary's identifications also included several limitations. The Secretary expressly stated that "[t]he identified prohibitions herein only apply to the parties to business-to-business transactions[.]" *Id.* at 7. Similarly, "[t]hese identified prohibitions do not apply to . . .

[t]he exchange between or among TikTok mobile application users of personal or business information using the TikTok mobile application[.]" *Id.* Additionally, the Secretary made clear that the prohibitions do not include any transactions related to the corporate restructuring of TikTok's U.S. operations pursuant to the divestment order. *See id.* at 8.

## III.   Procedural History

Plaintiffs here are three U.S.-based TikTok content creators. *See* Compl. (ECF No. 1) ¶¶ 9-11. Plaintiffs filed this lawsuit on Friday, September 18, 2020, and filed an emergency motion for a temporary restraining order early in the morning of Saturday, September 19, 2020, *see* ECF No. 7 (hereafter "TRO Mot."), requesting that the Court issue a nationwide injunction enjoining Defendants "from taking any actions to enforce the Executive Order and implementing regulations." ECF No. 7-17, at 3.

This Court held a hearing on Plaintiffs' TRO Motion on September 19. *See* Tr. of TRO Hr'g (Sept. 19, 2020). Following that hearing, the Secretary of Commerce delayed enforcement of the September 20 restrictions for one week, given developments in the possible corporate restructuring of TikTok. *See* ECF No. 12. The Secretary then published a revised Identification of Prohibited Transactions including the updated implementation dates. *See* Ex. 14 ("Commerce Identification"). The Government now respectfully submits this written opposition to Plaintiffs' TRO motion, in addition to the arguments presented orally.

## STANDARD OF REVIEW

A temporary restraining order is "an extraordinary and drastic remedy[.]" *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A party seeking such relief "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that [a temporary restraining order] is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). When "the Government is the opposing party,"

the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he burden is clearly on the moving party to prove all elements required for a preliminary injunction[.]" *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 486 n.10 (3d Cir. 2000).

## DISCUSSION

### I.   Plaintiffs Have Not Established a Likelihood of Success on the Merits

#### A.   Plaintiffs Have Not Demonstrated that Their Claims are Justiciable

As discussed at the TRO hearing, *see* TRO Hr'g Tr. at 11-14, there are two justiciability problems with respect to Plaintiffs' claims.  First, with respect to challenges to the prohibitions taking effect November 12, those claims are not yet ripe.  "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013).  There are ongoing corporate negotiations related to a possible restructuring of TikTok pursuant to the President's August divestiture order, and if that restructuring were to occur, the Government would re-evaluate whether the November 12 restrictions remain necessary. Because it is speculative whether the November 12 restrictions will ever be enforced, therefore, Plaintiffs' claims challenging those restrictions are not yet ripe.  *See Ryan v. Trump*, No. 3:20-cv-05948-VC (N.D. Cal. Sept. 15, 2020), ECF No. 30 at 2 (denying a TRO motion as unripe, noting "ByteDance is widely reported to be in negotiations to alter its ownership structure in a manner that could result in non-enforcement of the Executive Order").

Second, as for the prohibition that will now take effect September 27, 2020, Plaintiffs have not demonstrated any concrete, certainly impending injuries flowing from that prohibition.  As discussed further below in the context of irreparable harm, *see* Section II, *infra*, Plaintiffs have established, at most, a hypothetical chain of contingencies, which does not satisfy the injury-in-

fact element of Article III standing, *see Clapper*, 568 U.S. at 409, much less support the extraordinary remedy of a TRO.

      **B.**      **The Government's Actions Do Not Violate the First Amendment**

            **1.**      **The Challenged Restrictions Are Not Subject to First Amendment Scrutiny Because They Are Directed at Business Transactions**

All of Plaintiffs' First Amendment arguments overlook a threshold point—whether the challenged restrictions are subject to First Amendment scrutiny in the first place. Consistent with IEEPA's grant of authority to the President to regulate economic transactions, *see* 50 U.S.C. § 1702(a)(1)(B), both the Executive Order and the Commerce Identification prohibit only certain business transactions—not protected First Amendment activity.

Plaintiffs here do not claim a First Amendment right to engage in any of the regulated economic transactions themselves—*e.g.*, a right to "distribute or maintain the TikTok mobile application, constituent code, or application updates through an online mobile application store," or a right to provide "internet hosting services . . . enabling the functioning or optimization of the TikTok mobile application." Commerce Identification, ¶¶ (1), (2). Presumably that is because Plaintiffs themselves do not seek to engage in any of the business-to-business transactions actually proscribed (and because economic regulations of this nature generally are not subject to First Amendment scrutiny, *see, e.g.*, *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 469-70 (1997)). Plaintiffs also do not claim that either the TikTok Order or the Commerce Identification exposes them to criminal or civil liability for engaging in protected speech.

