**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DOUGLAS MARLAND, COSETTE RINAB AND ALEC CHAMBERS,** Plaintiffs, | **CIVIL ACTION** |
| **v.** | |
| **DONALD J. TRUMP, in his official capacity as President of the United States; WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce; AND U.S. DEPARTMENT OF COMMERCE,** Defendants. | **NO.  20-4597** |

## OPINION

Plaintiffs Douglas Marland, Cosette Rinab, and Alec Chambers, three users of the mobile video-sharing application TikTok, bring this action against President Donald J. Trump and U.S. Secretary of Commerce Wilbur L. Ross, Jr. in their official capacities, and the U.S. Department of Commerce.  Plaintiffs challenge an executive order and regulation issued pursuant to the President's authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-07: (1) Executive Order 13942, "Addressing the Threat Posed by TikTok, and Taking Additional Steps to Address the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain," 85 Fed. Reg. 48,637 (Aug. 6, 2020) (the "Order"); and (2) its implementing regulation, "Identification of Prohibited Transactions to Implement Executive Order 13942 and Address the Threat Posed by TikTok and the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain," 85 Fed. Reg. 60,061 (Sept. 22, 2020) (the "Regulation").

The effect of the Order and Regulation will be the phased elimination of TikTok in the

United States.  The Order directs the Secretary of Commerce to identify prohibited "transactions" with TikTok and authorizes the Secretary to issue regulations necessary to implement the order.  Pursuant to the Secretary's implementing regulation, beginning September 27, 2020, distribution of TikTok within the United States will be prohibited and current TikTok users will no longer be able to update the application.  On November 12, 2020, TikTok will be effectively banned in the United States.

Before the Court is Plaintiffs' Motion for a Temporary Restraining Order ("TRO"), made pursuant to Federal Rule of Civil Procedure 65(b), seeking to enjoin enforcement and implementation of the Order and Regulation.  Plaintiffs argue that the Order and Regulation violate their rights under the First and Fifth Amendments to the U.S. Constitution and are *ultra vires*, that is, outside the scope of the President's authority under IEEPA.  In response, the Government contends the case is nonjusticiable and, alternatively, that Plaintiffs fail to meet their burden to show that temporary injunctive relief is warranted.  For the reasons that follow, Plaintiffs' Motion shall be denied.

## I.   BACKGROUND

TikTok is a global video-sharing application owned by the Chinese company ByteDance Ltd.  The application allows users to create, share, watch, and comment on short-form videos that range from 15 to 60 seconds in length.  These videos present a large universe of content, from comedy and musical performances to politics and current events.  Beyond offering information and entertainment, TikTok can also provide exposure and professional opportunities for individuals who create and upload content.  As of July 2020, TikTok had a community of approximately 700 million active monthly users globally.  In the United States, TikTok currently has more than 100 million active monthly users and 50 million active daily users.

2

Plaintiffs are three TikTok users who consume content on TikTok and have made careers out of creating and posting content.  All Plaintiffs allege that they earn a livelihood from the content they post on TikTok, be it through the promotional and branding work their videos attract or an increase in revenue resulting from their TikTok exposure.  As alleged in the Complaint, Plaintiffs have large followings on TikTok:  Marland has 2.7 million subscribers to his video feed, where he posts comedic videos; Rinab has 2.3 million subscribers to her video feed, where she posts fashion and lifestyle videos; and Chambers has 1.8 million subscribers to his video feed, where he posts musical videos.  Marland avers that "[t]here is no platform that would give [him] the opportunities TikTok has" because "TikTok uses an algorithm to create a page called 'For you' designed to show viewers content that they will like," which allows "little-known creators to show their content to a large audience."  Consistent with Marland's declaration, Rinab avers that TikTok's "For You" page allows her "to reach new audiences on TikTok outside of [her] network."  Similarly, Chambers avers that he "owe[s] [his] fan base to TikTok's ability to reach an audience."   Plaintiffs allege that they also benefit from TikTok as viewers of TikTok videos; for example, one Plaintiff notes that she has gained information about retirement accounts and presidential candidates from the application.