Instead, Plaintiffs argue that prohibiting economic transactions between other parties will have a downstream effect on their ability to engage in expressive activity. But such downstream, incidental effects on expressive activity generally do not justify First Amendment scrutiny of the challenged regulation. For example, in *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), a

bookstore ordered to be closed as a public nuisance sought to argue that "the effect of the statutory closure remedy impermissibly burdens its First Amendment protected bookselling activities," but the Supreme Court rejected that argument because "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities," and booksellers may not assert "First Amendment coverage to defeat a valid statute aimed at penalizing and terminating illegal uses of premises." *Id.* at 705-707; *see also Virginia v. Hicks*, 539 U.S. 113, 123 (2003) (upholding a state trespass policy even as to those who trespass for First Amendment purposes, because "it is Hicks' nonexpressive *conduct*—his entry in violation of the notice-barment rule—not his speech, for which he is punished as a trespasser"); *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991).

Here, the Executive Order and Commerce Identification prohibit business-to-business economic transactions with a foreign entity and its subsidiaries based on the President's national security determinations. The fact that those prohibitions may have adverse, downstream effects on a purported forum for Plaintiffs' speech is legally irrelevant: "Neither the basis for the . . . sanction . . . nor its purpose . . . has anything to do with the First Amendment." *Hicks*, 539 U.S. at 123. Thus, the First Amendment is inapplicable to the Government's challenged actions.[4]

### 2. Even If the First Amendment Applied, the Government's Actions Are Valid "Time, Place, or Manner" Regulations

Even if the Court concluded that the economic prohibitions implicate sufficient expressive activity to warrant First Amendment scrutiny, the prohibitions would be valid as a regulation of conduct that incidentally burdens speech, *see United States v. O'Brien*, 391 U.S. 367, 376 (1968), and as "time, place, or manner" restrictions. *See United States v. Albertini*, 472 U.S. 675, 687-88

---

[4] Nor can Plaintiffs argue that TikTok has been singled out for special treatment, *cf. Arcara*, 478 U.S. at 704-05, because the prohibition of transactions pertaining to ByteDance is expressly part of the Government's broader efforts to respond to the growing threats posed by China and its technology companies. *See* ICTS Order § I; Background § II, *supra*.

(1985) (applying the *O'Brien* standard to "[a]pplication of a facially neutral regulation that incidentally burdens speech"); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298 (1984) (equating the *O'Brien* standard to the standard for "time, place, or manner" restrictions).

Under the standard for evaluating time, place, or manner restrictions, Government restrictions on speech "are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark*, 468 U.S. at 293. Plaintiffs' TRO motion does not advance any argument that the Government's actions fail to meet this "intermediate scrutiny" standard. And at the TRO hearing, Plaintiffs expressly disavowed any such claim—instead reiterating that they are pursuing an overbreadth theory. *See* TRO Hr'g Tr. at 28 ("Your Honor, we didn't make a time, place, or manner argument because we made an overbreadth argument."). Thus, Plaintiffs have waived any argument that the Government's actions fail to satisfy intermediate scrutiny. Nonetheless, the Government will briefly explain why the challenged actions here are valid under that standard.

First, both the TikTok Order and the Commerce Identification are content-neutral, because they do not depend in any way on the content of the message being communicated. *See Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015) (setting forth the relevant test).

Second, the restrictions are narrowly tailored to serve a significant governmental interest. The "sensitive and weighty interests of national security and foreign affairs" are critically important Government interests. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010); *see also Haig v. Agee*, 453 U.S. 280, 307 (1981). And in the First Amendment context, narrow tailoring is satisfied "so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Albertini*, 472 U.S. at 689; *see also*

-14-

*Clark*, 468 U.S. at 297 ("[I]f the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment[.]").

Pursuant to the President's findings, "TikTok automatically captures vast swaths of information from its users, including internet and other network activity information such as location data and browsing and search histories." TikTok Order, pmbl. Because this danger is inherent in the application itself, the Government sensibly responded by prohibiting transactions that enable the U.S. operations of the application. The United States' national security and foreign affairs interests would obviously be achieved less effectively absent these restrictions, *i.e.*, if TikTok were allowed to continue operating in an unrestricted manner, with mass amounts of sensitive information about U.S. persons continuing to flow to a foreign entity aligned with the PRC and subject to their data collection authorities. *Cf. Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508 (1981) ("If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them.").