On May 15, 2019, President Trump issued an executive order finding that "foreign adversaries are increasingly creating and exploiting vulnerabilities in information and communications technology and services . . . in order to commit malicious cyber-enabled actions, including economic and industrial espionage against the United States and its people."  Securing the Information and Communications Technology and Services Supply Chain, Exec. Order No. 13873, 84 Fed. Reg. 22,689, 22,689 (May 15, 2019) (the "May 15 Executive Order").  The May 15 Executive Order explained that "the unrestricted acquisition or use in the United

States of information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries augments the ability of foreign adversaries to create and exploit vulnerabilities in information and communications technology or services, with potentially catastrophic effects," resulting in "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *Id.* Pursuant to the President's authority under IEEPA and the National Emergencies Act, 50 U.S.C. §§ 1601-51, the May 15 Executive Order declared a national emergency with respect to this threat. On May 14, 2020, the President continued the May 15 Executive Order for one year, pursuant to 50 U.S.C. § 1622(d). *See* Continuation of the National Emergency with Respect to Securing the Information and Technology and Services Supply Chain, 85 Fed. Reg. 29,321 (May 13, 2019).

On August 6, 2020, President Trump issued Executive Order 13942, "Addressing the Threat Posed by TikTok, and Taking Additional Steps to Address the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain," 85 Fed. Reg. 48,637 (Aug. 6, 2020). Citing the President's authority under IEEPA, the Order explains that the President "find[s] that additional steps must be taken to deal with the national emergency with respect to the information and communications technology and services supply chain declared in [the May 15 Executive Order]." *Id.* at 48,637. The Order specifically identifies TikTok as a threat to the "national security, foreign policy, and economy of the United States," and presents the following findings:

> TikTok automatically captures vast swaths of information from its users, including internet and other network activity information such as location data and browsing and search histories. This data collection threatens to allow the Chinese Communist Party access to Americans' personal and proprietary information – potentially allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage.

TikTok also reportedly censors content that the Chinese Communist Party deems politically sensitive, such as content concerning protests in Hong Kong and China's treatment of Uyghurs and other Muslim minorities.  This mobile application may also be used for disinformation campaigns that benefit the Chinese Communist Party, such as when TikTok videos spread debunked conspiracy theories about the origins of the 2019 Novel Coronavirus.

These risks are real.  The Department of Homeland Security, Transportation Security Administration, and the United States Armed Forces have already banned the use of TikTok on Federal Government phones.  The Government of India recently banned the use of TikTok and other Chinese mobile applications throughout the country; in a statement, India's Ministry of Electronics and Information Technology asserted that they were "stealing and surreptitiously transmitting users' data in an unauthorized manner to servers which have locations outside India."  American companies and organizations have begun banning TikTok on their devices.  The United States must take aggressive action against the owners of TikTok to protect our national security.

*Id.* Accordingly, the Order directed that beginning on September 20, 2020, "any transaction by any person, or with respect to any property, subject to the jurisdiction of the United States, with ByteDance Ltd. (a.k.a. Zìjié Tiàodòng), Beijing, China, or its subsidiaries, in which any such company has any interest, as identified by the Secretary of Commerce" would be prohibited.  *Id.* § 1(a).  The Order authorized the Secretary of Commerce to implement the Order's provisions and directed the Secretary to identify transactions prohibited under Section 1(a) of the Order.  *Id.* § 1(c).

On September 18, 2020, the Department of Commerce issued a regulation pursuant to the Order, "Identification of Prohibited Transactions to Implement Executive Order 13942 and Address the Threat Posed by TikTok and the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain," 85 Fed. Reg. No. 2020-20920 (Sept. 18, 2020) (withdrawn Sept. 22, 2020).  The Regulation identified a series of transactions prohibited pursuant to the Order, but only one category of transactions would be prohibited "immediately upon the effective date of September 20, 2020":

> Any provision of services to distribute or maintain the TikTok mobile application, constituent code, or application updates through an online mobile application store, or any online marketplace where mobile users within the land or maritime borders of the United States and its territories may download or update applications for use on their mobile devices.