Nor is there any basis for judicial second-guessing the President's determinations in these fields of foreign affairs and national security. *See Humanitarian Law Project*, 561 U.S. at 35 ("The Government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions.").[5] Plaintiffs also do not advance their argument by identifying

---

[5] Plaintiffs contend that the President's determinations describe only hypothetical harms, not grounded in facts. But there is no requirement that the President prove his findings with detail or evidence. *See Humanitarian Law Project*, 561 U.S. at 34-35 (describing such a requirement as "dangerous"); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999). Moreover, a fair reading of the Order makes plain that the President's identified harms are not speculative. *See, e.g.*, TikTok Order , pmbl. ("These risks are real. . . . The United States must take aggressive action against the owners of TikTok to protect our national security.").

possible alternative approaches that (in their view) would have restricted less speech—*e.g.*, by relying on the August 14 divestiture order alone, *see* TRO Mot. at 11. Such alternative approaches are irrelevant to the analysis. *See Albertini*, 472 U.S. at 689 ("Nor are such regulations invalid simply because there is some imaginable alternative that might be less burdensome on speech."); *Clark*, 468 U.S. at 299. The First Amendment does not provide Plaintiffs with a license to dictate how the President may respond to an emerging national-security threat—*i.e.*, foreclosing a robust response, and instead requiring a piecemeal response relying solely on the divestiture order. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2421 (2018) ("[W]e cannot substitute our own assessment for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy.").

Finally, the Government's restrictions also leave open ample alternative modes of communication. Even if those modes of communication are not Plaintiffs' preferred channels, there is no question that alternatives do exist, as Plaintiffs themselves note. *See* Compl. ¶ 7 ("TikTok is a platform—*like Facebook, Instagram and Twitter*—on which creators post content and thereby communicate with other users." (emphasis added)); *see also Christian Legal Soc. v. Martinez,* 561 U.S. 661, 690 (2010) (upholding bar on "specific methods of communication," in part because "the advent of electronic media and social-networking sites reduces the importance of those [specific] channels"); *Kovacs v. Cooper*, 336 U.S. 77, 88-89 (1949) ("That more people may be more easily and cheaply reached by sound trucks . . . is not enough to call forth constitutional protection . . . when easy means of publicity are open."). Accordingly, even if they were subject to First Amendment scrutiny, the Government's actions would be sustained as reasonable "time, place, or manner" restrictions.

### 3.    Plaintiffs' First Amendment Theories Are Meritless

Plaintiffs' TRO motion raises three arguments as to why the Government's actions violate

the First Amendment.  *See* TRO Mot. at 10-16.  Regardless of any of the above analysis, all three of Plaintiffs' theories fail on their own terms, which is an independent reason for denying relief.

**a.** Plaintiffs first argue that that the Government's actions are overbroad.  But their argument misconstrues First Amendment overbreadth doctrine, mistakenly treating the claim as if it were a free-floating "narrow tailoring" inquiry.  *See* TRO Mot. at 10-11.

Properly understood, an overbreadth challenge is a "type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).  The overbreadth doctrine is "strong medicine" that should be administered "only as a last resort." *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999).

Plaintiffs' TRO motion makes no effort to carry their "burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists." *Free Speech Coal., Inc. v. Att'y Gen.*, No. 18-3188, 2020 WL 5200685, at *11 (3d Cir. Sept. 1, 2020).  Nor is such an argument plausible on this record.  Any overbreadth challenge would require proving, for example, that it violates the First Amendment to prohibit a business from providing Internet hosting services to ByteDance.  *See* Commerce Identification, ¶ 2.  But neither the provision of Internet hosting services nor any of the other business-to-business transactions prohibited by the Commerce Identification "possesses sufficient communicative elements to bring the First Amendment into play," *Texas v. Johnson*, 491 U.S. 397, 404 (1989), and therefore such economic transactions may validly be prohibited without raising any concerns under the First Amendment.

It is unsurprising that Plaintiffs cannot sustain an overbreadth challenge here, because "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as

picketing or demonstrating).″  *Hicks*, 539 U.S. at 124.  Indeed, Plaintiffs' cited authority only underscores why such a claim must fail here.  In *Board of Airport Commissioners of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987), the challenged regulation "prohibit[ed] *all* protected expression" within the airport, and "virtually every individual who enters LAX may be found to violate the resolution[.]″  *Id.* at 574-75.  And in *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), the state statute barred certain individuals from accessing *any* "commercial social networking Web site," which encompassed not only "commonplace social media websites" but also potentially "[m]any news websites," "health-related resources" like WebMD, and even e-commerce sites like Amazon.com."  *Id.* at 1736-37, 1739, 1742.  Those laws were direct prohibitions on expressive activity that shutdown entire places (an airport) or mode of communication (virtually the entire Internet), whereas here the Government has prohibited only certain business-to-business transactions (to which Plaintiffs are not a party), and the prohibitions expressly do not apply to individuals' expressive activity.  *See* Commerce Identification at 7 ("These identified prohibitions do not apply to . . . [t]he exchange between or among TikTok mobile application users of personal . . . information using the TikTok mobile application[.]").