*Id.* The Regulation also identified other categories of prohibited transactions that would, on November 12, 2020, be "the subject of a second phase" of prohibitions on TikTok's operations "within the land and maritime borders of the United States and its territories":

> Any provision of internet hosting services enabling the functioning or optimization of the TikTok mobile application[;]
>
> Any provision of content delivery network services enabling the functioning or optimization of the TikTok mobile application[;]
>
> Any provision of directly contracted or arranged internet transit or peering services enabling the functioning or optimization of the TikTok mobile application[;] [and]
>
> Any utilization of the TikTok mobile application's constituent code, functions, or services in the functioning of software or services.

*Id.*

Plaintiffs filed suit mere hours after the Regulation was issued. Their Complaint alleges that the Order and Regulation (1) violate the free speech protections of the First Amendment, U.S. Const. amend. I; (2) constitute a deprivation without due process of law in violation of the Fifth Amendment, U.S. Const. amend. V; and (3) were issued outside the bounds of executive authority, *i.e.*, were *ultra vires*, under IEEPA. The Complaint seeks a declaratory judgment that the Order and Regulation are unlawful, as well as an injunction prohibiting the Government from implementing or enforcing them.

Shortly thereafter, Plaintiffs filed the Emergency Motion for a Temporary Restraining Order now before the Court, seeking an injunction to prevent the Government from taking any actions to implement or enforce the Order and Regulation. The Court held a hearing on the

Motion on September 19, 2020.  That same day, the Department of Commerce announced it would delay implementation of the September 20 prohibitions until 11:59 p.m. on September 27, 2020.  The Secretary then published revised restrictions reflecting the updated implementation dates.  *See* 85 Fed. Reg. 60,061 (Sept. 22, 2020).

## II.    STATUTORY SCHEME

Enacted in 1977, IEEPA is "the source of statutory authority for the Executive's exercise of emergency economic powers in response to peacetime crises."  *United States v. Amirnazmi*, 645 F.3d 564, 572 (3d Cir. 2011).  Under IEEPA, the President can take emergency measures "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."  50 U.S.C. § 1701(a).  To exercise these emergency powers, the President must first declare an emergency pursuant to the National Emergencies Act, *id.* § 1621, the "predicate for an exercise of executive authority under IEEPA," *Amirnazmi*, 645 F.3d at 572.  Once the President declares a national emergency, IEEPA authorizes the President to:

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B).

But while IEEPA confers on the President broad authority and specific powers to confront national emergencies, this authorization of executive power is subject to substantive and procedural limits.  *See Amirnazmi*, 645 F.3d at 572-73.  For instance, the President must, as

noted, first declare a national emergency before exercising authority under IEEPA.  Further, where the President has already declared a national emergency, IEEPA provides that "[a]ny exercise of such authorities to deal with any *new* threat shall be based on a *new* declaration of national emergency which must be with respect to such threat."  50 U.S.C. § 1701(b) (emphasis added).

IEEPA further limits executive authority in two pertinent ways.  First, the Act provides that the President's authority "does not include the authority to regulate or prohibit, directly or indirectly . . . any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value."  *Id.* § 1702(b)(1).  Second, the President is barred from "regulat[ing] or prohibit[ing], directly or indirectly . . . the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds."  *Id.* § 1702(b)(3).

## III.  DISCUSSION

### A.  Threshold Issues

Before considering the merits of the pending Motion, threshold issues of standing and ripeness must be addressed.  The Government contends that neither requirement is satisfied here.

#### 1.  *Article III Standing*

To bring suit in federal court, it is a constitutional requirement that Plaintiffs be among the "category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is

(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

(2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

"In assessing whether a plaintiff has carried this burden, we separate our standing inquiry

from any assessment of the merits of the plaintiff's claim." *Cottrell v. Alcon Labs.*, 874 F.3d

154, 162 (3d Cir. 2017). "[A] valid claim for relief is *not* a prerequisite for standing." *Id.* at 166.