In this respect, the Government's actions here are the *opposite* of the *Jews for Jesus* case, with the Commerce Identification itself containing a carve-out for potential First Amendment activity.  *Compare id.*, *with* 482 U.S. at 575 ("The resolution expressly applies to all 'First Amendment activities,' and the words of the resolution simply leave no room for a narrowing construction.").  Even if the overbreadth inquiry were akin to narrow tailoring, therefore, the Secretary's Identification would be valid for all of the reasons explained above.

**b.**  Plaintiffs also seek to invalidate the Executive Order and Commerce Identification as an unconstitutional prior restraint.  *See* TRO Mot. at 11-14.  But "prior restraint" is a term of art in

the First Amendment context, and neither of the Government's actions here qualifies as such.

A prior restraint is "used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993); *see also Matter of Subpoena 2018R00776*, 947 F.3d 148, 155 (3d Cir. 2020). Here, there is no direct, advance prohibition on any communications. Plaintiffs are not prohibited from doing or saying anything. Restrictions on economic transactions, even when involving a particular platform for communication, simply are not "prior restraints" within the meaning of First Amendment doctrine.

**c.** Finally, Plaintiffs' claim as to the right to receive information does not change the First Amendment analysis. *See* TRO Mot. at 14-16. The Third Circuit has described "[t]he listener's right to receive information" as "reciprocal to the speaker's right to speak." *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015). Accordingly, where a policy is upheld with respect to *speakers*, a claim brought by *listeners* is likewise foreclosed. *See id.* ("As we concluded in *King*, [the challenged law] does not violate the counselors' right to speak, and, as a result, it does not violate Appellants' right to receive information."). Here, because the Government's actions do not violate the First Amendment as to speakers (for all the reasons discussed above), they also do not infringe on any listeners' right to receive information.[6]

### C.   The Challenged Actions Do Not Violate Procedural Due Process

Plaintiffs' claims under the Due Process Clause are foreclosed for four independent

---

[6] The recent decision in *WeChat Users Alliance v. Trump*, No. 20-cv-5910 (N.D. Cal.), ECF No. 59 (Sept. 19, 2020), does not support Plaintiffs' claims here. The Government respectfully submits that decision was incorrect because, *inter alia*, it failed to address the threshold question whether First Amendment scrutiny is even warranted; incorrectly faulted the Government for failing to submit detailed evidence supporting its national-security justification; and misconstrued the tailoring inquiry by focusing on potential alternatives, rather than whether the Government's action was effective in advancing its interests. In any event, that decision was also based on the particular factual record associated with WeChat, *see id.* at 17, which does not help Plaintiffs here.

reasons.  First, Plaintiffs are not a party to any of the challenged restrictions, which apply only to business-to-business economic transactions, not to any of Plaintiffs' activities.  *See O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 789 (1980) ("Over a century ago this Court recognized the principle that the due process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action.").

Second, Plaintiffs have not established cognizable liberty or property interests.  All of their claimed interests, *see* TRO Mot. at 17-20, depend on the assumption that they have a legally protected right under state law to continue to use their TikTok accounts.  Their reliance on state law conversion claims, *see* TRO Mot. at 17, is inapposite, because even if state law protects against someone *stealing* a social media account, that does not mean state law establishes a protected interest in continued, unfettered access to the account.  Indeed, the relevant contract here between Plaintiffs and TikTok—*i.e.*, the Terms of Service that all users must agree to when they create an account on TikTok—makes clear that Plaintiffs have no protected interest in their accounts.  *See* Ex. 2 at 5 ("We reserve the right, at any time and without prior notice, to remove or disable access to content at our discretion for any reason or no reason.").  In analogous circumstances, courts have held that no property interest exists.  *Cf. Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) ("The decisional law is clear that an at-will employee does not have a legitimate entitlement to continued employment because she serves solely at the pleasure of her employer.").[7]

---

[7] Plaintiffs' other claimed interests fail for additional reasons as well.  Plaintiffs claim a liberty interest in the right to receive information, *see* TRO Mot. at 18-19, but they cite no Third Circuit authority recognizing such an interest.  And even if one existed, it would only be as to broad areas of knowledge, and Plaintiffs have "failed to identify . . . a single area of useful knowledge to which [they] ha[ve] been denied access."  *Student Roe by Roe v. Com. of Pa.*, 638 F. Supp. 929, 932 (E.D. Pa. 1986), *aff'd sub nom. Roe v. Com. of Pa.*, 813 F.2d 398 (3d Cir. 1987); *see also Bohm v. Straw*, No. CIV.A. 12-16J, 2013 WL 85273, at *8 (W.D. Pa. Jan. 8, 2013) ("Plaintiff's argument that he had a protected liberty interest in the knowledge contained in the