Whereas a TRO is "an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689

(2008) (internal quotation marks and citation omitted), "[i]njury-in-fact is not Mount Everest,"

*Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005). Indeed, "[t]he

contours of the injury-in-fact requirement, while not precisely defined, are very generous."

*Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982).

Plaintiffs satisfy the standing requirements of Article III. Beginning on September 27,

2020, as a direct result of the Order and Regulation, Plaintiffs will be unable to install TikTok

application updates, and will be unable to communicate or share videos on TikTok with persons

in the United States who do not already have the application. Further, beginning on November

12, Plaintiffs and all other users in the United States will be unable to access or use TikTok.

Plaintiffs earn a living through their use of TikTok, and they allege that the Regulation's phased

restrictions will initially restrict, then eliminate completely, their ability to earn a livelihood.

"[F]inancial harm is a 'classic' and 'paradigmatic form[]' of injury in fact." *Cottrell*, 874 F.3d at

163 (second alteration in original) (quoting *Danvers*, 432 F.3d at 291, 293). A ruling in their

favor would prevent these injuries. Accordingly, Plaintiffs meet the "minimal requirements" for

Article III standing. *Id.* at 162.

Case 2:20-cv-04597-WB   Document 21   Filed 09/26/20   Page 10 of 20

## 2. *Ripeness*

"At its core, ripeness works 'to determine whether a party has brought an action prematurely . . . and counsels abstention until such a time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.'" *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017) (alteration in original) (quoting *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003)). A dispute is therefore ripe only when it presents "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1463 (3d Cir. 1994) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

In pre-enforcement disputes, where the plaintiff seeks relief from an action that has yet to go into effect, the ripeness inquiry involves an examination of "the adversity of the interest of the parties, the conclusiveness of the judicial judgment and the practical help, or utility, of that judgment." *Id.* (quoting *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990)). "Although the party seeking review need not have suffered a 'completed harm' to establish adversity of interest, it is necessary that there be a substantial threat of real harm and that the threat 'must remain "real and immediate" throughout the course of the litigation.'" *Id.* (first quoting *Armstrong*, 961 F.2d at 412; and then *Salvation Army v. Dep't of Cmty. Affairs*, 919 F.2d 183, 192 (3d Cir. 1990)). A pre-enforcement action "should not be considered justiciable unless 'the court is convinced that [by its action] a useful purpose will be served.'" *Florio*, 40 F.3d at 1464 (alteration in original) (quoting *Step-Saver*, 912 F.2d at 649).

Here, the Regulation implements phased restrictions on use of the TikTok application: On September 27, any provision of service to distribute or maintain the TikTok mobile

application, constituent code, or application updates through an online mobile application store in the United States will be prohibited.  Accordingly, while Plaintiffs will still be able to access and use the TikTok application on this date, they will be unable to update the application, and new users will be unable to download the application.  Then, on November 12, TikTok will be effectively banned in the United States, with the Regulation barring any provision of internet hosting services enabling the functioning or optimization of the application.  On this later date, Plaintiffs will no longer have access to their TikTok accounts.

Though Plaintiffs request a TRO to prevent enforcement of both the September 27 and November 12 prohibitions, only their challenge to the September 27 prohibitions is presently ripe for review.[1]  Plaintiffs' challenge to the September 27 prohibitions is premised on the real and immediate threat that, as of 11:59 p.m. that day, they will no longer be able to update the TikTok application – both the source of their income and an outlet for their creative endeavors – and will lose out on income stemming from exposure to new TikTok users.  The threat posed by the November 12 TikTok ban, on the other hand, remains hypothetical.  Indeed, the Department of Commerce has noted that its reason for delaying a complete ban until November 12 is to reserve time for the national security concerns posed by TikTok to be resolved, in which case the ban may not even go into effect.  *See also Ryan v. Trump*, 2020 WL 5526649, at *1 (N.D. Cal. Sept. 15, 2020) (declining to issue a TRO enjoining Executive Order 13942 and noting that "ByteDance is widely reported to be in negotiations to alter its ownership structure in a manner