Third, even if a cognizable liberty or property interest exists, Plaintiffs have not established that they have actually been deprived of such interest. *See Ingraham v. Wright*, 430 U.S. 651, 674 (1977) ("There is, of course a *de minimis* level of imposition with which the Constitution is not concerned."); *United States v. Shenandoah*, 595 F.3d 151, 162-63 (3d Cir. 2010) (finding that the right to travel is not offended by a law causing inconvenience), *abrogated on other grounds by Reynolds v. United States*, 565 U.S. 432 (2012). As noted above, numerous other social media platforms remain available to Plaintiffs, even if such platforms are not their preferred ones.

Fourth and finally, even if these threshold hurdles were overcome, Plaintiffs cannot establish that they were constitutionally entitled to any additional process. "The Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy." *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 283 (1984); *see also Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). Here, the Executive Orders provide ample reasons on their face demonstrating the reasons for the policy; the legislative structure of IEEPA and the NEA provides Congressional oversight; and the nature of the policy judgment at issue precludes any entitlement to additional process. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."); *see also Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 77 (D.D.C. 2002) (holding that pre-deprivation notice of IEEPA sanctions was not required), *aff'd*, 333 F.3d 156, 164 (D.C. Cir. 2003).

---

dictionary is unpersuasive."). As for their claimed liberty interest in pursuing their chosen profession, "this liberty interest is not the right to a specific job," and "plaintiffs must allege an inability to obtain employment within the field, not just a particular job or at a specific location or facility." *Shaw v. Temple Univ.*, 357 F. Supp. 3d 461, 484 (E.D. Pa. 2019). Thus, Plaintiffs cannot claim a liberty interest in pursuing employment only through a specific social media application.

D.   **The President's Actions Are Consistent with IEEPA**

1.   **Neither Claim Can Proceed Because Plaintiffs Have Not Identified a Private Cause of Action Allowing Private Citizens to Enforce IEEPA**

Plaintiffs here bring two claims seeking to enforce IEEPA—one that the Department of Commerce's restrictions exceed the Berman Amendment codified at 50 U.S.C. § 1702, and one that the TikTok Order and restrictions do not validly fall within the President's declared emergency under the ICTS Order.  Neither claim can proceed, however, because Plaintiffs have not identified a private right of action allowing them to bring claims under those statutes.  *See* TRO Hr'g Tr. at 21 (expressly disavowing an APA claim in connection with the TRO proceedings).

 "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  Where the necessary intent is absent, "a cause of action does not exist and courts may not create one."  *Id.* at 286-87.

The NEA and IEEPA confer highly discretionary authority upon the President to act quickly and decisively to address threats to the United States, and have no provision creating a private right of action for individuals purportedly affected by the President's actions.  The statutes do not contain the sort of "rights-creating language" that courts find "critical" to imputing a private right of action.  *Id.* at 288-89; *see Brunner v. Ohio Republican Party*, 555 U.S. 5 (2008) (per curiam).

The lack of a private right of action is buttressed by the constitutional context in which Congress legislated.  "National-security policy is the prerogative of the Congress and President."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017).   Nothing in the NEA or IEEPA suggests an intent by Congress to invert the constitutional order by permitting an injunction of an Executive Order that addresses a national security threat, based solely on a third party's complaints, particularly where Congress *itself* has not exercised its authority to terminate the relevant declaration, *see* 50 U.S.C. § 1622(a)(1).  In fact, the text of IEEPA demonstrates just the opposite, making clear that

a provision permitting judicial access to classified materials "does not confer or imply any right to judicial review." 50 U.S.C. § 1702(c).  And the Third Circuit has recognized that Congress enacted IEEPA seeking to establish a delicate balance between the two political Branches, *see United States v. Amirnazmi*, 645 F.3d 564, 577 (3d Cir. 2011), which further confirms that the overall scheme does not envision a role for courts acting at the behest of private parties in civil lawsuits.[8]

## 2.        The Restrictions are Consistent with IEEPA's Berman Amendment

Plaintiffs challenge the restrictions here as contrary to 50 U.S.C. § 1702(b), *see* TRO Mot. at 22-23, but the restrictions are fully consistent with both cited statutory subsections.