---

[1] On August 6, 2020, President Trump also issued Executive Order 13943, "Addressing the Threat Posed by WeChat, and Taking Additional Steps to Address the National Emergency with Respect to the Information and Communication Technology and Services Supply Chain," 85 Fed. Reg. 48,641 (Aug. 6, 2020), which directed the Department of Commerce to identify prohibited transactions in connection with WeChat, a mobile application owned by the Chinese company Tencent Holdings Ltd.  On September 18, 2020, the Department of Commerce issued a regulation setting out a list of prohibited transactions that, unlike the regulation targeting TikTok at issue here, would render WeChat effectively non-operational in the United States as of September 20, 2020.  On September 19, 2020, a federal district court enjoined the enforcement of Executive Order 13943 and its implementing regulation.  *See U.S. WeChat Users All. v. Trump*, 2020 WL 5592848 (N.D. Cal. Sept. 19, 2020).

that could result in non-enforcement of the Executive Order").

Most importantly, issuing a TRO as to the November 12 prohibitions would serve no useful purpose, as a TRO would be of limited duration – by operation of rule – and would not extend to this later date.  *See* Fed. R. Civ. P. 65(b)(2) (a TRO expires within 14 days of issuance).  Accordingly, the only remaining consideration is whether a TRO preventing the Government from enforcing the upcoming September 27 prohibitions is warranted.

### B.  A Temporary Restraining Order Is Not Warranted

A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  The standard for issuing a TRO is whether Plaintiffs have demonstrated (1) a likelihood of success on the merits; (2) that they will be irreparably harmed by the denial of injunctive relief; (3) that the balance of equities is in their favor; and (4) that the public interest favors injunctive relief.  *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015).  The first two factors – likelihood of success and irreparable harm – are the most critical, and a plaintiff's failure to meet either one is dispositive.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).  But "[i]f these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."  *Id.*  "[W]hen the Government is the opposing party," the assessment of harm to the opposing party, in the context of balancing the equities, and whether public interest favors injunctive relief merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

#### 1.  *First Amendment*

Plaintiffs challenge the Order and Regulation on First Amendment grounds, advancing three theories as to why they are unconstitutional.  First, Plaintiffs argue that the Order and

Regulation are facially overbroad, prohibiting a substantial amount of constitutionally protected speech.  Second, Plaintiffs claim the Order and Regulation constitute an unconstitutional prior restraint, first by stopping new users from downloading TikTok, and then by banning the TikTok application in the United States altogether.  Finally, Plaintiffs argue that the Order and Regulation will infringe on their right to receive information.

"[T]he overbreadth doctrine enables litigants 'to challenge a [restriction] not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the [restriction's] very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'"  *Hill v. Colorado*, 530 U.S. 703, 731-32 (2000) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)).  The plaintiff "bears the burden of demonstrating, 'from the text of [the restriction] and from actual fact,' that substantial overbreadth exists."  *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (quoting *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988)).  "Because of the wide-reaching effects of striking down a statute on its face . . . [the Supreme Court] ha[s] recognized that the overbreadth doctrine is strong medicine and ha[s] employed it with hesitation, and then only as a last resort."  *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 241 (3d Cir. 2010) (quoting *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999)).

Plaintiffs argue that the Government's attempt to "effectively shutter[] TikTok" will result in the prohibition of a substantial amount of constitutionally protected speech, such that the Order and Regulation are overbroad.[2]  But Plaintiffs' overbreadth argument focuses solely on

---

[2] The Government contends that the Order and Regulation are better analyzed under a different First Amendment framework, namely, as "time, place, and manner" restrictions.  *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  The theory is interesting.  Nevertheless, neither Plaintiffs' Complaint nor their opening brief challenge the restrictions on this ground, and Plaintiffs expressly stated at oral argument that for the purposes of the TRO they are not propounding a "time, place, and manner" theory (although they do presage their response to the Government's arguments in their reply brief).  Accordingly, the Court will not address this issue at this time.