First, with respect to the exclusion for "any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value," § 1702(b)(1), the restrictions here expressly do not restrict such communications.  As noted above, they restrict economic transactions, not personal communications.  Moreover, any communications occurring on TikTok do in fact "involve a transfer of anything of value," *id.*, because pursuant to TikTok's Terms of Service, every time a user posts or transmits content through TikTok, that user grants TikTok "an unconditional irrevocable, non-exclusive, royalty-free, fully transferable, perpetual worldwide licence to use, modify, adapt, reproduce, make derivative works of, publish and/or transmit . . . your User Content in any format and on any platform, either now known or hereinafter invented."  TikTok Terms of Service, Ex. 2 at 8.  Similarly, the use of TikTok itself involves transmitting information to TikTok about its users—yet another item of value, as social media

_____

[8] Nor can Plaintiffs compensate for these deficiencies by characterizing their claim as *ultra vires* conduct by the President.  *See* TRO Mot. at 21.  Separation-of-powers concerns mandate that an "express statement by Congress" is required before even a generally available cause of action may be extended to challenge an action of the President.  *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982).  And no equitable relief is available against the President here because federal courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties."  *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866).

companies have proven, and as the TikTok Order confirms.  Indeed, Plaintiffs' own allegations are that their TikTok posts have economic value, as their posting of content on TikTok is allegedly the source of their income.  *See* Compl. ¶¶ 2-3, 9-11.

Second, with respect to the exclusion for "information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds," § 1702(b)(3), again the restrictions here do not prohibit any exchanges of such media—only business-to-business economic transactions.  Additionally, Plaintiffs ignore the second sentence of that subsection, which states that it does not apply "with respect to which acts are prohibited by chapter 37 of Title 18," one provision of which prohibits transmission of "information relating to the national defense" to any foreign government with reason to believe that it could "be used to the injury of the United States or to the advantage of a foreign nation." 18 U.S.C. § 794(a); *see also id.* §§ 793(e), (f).   Because the TikTok Order takes action to prevent exactly such harms, and contemplates that the vast swaths of user information collected by TikTok is information relating to the national defense, it falls outside any limitations otherwise posed by section 1702(b)(3).

### 3.  The TikTok Executive Order Plainly Falls Within the Prior Declaration of Emergency

Plaintiffs also seek to invalidate the TikTok Order as purportedly being outside the President's prior declaration of emergency, which they portray as being limited to "certain telecommunications companies."  Compl. ¶ 7.  As an initial matter, the TikTok Order expressly states that the "additional steps" being ordered are in connection with "the national emergency . . . declared in Executive Order 13873 of May 15, 2019."  TikTok Order, pmbl.  The fact that the President determined that the TikTok restrictions were encompassed within his prior declaration of emergency should be the end of the matter. *See California v. Trump*, 407 F. Supp. 3d 869, 890-

91 (N.D. Cal. 2019) (holding that national emergency determinations are "nonjusticiable political questions").  In any event, that result is confirmed by the ICTS Order itself, which applies to "information and communications technology or services" and then defines that term broadly: "any hardware, software, or other product or service primarily intended to fulfill or enable the function of information or data processing, storage, retrieval, or communication by electronic means, including transmission, storage, and display[.]"  ICTS Order, § 3(c).  Here, TikTok plainly qualifies as a "product or service primarily intended to fulfill . . . communication by electronic means."  *Id.*  Thus, there is no plausible claim under IEEPA.

## II.  Plaintiffs Have Not Proven Immediate, Urgent Irreparable Harm Justifying a Temporary Restraining Order

Plaintiffs here have not demonstrated the irreparable harm necessary to justify a TRO. Plaintiffs largely rely on the argument that a First Amendment claim always constitutes irreparable harm.  *See* TRO Mot. at 23-24.  But the Third Circuit has held that "[t]he assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits."  *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d. Cir. 1989); *see also Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997) (noting that the Supreme Court did not intend to "do away with the traditional prerequisites for injunctive relief simply because First Amendment freedoms were implicated").

Here, Plaintiffs have not demonstrated, through evidence, *see Adams*, 204 F.3d at 487, that they will suffer irreparable harm in the absence of a TRO.  Plaintiffs cannot "show a chilling effect on free expression" akin to "threatened criminal prosecution," *Hohe*, 868 F.2d at 73, particularly because Plaintiffs (even under their own allegations) remain free to post content on TikTok for the next six weeks.  *See* Compl. ¶¶ 41-42.  And even if TikTok were completely shuttered, Plaintiffs have ample other alternatives available for expressing their views. *Cf. Benner v. Wolf*, No. 20-CV-

775, 2020 WL 2564920, at *8 (M.D. Pa. May 21, 2020) (denying a TRO motion bringing a First Amendment claim based on the lack of irreparable harm, because other modes of communication prevent any "chilling effect on free speech").