the impact of the Regulation's "outright ban" of TikTok on November 12, and not the narrower

September 27 prohibitions.  This distinction is not addressed in Plaintiffs' briefing but is critical

in the overbreadth context, where it is the plaintiff's burden to demonstrate "that substantial

overbreadth exists."  *Hicks*, 539 U.S. at 122 (emphasis added).  Indeed, in challenging the

November 12 prohibitions, Plaintiffs rely on cases that considered restrictions constituting direct

and total prohibitions on expressive activity, distinguishable from the September 27 prohibitions

currently under review.  *See Bd. of Airport Comm'rs of City of L.A. v. Jews for Jesus, Inc.*, 482

U.S. 569, 571 (1987) (invalidating as overbroad a direct ban on all "First Amendment activities"

in an airport, finding that "no conceivable governmental interest would justify such an absolute

prohibition of speech"); *Packingham v. North Carolina*, 137 S. Ct. 1730, 1738 (2017)

(invalidating a state law imposing a "complete bar to the exercise of First Amendment rights on

websites" accessible to minors by registered sex offenders).[3]  Without more, Plaintiffs fail to

carry their burden of showing that they are likely to succeed on a First Amendment theory

applied only as a last resort – at least with respect to the September 27 prohibitions (which are

the only one's addressed here).

Turning now to Plaintiffs' prior restraint argument: A prior restraint occurs when the

government restricts or censors a communication prior to its publication, *Near v. Minnesota*, 283

U.S. 697, 701-02, 716 (1931), generally by either "preventing the printed publication of

disfavored information" or "set[ting] up an administrative apparatus with the power and

discretion to weed out disfavored expression before it occurs," *Citizens United v. Schneiderman*,

882 F.3d 374, 386-87 (2d Cir. 2018).  Such restraints are presumed to be constitutionally invalid.

---

[3] The Supreme Court in *Packingham* struck down the challenged government restriction under intermediate scrutiny, finding the law insufficiently tailored to serve the government's proffered interest in regulating the conduct of registered sex offenders, with no mention of the overbreadth doctrine.  137 S. Ct. at 1737.

*New York Times Co. v. United States*, 403 U.S. 713, 714 (1971).  But here, Plaintiffs (and other similarly-situated TikTok users who have already downloaded the application) will continue to be able to share their content and communicate on the application after the September 27 prohibitions go into effect and, further, the restrictions make no distinction between favored and disfavored content.  Plaintiffs therefore are unlikely to succeed on the merits of their prior restraint claim as to the September 27 prohibitions.

Finally, Plaintiffs broadly argue that the Order and Regulation infringe on their right to receive information, and further suggest that if a government restriction infringes on this right, the restriction "must survive the strictest scrutiny."  Not necessarily so.  While the U.S. Supreme Court has recognized a "'penumbral' right to receive information" under the First Amendment, "the right to receive information is not unfettered and may give way to significant countervailing interests."  *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1252, 1255 (3d Cir. 1992).  Accordingly, even were the Court to find that the September 27 prohibitions are likely to impair Plaintiffs' right to receive information from individuals unable to download TikTok, it would still need to determine whether this restriction is nevertheless constitutionally permissible.  *See id.* (finding that restrictions on use of a library facility infringed plaintiff's right to receive information but were nevertheless constitutional, citing the library's authority to achieve the safest use of its facilities).  Plaintiffs' cited case law does not help us here.  *See, e.g.*, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (holding "that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books"); *Stanley v. Georgia*, 394 U.S. 557, (1969) (holding that the First Amendment "prohibit[s] making mere private possession of obscene material a crime").  Plaintiffs' limited briefing on this issue simply does not provide the

Court a means of making this weighty determination in the context of a TRO.