The only evidence cited by Plaintiffs demonstrating their irreparable harm is Mr. Marland's declaration, *see* TRO Mot. at 23-24, but his claimed harm is expressly hypothetical:  "300 Entertainment has told me that *if* they hire me, they will not pay me the usual amount because there is uncertainty whether TikTok will be shut down."  ECF No. 7-2, ¶ 9 (emphasis added).  A contingent harm—particularly one that depends on the independent actions of third parties—is insufficient for Article III standing, let alone irreparable harm.  *See Clapper*, 568 U.S. at 409; *Adams*, 204 F.3d at 488.  Indeed, if Mr. Marland has already "seen a drop in [his] business" based on perceived "uncertainty whether TikTok will be shut down," ECF No. 7-2, ¶ 9, it is doubtful that this harm is even redressable, as an emergency, time-limited TRO is unlikely to resolve Mr. Marland's advertising partner's perceived "uncertainty" about TikTok's future.

At bottom, Plaintiffs cannot demonstrate an immediate need for emergency relief with respect to the November 12 restrictions, which are still over six weeks away from being enforced. And with respect to the September 27 restrictions, any claimed harm is inherently speculative:  it requires assuming there is some universe of unknown individuals (1) who do not presently have TikTok; (2) who will not download TikTok prior to September 27; (3) who would have decided to download it after September 27; (4) who would then have discovered one of the Plaintiffs on TikTok; (5) who would have enjoyed Plaintiffs' content sufficiently to "follow" them; and (6) that this universe of individuals is so large that, even during the short timeframe of a TRO, the lack of these individuals discovering Plaintiffs would not only have an appreciable impact on Plaintiffs' ability to earn an income, but that such an impact would be so large as to constitute irreparable

harm.  These contingencies are inherently speculative, and Plaintiffs do nothing to support them factually except rely on rough estimates.  *See* TRO Hr'g Tr. at 37; TRO Mot. at 4.  Given that statistical probabilities are insufficient to establish Article III injury-in-fact, *see Summers v. Earth Island Inst.*, 555 U.S. 488, 497-99 (2009), such speculation is *a fortiori* inadequate to demonstrate immediate irreparable harm warranting entry of a TRO.

### III.    The Balance of the Equities and Public Interest Strongly Favor the Government

Even if Plaintiffs could demonstrate some cognizable harm, the balance of the equities tips sharply in favor of the Government.  At issue is a formal national security and foreign affairs determination made by the President, pursuant to an emergency declaration, as authorized by Congress.  These interests weigh strongly against an injunction.  *See Winter*, 555 U.S. at 24; *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme "is in itself a declaration of public interest and policy which should be persuasive" to courts).  The injunction Plaintiffs seek would frustrate and displace the President's determination of how best to address threats to national security.  *Milena Ship Mgmt. Co. v. Newcomb*, 804 F. Supp. 846, 854 (E.D. La. 1992) (holding that injunction "unblocking the plaintiffs' vessels and bank accounts before a full hearing on the merits of OFAC's blocking decisions would risk impermissible interference with Executive and Congressional decisions").

Plaintiffs criticize the timing of the Government's actions, asserting that the delay in enforcing the prohibitions suggests the Government's interests are not serious.  *See* TRO Mot. at 24-25.  But decisions regarding how to address threats from abroad "involve significant political ramifications[,]" and, "[a]ccordingly, the Court must defer to the Executive's discretion on the timing of those . . . decisions."  *Holy Land Found. for Relief & Dev.*, 219 F. Supp. 2d at 74 n.28. Moreover, as discussed at the TRO hearing, the Government should not be precluded from enacting calibrated, strategic measures; Plaintiffs' approach would effectively require the

Executive Branch to respond to every national-security threat with full force, or else risk having its judgments second-guessed by courts.

Plaintiffs again rely on the First Amendment to claim that the public interest favors relief here. *See* TRO Mot. at 24. But First Amendment values are hardly promoted by allowing a foreign-owned media application to continue operating while surreptitiously censoring U.S. users' content on politically sensitive topics, engaging in disinformation, and promoting foreign propaganda. *See* TikTok Order pmbl.; *see also* Ex. 1 at 4-24 (cited in n.1, *supra*). In any event, even in First Amendment cases, the Court must grant deference to the Executive's "evaluation of the facts" and the "sensitive and weighty interests of national security and foreign affairs." *Humanitarian Law Project*, 561 U.S. at 33-34. Even if Plaintiffs established some modicum of harm, therefore, those "weighty interests" ensure that the equitable balance squarely favors the Government and is an independent reason for denying relief. *Cf. Def. Distributed v. Dep't of State*, 838 F.3d 451, 458-60 (5th Cir. 2016) (Government's interests in national defense and national security outweighed potential temporary infringement of plaintiffs' constitutional rights).