Accordingly, Plaintiffs fail at this time to meet their burden of showing a likelihood of success on the merits of their First Amendment claims with respect to the September 27 prohibitions. Whether the November 12 prohibitions – effectively banning TikTok in the United States – are consistent with First Amendment, however, is an open question. *See U.S. WeChat Users All. v. Trump*, 2020 WL 5592848, at *10 (N.D. Cal. Sept. 19, 2020) (finding plaintiffs likely to succeed on the merits of their First Amendment challenge to the complete shutdown of the WeChat application, when their evidence demonstrated that "WeChat is effectively the only means of communication for many" in the Chinese-speaking and Chinese-American community, and "there are no viable substitute platforms or apps").[4]

### 2. IEEPA

In addition to their constitutional claims, Plaintiffs allege the Order and Regulation are *ultra vires*—that is, outside of the President's statutorily authorized power—for two reasons.

---

[4] Plaintiffs also allege that the Order and Regulation violate their rights under the Due Process Clause of the Fifth Amendment, prohibiting the Government from depriving individuals of their "life, liberty, or property, without due process of law" without first providing them notice and an opportunity to respond. *See* U.S. Const. amend. V. "It is elementary that procedural due process is implicated only where someone has claimed that there has been a taking or deprivation of a legally protected liberty or property interest." *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998). Here, Plaintiffs allege that the Order and Regulation deprive them of their (1) property interest in their TikTok accounts; (2) liberty interest in obtaining information from others on TikTok; and (3) liberty interest in working in their chosen field of occupation. In response, the Government contends that Plaintiffs fail to establish (1) that any deprivation caused by the Order and Regulation will be direct, rather than merely incidental, *see O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 789 (1980); (2) any interest cognizable under the Due Process Clause; (3) any deprivation of said interest; and (4) the necessity of any process additional to what the Government has already provided.

The Court need not reach these arguments, because even were it to assume that Plaintiffs have cognizable property and liberty interests in their TikTok accounts that will be directly affected by the Regulation, Plaintiffs fail to allege a deprivation as to the September 27 prohibitions. On September 27, Plaintiffs will be prevented from updating TikTok, not banned from the application altogether. Similarly, the September 27 prohibitions will neither deprive Plaintiffs of their ability to obtain information from others on TikTok nor prevent Plaintiffs from working in their chosen field of occupation. Plaintiffs implicitly acknowledge as much, premising their due process claim on the fact that the Order and Regulation will, on November 12, "effectively bar[]" and "clos[e] down" TikTok. But the September 27 prohibitions are the only restrictions currently under review, and Plaintiffs' due process claims therefore cannot succeed at this time.

First, they argue that the Order and Regulation regulate or prohibit "personal communication[s]" and the exchange of "informational materials" between U.S. and foreign persons, in violation of IEEPA.  *See* 50 U.S.C. § 1702(b)(1), (3).  Second, they argue that the declaration of national emergency contained in the May 15 Executive Order provides an insufficient legal basis for issuing the Order and Regulation, *see id.* § 1701(a), because the later Order addresses a "new threat" and therefore required promulgation of a "new [emergency] declaration," *id.* § 1701(b).

There is no need to address Plaintiffs' likelihood of success on the merits of either IEEPA claim because Plaintiffs fail to make a clear showing that the September 27 prohibitions will likely subject them to irreparable harm.[5]  *Winter*, 555 U.S. at 21 ("A plaintiff seeking a preliminary injunction must establish . . . that he is likely to suffer irreparable harm in the absence of preliminary relief.").

On September 27, 2020, Plaintiffs will be unable to update their existing TikTok applications.  Neither will their current or prospective followers who already have TikTok.  Additionally, anyone who has not downloaded the application by 11:59 p.m. on September 27 will be foreclosed from doing so within the geographic boundaries of the United States and its territories.  This is undoubtedly an inconvenience to Plaintiffs.  Nevertheless, Plaintiffs do not dispute that they will still be able to create, publish, and share content for their millions of current followers.  They also will apparently be able to expand their audience to include any of the current 700 million global active monthly users, as well as any new users that download the