## IV.    Any Relief Should Be Appropriately Limited, and Require Posting of a Bond

To the extent the Court is inclined to grant relief, the remedy "must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). A nationwide injunction "is a drastic remedy" that may "transgress the bounds of [judicial] authority." *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 256 (4th Cir. 2020). As Justice Thomas, Justice Gorsuch, and Circuit Courts have recently made clear, nationwide injunctions present numerous detrimental consequences, including depriving non-parties of the right to participate and encouraging forum shopping. *DHS v. New York*, 140 S. Ct. 599, 600-01 (2020) (Mem.) (Gorsuch, J., concurring);

*Trump v. Hawaii*, 138 S. Ct. at 2424-29 (2018) (Thomas, J., concurring); *CASA de Maryland*, 971 F.3d at 256-62; *see also Free Speech Coal.* 2020 WL 5200685, at \*14 (reversing a nationwide injunction in a First Amendment case).

Plaintiffs here do not explain why nationwide preliminary relief is necessary to protect *their* constitutional rights, as opposed to the rights of third parties not before the Court (*e.g.*, potential future users of TikTok). Further, granting nationwide relief would be particularly inappropriate here given (1) the lack of a record as to the effect of the Order on non-Plaintiff TikTok users (including potential future users), *see California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018); and (2) Plaintiffs' failure to seek class certification, *see CASA*, 971 F3d at 259.

Defendants acknowledge that this Court has previously imposed a nationwide injunction to enjoin enforcement of two final rules promulgated by Federal agencies. *See Pennsylvania v. Trump*, 351 F. Supp. 3d 791 (E.D. Pa.), *aff'd*, 930 F.3d 543 (3d Cir. 2019), *as amended* (July 18, 2019), *and rev'd and remanded sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pa.*, 140 S. Ct. 2367 (2020). Even under the framework articulated in that decision, there are several reasons why this Court should adopt a different approach here. First, Plaintiffs do not assert any cause of action under the Administrative Procedures Act. *See* Compl. ¶¶ 62-89. Second, Plaintiffs are individuals, not geographically bounded States faced with "numerous citizens losing contraceptive coverage, resulting in 'significant, direct and proprietary harm' to the States in the form of increased use of state-funded contraceptive services, as well as increased costs associated with unintended pregnancies[,]" *Pennsylvania*, 351 F. Supp. 3d at 835. Third, a nationwide injunction would significantly burden the Government by interfering with the Executive's exercise of its emergency powers and conduct of foreign policy. And fourth, the legality of the TikTok Order is being challenged in separate proceedings. *See Ryan v. Trump*, No. 3:20-cv-05948 (N.D.

Cal.); *TikTok v. Trump*, No. 1:20-cv-2658 (D.D.C.).  Issuing preliminary relief with nationwide effect would thus prevent important "legal questions from percolating through the federal courts." *Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring).  Accordingly, if the Court is inclined to enter preliminary relief, any such relief should be limited to the named Plaintiffs.

Finally, although the Government did not request posting of a bond at the TRO hearing, *see* TRO Hr'g Tr. at 81-82, after further conferring on the issue, the Government now believes such a bond would be appropriate.  The plain text of Fed. R. Civ. P. 65(c) appears to require such a bond, and the Third Circuit has noted that "[o]n its face, this language admits no exceptions." *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 210 (3d Cir. 1990).  Here, in addition to the numerous non-pecuniary harms the Government would suffer as a result of entry of preliminary relief, the practical effect of such relief would be to permit additional sensitive user information to flow to ByteDance.  The value of such user information is reasonably capable of monetization, and this Court is obliged to address "the economic impact" of its order.  *Globus Med., Inc. v. Vortex Spine, LLC*, 605 F. App'x 126, 129 (3d Cir. 2015).  Accordingly, consistent with Rule 65(c) and Third Circuit precedent, the Court should order Plaintiffs to post a bond commensurate with the value of the user information that would continue flowing to ByteDance as a result of any preliminary relief entered in this case.

## CONCLUSION

This Court should deny Plaintiffs' motion for a temporary restraining order.

Dated: September 23, 2020                    Respectfully submitted,

                                             JEFFREY BOSSERT CLARK
                                             Acting Assistant Attorney General

                                             AUGUST FLENTJE
                                             Special Counsel to the Acting
                                             Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

DIANE KELLEHER
Assistant Branch Director

*/s/  Daniel Schwei*
DANIEL SCHWEI
Special Counsel
SERENA M. ORLOFF
MICHAEL DREZNER
AMY E. POWELL
STUART J. ROBINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box No. 883
Washington, DC 20044
Phone: (202) 305-8693
Fax: (202) 616-8470
E-mail: daniel.s.schwei@usdoj.gov

*Counsel for Defendants*