---

[5] Plaintiffs allege they will suffer irreparable harm in the form of an infringement on their free speech rights. Indeed, the harm caused by even a brief deprivation of a person's First Amendment rights cannot be repaired and therefore will often be treated as irreparable.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013) (same).  However, as noted above, Plaintiffs fail to demonstrate a likelihood of success on the merits of their First Amendment challenge to the September 27 prohibitions.

application outside the United States.  Moreover, Plaintiffs can view content from and interact

with any users on the application.  In essence, the status quo for Plaintiffs after the September 27

prohibitions go into effect – but before the effective ban goes into effect on November 12 – will

remain more or less the same.  *See Foreman v. Dallas Cty.*, 193 F.3d 314, 323 (5th Cir. 1999)

("A temporary restraining order is a 'stay put,' equitable remedy that has as its essential purpose

the preservation of the status quo while the merits of the cause are explored through litigation.").

The current TikTok audience and usership within the United States will be frozen in place until

November 12.

On this record, the inability of Plaintiffs to grow their audience to include new U.S. users

who do not currently have TikTok but might download the application and view Plaintiffs'

content after September 27 is not the type of irreparable injury that warrants extraordinary relief.

Plaintiff Rinab alleges that "[i]f TikTok cannot allow new users, [she] would lose access to [her]

growing audience."  But such general allegations of possible injury lack the specificity needed to

clearly demonstrate a likelihood of irreparable harm.  *Winter*, 555 U.S. at 22 (issuing a TRO

"based only on a possibility of irreparable harm is inconsistent with [the] characterization of

injunctive relief as an extraordinary remedy that may be awarded only upon a clear showing that

the plaintiff is entitled to such relief"); *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 262

(3d Cir. 2020) ("The harm must be 'likely' to occur 'in the absence of an injunction.'" (quoting

*Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 217 n.11 (3d Cir. 2014))).

Plaintiffs offer no measuring stick to gauge the lost hypothetical increase in viewership of their

videos by new TikTok users.  Where Plaintiffs carry the burden of demonstrating an entitlement

to extraordinary relief, vague assertions that an unspecified number of new users to TikTok

might follow Plaintiffs or view their content if they could download the application is

18

insufficient to establish an irreparable harm.

Given the limited duration of a TRO, Plaintiffs also fail to demonstrate the requisite urgency of the need for injunctive relief based on an inability to update the existing version of the application.  Plaintiffs have not demonstrated that the inability to update the current version of TikTok will immediately and adversely affect their user experience or ability to create and post content.  *See ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) ("A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" (quoting *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir.1980))).  The record does not show how often TikTok pushes updates, or whether the failure to accept an update affects usage on the previous version of the application.  Absent such information, an alleged injury based on the inability to update TikTok is too remote and speculative to warrant relief at this juncture.  *See In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015) ("To establish irreparable harm, a . . . movant 'must demonstrate an injury that is neither remote nor speculative, but actual and imminent.'" (quoting *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir. 1989))).

Plaintiffs therefore fail to allege that they will suffer immediate, irreparable harm if users and prospective users cannot download or update – yet may continue to use – the TikTok application after September 27.  Plaintiffs' failure to demonstrate a risk of irreparable harm resulting from the implementation of the September 27 prohibitions eliminates the need to evaluate the likelihood of success on either of the IEEPA claims.

### 3.   *Remaining Factors*

Because Plaintiffs fail to meet their burden to show, with respect to the September 27 prohibitions, a likelihood of success on their constitutional claims and a likelihood of irreparable harm stemming from their IEEPA claims, there is no need to reach the remaining factors.

IV.     **CONCLUSION**

For the reasons stated above, Plaintiffs have failed to demonstrate that they are entitled to the extraordinary relief of a TRO.  Accordingly, their Motion for a Temporary Restraining Order shall be denied.

An appropriate order follows.

**September 26, 2020**                                     **BY THE COURT:**

                                                          **/s/Wendy Beetlestone, J.**

                                                          _____
                                                          **WENDY BEETLESTONE, J.**