## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

|  |  |  |
|---|---|---|
| DOUGLAS MARLAND, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:20-cv-4597-WB |
| | ) | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## NOTICE OF APPEAL

On October 30, 2020, the Court entered an order and memorandum opinion granting Plaintiffs' motion for a preliminary injunction. *See* ECF No. 35; ECF No. 36 ("Order and Opinion") (both attached hereto). Defendants hereby appeal the Court's Order and Opinion to the United States Court of Appeals for the Third Circuit.

Dated: November 12, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JOHN V. COGHLAN
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

DIANE KELLEHER
Assistant Branch Director

*/s/ Daniel Schwei*
DANIEL SCHWEI
Special Counsel

SERENA M. ORLOFF
MICHAEL DREZNER
AMY E. POWELL
STUART J. ROBINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box No. 883
Washington, DC 20044
Phone: (202) 305-8693
Fax: (202) 616-8470
E-mail: daniel.s.schwei@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DOUGLAS MARLAND, COSETTE RINAB, and ALEC CHAMBERS,** Plaintiffs, | **CIVIL ACTION** |
| **v.** | |
| **DONALD J. TRUMP, in his official capacity as President of the United States; WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce; and U.S. DEPARTMENT OF COMMERCE,** Defendants. | **NO.  20-4597** |

## OPINION

Plaintiffs Douglas Marland, Cosette Rinab, and Alec Chambers have filed a motion to preliminarily enjoin the implementation by the Secretary of the U.S. Department of Commerce of President Trump's Executive Order 13942, which concerns limitations on the video-sharing application (or "app") TikTok.  Plaintiffs contend that, absent an injunction, TikTok will be effectively banned within the United States beginning November 12, 2020.

I.     **BACKGROUND**

A.  **The International Emergency Economic Powers Act**

Executive Order 13942, by its terms, was issued pursuant to the President's authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*. Enacted in 1977, IEEPA is "the source of statutory authority for the Executive's exercise of emergency economic powers in response to peacetime crises." *United States v. Amirnazmi*, 645 F.3d 564, 572 (3d Cir. 2011).  IEEPA authorizes the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United

1

States."  50 U.S.C. § 1701(a).  Once the President declares a national emergency, IEEPA permits

him to:

> investigate, block during the pendency of an investigation, regulate, direct and
> compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding,
> use, transfer, withdrawal, transportation, importation or exportation of, or dealing
> in, or exercising any right, power, or privilege with respect to, or transactions
> involving, any property which any foreign country or a national thereof has any
> interest by any person, or with respect to any property, subject to the jurisdiction of
> the United States.

*Id.* § 1702(a)(1)(B).

While Congress, through IEEPA, conferred on the Executive substantial authority to

confront national emergencies, it also took care to identify certain substantive limitations on the

President's otherwise broad powers.  As originally enacted, IEEPA limited the President's

authority to regulate "any postal, telegraphic, telephonic, or other personal communication,

which does not involve a transfer of anything of value."  50 U.S.C. § 1702(b)(1).  In 1988,

Congress enacted the Berman Amendment, in response to "several seizures by the United States

of shipments of magazines and books" from countries subject to trade embargoes, as well as "to

the Treasury Department's restrictions on the permissible forms of payment for informational

materials purchased from Cuba."  *Amirnazmi*, 645 F.3d at 584 (quoting *Kalantari v. NITV, Inc.*,

352 F.3d 1202, 1205 (9th Cir. 2003)).  The Berman Amendment constrained the President's

ability to regulate certain types of information and informational materials when relying on

IEEPA to respond to a national emergency.  *See id.*  Further, the amendment "removed from the

Executive's purview the authority to regulate or prohibit such transactions 'directly or

indirectly.'"  *Id.*

The President's IEEPA authority was further limited in 1994, when Congress, through

the Free Trade in Ideas Act, expanded the Berman Amendment "to restrict the Executive from

regulating transactions concerning informational materials 'regardless of format or medium of transmission.'"  *Id.* at 585.  This "informational materials" exception to the President's IEEPA authority provides:

> The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly . . .
>
> (3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds.

*Id.* § 1702(b).

The House Conference Report clarified that under the informational materials exception, "no embargo may prohibit or restrict directly or indirectly the import or export of information that is protected under the First Amendment to the U.S. Constitution."  H.R. Conf. Rep. No. 103-482, at 239 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 483.  To that end, the Report notes that the exception was "explicitly intended, by including the words 'directly or indirectly,' to have a broad scope," and to "facilitate transactions and activities incident to the flow of information and informational materials without regard to the type of information, its format, or means of transmission."  *Id.*

### B.  Executive Order 13873

On May 15, 2019, prior to issuing the executive order challenged by Plaintiffs here, President Trump issued Executive Order 13873 (the "ICTS Executive Order"), which declared a national emergency under IEEPA and the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*, with respect to the threat posed by foreign adversaries to the United States' information and communications technology and services.  *See* Securing the Information and Communications Technology and Services Supply Chain, 84 Fed. Reg. 22,689 (May 15, 2019).  Specifically, the

3

President found that "foreign adversaries are increasingly creating and exploiting vulnerabilities in information and communications technology and services, which store and communicate vast amounts of sensitive information, facilitate the digital economy, and support critical infrastructure and vital emergency services, in order to commit malicious cyber-enabled actions." *Id.* The ICTS Executive Order does not, however, name the particular foreign adversaries or technologies posing a threat to national security.

In May 2020, the President renewed the ICTS Executive Order for one year, and again did not specify a particular foreign adversary or technology of concern. *See* Continuation of the National Emergency with Respect to Securing the Information and Communications Technology and Services Supply Chain, 85 Fed. Reg. 28,321 (May 13, 2020).

### C.  Executive Order 13942

Citing the ICTS Executive Order and pursuant to his authority under IEEPA, President Trump issued Executive Order 13942 (the "TikTok Executive Order") on August 6, 2020. *See* Addressing the Threat Posed by TikTok, and Taking Additional Steps to Address the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain, 85 Fed. Reg. 48,637 (Aug. 6, 2020). The TikTok Executive Order is more specific than either the May 2019 or the May 2020 ICTS Executive Orders: It identifies the country of concern – China; the company of concern – ByteDance Ltd.; and the technology of concern – the TikTok mobile application.

Specifically, it names TikTok – a global video-sharing application, or "app," owned by Chinese company ByteDance and used by over 100 million Americans – as a threat to the "national security, foreign policy, and economy of the United States." *Id.* Because of TikTok's foreign ownership and the company's ability to "automatically capture[] vast swaths of

information from its users," President Trump identified a risk that the People's Republic of

China (the "PRC") and the Chinese Communist Party (the "CCP") could use TikTok to "access .

. . Americans' personal information for blackmail, and conduct corporate espionage."  Further,

the President identified a risk of the CCP using TikTok "for disinformation campaigns that

benefit the [CCP], such as when TikTok videos spread debunked conspiracy theories about the

origins of the 2019 Novel Coronavirus."  The President determined that "additional steps must

be taken" to deal with these risks to the national security.

  The TikTok Executive Order directed the Secretary of Commerce to identify a list of

transactions related to ByteDance and its subsidiaries – including TikTok – by persons subject to

the jurisdiction of the United States.  Separately, ByteDance was ordered to divest itself of

TikTok's U.S. operations, including any interest in U.S. user data.  *See* Regarding the

Acquisition of Musical.ly by ByteDance Ltd., 85 Fed. Reg. 51,297 (Aug. 14, 2020).

  **D.  The Commerce Identification**

  Pursuant to the President's directive, the Commerce Department issued a memorandum

on September 17, 2020 recommending to the Secretary of Commerce, Defendant Wilbur L.

Ross, that certain categories of TikTok-related transactions be prohibited.  The memorandum

discusses the threats to national security posed by ByteDance and TikTok, noting that the

Chinese government is "building massive databases of Americans' personal information" to help

"further its intelligence-gathering and to understand more about who to target for espionage,

whether electronically or via human recruitment."

  On September 18, 2020, the Secretary of Commerce published a list of six prohibited

transactions that was shortly revised and re-published.[1]  *See* Identification of Prohibited

---

[1] The revision postponed the date of implementation of one prohibition by one week but made no other substantive changes.

Transactions to Implement Executive Order 13942 and Address the Threat Posed by TikTok and the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain, 85 Fed. Reg. 60,061 (Sept. 24, 2020) (the "Commerce Identification"). As relevant here, the Commerce Identification prohibits the following:

> (1) Any provision of services, occurring on or after 11:59 p.m. eastern standard time on September 27, 2020, to distribute or maintain the TikTok mobile application, constituent code, or application updates through an online mobile application store[;]
>
> (2) Any provision of internet hosting services, occurring on or after 11:59 p.m. eastern standard time on November 12, 2020, enabling the functioning or optimization of the TikTok mobile application[;]
>
> (3) Any provision of content delivery network services, occurring on or after 11:59 p.m. eastern standard time on November 12, 2020, enabling the functioning or optimization of the TikTok mobile application[;]
>
> (4) Any provision of directly contracted or arranged internet transit or peering services, occurring on or after 11:59 p.m. eastern standard time on November 12, 2020, enabling the functioning or optimization of the TikTok mobile application[; and]
>
> (5) Any utilization, occurring on or after 11:59 p.m. eastern standard time on November 12, 2020, of the TikTok mobile application's constituent code, functions, or services in the functioning of software or services developed and/or accessible within the land and maritime borders of the United States and its territories.

*Id.*

The Commerce Identification states that its prohibitions "only apply to the parties to business-to-business transactions," and not to the exchange "of personal or business information" among users of the TikTok app. *Id.* The Commerce Department's September 17 memorandum notes, however, that the effect of the November 12 prohibitions will be to "significantly reduce the functionality and usability of the app in the United States," and that "these prohibitions may ultimately make the application less effective and may be challenging for U.S.-based TikTok

users."

### E.  Plaintiffs' Suit

In contrast to the picture presented by the Government, Plaintiffs offer an entirely different perspective on the TikTok app.  TikTok allows users, including Plaintiffs, to create, share, and view short-form videos – ranging from 15 to 60 seconds in length – on any subject, including politics, comedy, music, and social issues.  Plaintiffs consume a variety of content on the app, such as self-help videos, finance videos, psychology videos, and political videos.  Plaintiff Rinab, for instance, has experienced greater success in her college finance classes by watching TikTok videos explaining market manipulation schemes, and has used the app to learn about a presidential candidate's views on climate change and gun control.

Plaintiffs also rely on TikTok to earn a living.  The app has over 700 million users globally, and over 100 million users in the United States alone.  Fifty million of these U.S. users use the app on a daily basis.  This large audience gives content creators like Plaintiffs the opportunity to profit from the videos they post on TikTok.  Plaintiff Rinab, for example, creates videos for fashion brands and other companies, and earns between $5,000 and $10,000 per video.  Further, the exposure Plaintiffs have obtained through TikTok has resulted in promotional and branding opportunities.  For instance, Plaintiff Chambers earned $12,000 for promoting the Extra gum brand in a TikTok video.  Plaintiff Marland currently has 2.7 million followers on the app, Plaintiff Chambers has 1.8 million followers, and Plaintiff Rinab has 2.3 million followers.  Without access to the TikTok app, Plaintiffs will lose access to all of these followers, as well as to the professional opportunities afforded by TikTok.

Plaintiffs filed suit on September 18, 2020, seeking, *inter alia*, to enjoin the Secretary of Commerce's enforcement of the TikTok Executive Order through the Commerce Identification.

On September 26, the Court denied Plaintiffs' Motion for a Temporary Restraining Order with respect to the Commerce Identification's September 27 prohibition, finding that Plaintiffs did not demonstrate a likelihood of success on the merits of their constitutional claims and did not meet their burden of showing irreparable harm as to their statutory claims. *See Marland v. Trump*, 2020 WL 5749928, at *9-10 (E.D. Pa. Sept. 26, 2020). Before the Commerce Identification could take effect, however, a federal district court in the District of Columbia preliminarily enjoined the September 27 prohibition, finding that the plaintiff in that case – TikTok Inc. – established a likelihood of success on its claim that the TikTok Executive Order and Commerce Identification violate IEEPA, as well as a likelihood of irreparable harm if the September 27 prohibition took effect. *See TikTok Inc. v. Trump*, 2020 WL 5763634 (D.D.C. Sept. 27, 2020). The Government's appeal from this decision is currently pending before the U.S. Court of Appeals for the District of Columbia Circuit. *See TikTok Inc. v. Trump*, No. 20-5302 (D.C. Cir. Oct. 8, 2020).

Plaintiffs filed an Amended Complaint in this case on October 1, 2020, and filed a Motion for Preliminary Injunctive Relief on October 13, 2020. A hearing on Plaintiffs' Motion was held on October 28, 2020.

## II.     LEGAL STANDARD

A preliminary injunction is an extraordinary remedy; it "should be granted only in limited circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-27 (3d Cir. 1994). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The "failure to establish

any element . . . renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999).  The movant bears the burden of showing that these four factors weigh in favor of granting the injunction.  *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990).

"[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 177-78 (3d Cir. 2017) (quoting *Winter*, 555 U.S. at 24).  A "movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors [– likelihood of success and irreparable harm.]  If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.  Considerations of balancing of harms and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.    DISCUSSION

### A.  Likelihood of Success on the Merits

In demonstrating the likelihood of success on the merits, a plaintiff need not show that it is more likely than not that he will succeed.  *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc).  Instead, a plaintiff must "show[] a reasonable probability of success on the merits." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012).  This requires a showing "significantly better than negligible, but not necessarily more likely than not." *Reilly*, 858 F.3d at 179.

Initially, although Plaintiffs challenge the validity of both the TikTok Executive Order and the Commerce Identification, only the Commerce Identification – which identifies the prohibited transactions related to TikTok and specifies when these prohibitions will go into

effect – has operative effect, and is capable of being enjoined.[2]  Accordingly, only the validity of the Commerce Identification, and its November 12 prohibitions, is presently at issue.  Plaintiffs challenge the Commerce Identification on both statutory and constitutional grounds.  First, they contend that the Commerce Identification violates both the First and Fifth Amendments to the U.S. Constitution.  They then contend that the Commerce Identification violates the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, as it is both arbitrary and capricious, *see id.* § 706(2)(A), and *ultra vires*, *see id.* § 706(2)(C).  Plaintiffs' *ultra vires* claim consists of three separate arguments: (1) the Commerce Identification contravenes IEEPA's "informational materials" exception, 50 U.S.C. § 1702(b)(3); (2) the Commerce Identification contravenes IEEPA's prohibition on the regulation of "personal communication[s] . . . not involv[ing] a transfer of anything of value," *id.* § 1702(b)(1), and (3) the Commerce Identification is not responsive to the national emergency declared in the ICTS Executive Order, and therefore requires the declaration of a new national emergency to take effect, *see id.* § 1701(b).

The Court declines to reach the majority of these arguments, as Plaintiffs establish a likelihood of success on the merits of their claim that the issuance of the Commerce Identification is *ultra vires*.

### i.  *APA Cause of Action*

Pursuant to the APA, a reviewing court must "hold unlawful and set aside agency action" when that action is *ultra vires*, or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *Id.* § 706(2)(C).  The parties agree – as they must – that

---

[2] Because only the Commerce Identification has operative effect, the Court does not consider whether the TikTok Executive Order is capable of being enjoined.  The Court does, however, reject Plaintiffs' invitation to enjoin, in the context of this matter and at this point in time, any future actions the Secretary of Commerce may take to implement the TikTok Executive Order, as any ruling as to these hypothetical future acts would at present be impermissibly advisory.  *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013) ("Federal courts may not . . . give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'" (alteration in original) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990))).

the TikTok Executive Order, as a presidential action, is not subject to the requirements of the APA. *Dalton v. Specter*, 511 U.S. 462, 469 (1994) ("[T]he President's actions [are] not reviewable under the APA, because the President is not an 'agency' within the meaning of the APA.").[3] They dispute, however, whether the Commerce Identification is reviewable under the APA.

The APA provides for judicial review of agency action, *see* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review therof."), and establishes a strong presumption in favor of reviewability of agency action, *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). Still, not all agency actions will come within the statute's ambit. For instance, for the APA's judicial review provisions to apply, an agency action must be "final." 5 U.S.C. § 704 ("[F]inal agency action for which there is no other adequate remedy in a court [is] subject to judicial review."). Here, while the Government does not contest that the Commerce Identification constitutes a "final" agency action, it argues that the Identification is nevertheless unreviewable for two reasons. Neither is persuasive.

First, the Government argues that judicial review of the Commerce Identification is precluded under IEEPA and the National Emergencies Act (the "NEA"). Under § 701(a)(1) of the APA, courts may not review agency action when such review is precluded by a relevant statute, such as the statute authorizing the agency action. *See Block v. Cmty. Nutrition Inst.*, 467

---

[3] To the extent the Government suggests that the bar on APA review of presidential action extends to agency actions taken under a delegation of presidential authority, this argument is rejected. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question."); *Hawaii v. Trump*, 878 F.3d 662, 680-81 (9th Cir. 2017), *rev'd on other grounds*, *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) (finding final agency action reviewable under the APA, despite the fact that this agency action was implementing an executive proclamation).

U.S. 340, 345 (1984).  IEEPA does not contain a provision expressly precluding judicial review, and courts have in fact reviewed agency actions taken pursuant to IEEPA under the APA.  *See, e.g.*, *Holy Land Found. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003).  Despite, however, the absence of an express statutory provision barring judicial review, the "presumption favoring judicial review of administrative action . . . may be overcome by inferences of intent drawn from the statutory scheme as a whole."  *Sackett v. EPA*, 566 U.S. 120, 128 (2012) (quoting *Block*, 467 U.S. at 349).  The Government argues that a congressional intent to preclude judicial review of agency actions taken pursuant to IEEPA may be inferred from various provisions of the NEA, which outline the President's authority to declare a national emergency.  *See* 50 U.S.C. § 1621 (authorizing President to declare a national emergency); *id.* § 1622 (detailing termination of a national emergency); *id.* § 1641 (detailing the accountability and reporting requirements of the President after a national emergency declaration).  But while these provisions may suggest that the "essentially political questions surrounding the declaration or continuance of a national emergency" are nonreviewable, courts are nevertheless "free to review whether the actions taken pursuant to a national emergency comport with the power delegated by Congress."  *United States v. Spawr Optical Res., Inc.*, 685 F.2d 1076, 1080, 1081 (9th Cir. 1982).  In short, the Government points to nothing in the language or structure of IEEPA which suggests that the Court is precluded from reviewing whether the Commerce Identification complies with IEEPA's informational materials exception.

Second, the Government argues that the Commerce Department's exercise of authority under IEEPA is nonreviewable under § 701(a)(2) of the APA, which bars judicial review of agency actions "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  This narrow exception to judicial review applies only in "those rare circumstances where the relevant statute

is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhauser*, 139 S. Ct. at 370 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) ("[W]e have generally limited the [§ 701(a)(2)] exception to 'certain categories of administrative decisions that courts traditionally have regarded as "committed to agency discretion,"' such as a decision not to institute enforcement proceedings, or a decision by an intelligence agency to terminate an employee in the interest of national security." (quoting *Lincoln*, 508 U.S. at 191)).  This is not one of those rare circumstances.  While IEEPA confers broad authority to respond to national emergencies, this authority is not unbounded; rather, actions taken pursuant to IEEPA may not, among other things, "regulate or prohibit, directly or indirectly" the importation or exportation of "informational materials."  50 U.S.C. § 1702(b)(3); *see New York*, 139 S. Ct. at 2568 (finding that because "the Census Act constrains the Secretary's authority to determine the form and content of the census in a number of ways," the Act provided a meaningful standard by which to judge the Secretary of Commerce's decision to reinstate a citizenship question on the census questionnaire).  "Because this is not a case in which there is 'no law to apply,' the [Commerce Identification] is subject to judicial review."  *See New York*, 139 S. Ct. at 2569 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)).

Accordingly, Plaintiffs' *ultra vires* claim is reviewable under the APA, and the Court may therefore address the merits of Plaintiffs' argument that the Commerce Identification contravenes the plain language of IEEPA's informational materials exception.[4]

---

[4] Even if the Commerce Identification were not reviewable under the APA, the Court still would find that Plaintiffs have stated a nonstatutory cause of action for their *ultra vires* claim.  *See Hawaii*, 878 F.3d at 683 (observing that where APA review is unavailable, courts will still "permit[] judicial review of presidential orders implemented through the actions of other federal officials.  This cause of action, which exists outside of the APA, allows courts to review *ultra vires* actions by the President that go beyond the scope of the President's statutory authority."); *see also Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin officers who attempt to enforce the President's

### ii.   The Informational Materials Exception

Specifically, Plaintiffs assert that the Commerce Identification is in excess of the statutory authority conferred by IEEPA, because it violates IEEPA's express prohibition on the direct or indirect regulation of informational materials.  *See* 50 U.S.C. § 1702(b)(3).

"The starting point of all statutory construction is the text of the statute."  *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 611 (3d Cir. 2015).  Here, IEEPA's informational materials exception bars the President from "regulat[ing] or prohibit[ing], directly or indirectly" the importation or exportation of "information or informational materials," "whether commercial or otherwise" and "regardless of format or medium of transmission."  50 U.S.C. § 1702(b)(3). The statute contains a nonexclusive, exemplary list of items which qualify as "informational materials," into which the content exchanged by TikTok users clearly falls.  The short videos created and exchanged on TikTok are expressive and informative, and are analogous to the "films," "artworks," "photographs," and "news wire feeds" expressly protected under § 1702(b)(3).

The Commerce Identification also represents, at minimum, an indirect regulation of these informational materials.  The verb "regulate" means "to control" or "to govern."  The adverb "indirectly" means, of course, "not directly," or "mediately."  The TikTok app is a platform for creating and exchanging informational materials.  Though the Commerce Identification nominally governs only "business-to-business transactions" involving TikTok, the effect of the

---

directive.").  "In the administrative law context, ultra vires claims come in both a statutory and a non-statutory variety."  *Adamski v. McHugh*, 304 F. Supp.3d 227, 236 (D.D.C. 2015).  If "a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action."  *Reich*, 74 F.3d at 1327.  Under nonstatutory review, an agency action may be enjoined as *ultra vires* where, as here, that action "contravene[s] direct statutory prohibitions."  *Id.* at 1332.  Accordingly, nonstatutory review "provide[s the Court] with an additional avenue by which to review [Plaintiffs'] claims."  *See Hawaii*, 878 F.3d at 683.

14

Identification will be to undermine the app's functionality such that U.S. users will be prevented from exchanging data on the app.[5]  Accordingly, after November 12, TikTok will no longer properly function for U.S. users as a forum for exchanging informational materials.  Plaintiffs will no longer be able to export their comedy, music, and fashion videos, and will no longer be able to view videos from TikTok's substantial global user base which, as of this writing, consists of at least 600 million users.  In sum, Plaintiffs establish a likelihood of success on their claim that the Commerce Identification, by indirectly controlling the importation and exportation of informational materials, violates IEEPA.  *See TikTok Inc.*, 2020 WL 5763634, at *6 (finding the same).

Rather than accept this plain reading of the statute, the Government instead contends that the informational materials exception is violated only where the object of the challenged governmental action is the regulation of informational materials.  It argues that the exception's protection does not extend to mere "incidental" burdens on expressive activity stemming from a regulation that does not, on its face, seek to regulate such activity.  According to the Government, because the "intended object of the [Commerce Identification's] prohibitions is TikTok Inc.'s commercial transactions," any "incidental" effect these prohibitions may have on TikTok users' exchange of content cannot violate IEEPA.

Putting aside the question of what the "intended object" of the Commerce Identification may or may not be, the Government's interpretation of the informational materials exception is clearly incorrect.  Indeed, Congress itself rejected this very interpretation over 30 years ago,

---

[5] The parties dispute, as a factual matter, whether the effect of the November 12 prohibitions will constitute a "ban" on TikTok.  The Government now argues that the actual effect of these prohibitions is unknown, and may initially only result in a "slowing down," rather than a "shutting down," of the app for U.S. users.  But the Government has asserted in the hearing on the Plaintiffs' Motion for a Temporary Restraining Order that the November 12 prohibitions will "actually prevent users from using the app."  Further, the November 12 prohibitions themselves, by disallowing, among other things, the provision of internet hosting services, content delivery services, and internet transit or peering services enabling the TikTok app, will functionally make the app unavailable for U.S. users.

when it enacted the Berman Amendment.  As the Third Circuit has explained, "[p]rior to 1988,

trade sanctions that hampered the exchange of informational materials were routinely justified

under . . . IEEPA as incidental to the broader commercial purpose of these trade measures."

*Amirnazmi*, 645 F.3d at 583 (citing *Teague v. Reg'l Comm'r of Customs*, 404 F.2d 441, 445 (2d

Cir. 1968)).   Accordingly, before the Berman Amendment, First Amendment challenges to

governmental actions taken pursuant to IEEPA would be sustained only where the governmental

action "*directly* regulate[d] speech or expression arguably protected by the First Amendment."

*See id.* (quoting *Veterans & Reservists for Peace in Vietnam v. Reg'l Comm'r of Customs*, 459

F.2d 676, 681 (3d Cir. 1972))).   Any incidental effects the governmental action had on

expressive activity were left unprotected.

    With the Berman Amendment, however, Congress modified IEEPA to expressly "exempt

the regulation of informational materials from the Executive's congeries of powers."  *Id.*

Further, the Berman Amendment "specifically removed from the Executive's purview the

authority to regulate or prohibit [the exchange of informational materials] 'directly or

indirectly,'" *id.*, which in turn allowed the provision to extend even to regulations that do not on

their face regulate the exchange of informational materials, but nevertheless have such an effect.

The Government's suggested reading ignores Congress's deliberate insertion of the word

"indirectly" into IEEPA.  *See United States v. Menasche*, 348 U.S. 528, 538 (1955).  In short,

contrary to the Government's position, the "intended object" of the Commerce Identification is

not the analytical focus.  Because the Identification works to, at minimum, indirectly regulate the

exchange of informational materials, it violates IEEPA.

    The crux of the Government's remaining arguments is that too broad an interpretation of

"indirectly" will lead to a result Congress could not have intended, namely, a substantial

constriction of the President's authority to respond to national emergencies under IEEPA.  In

support, the Government cites to *Walsh v. Brady*, 927 F.2d 1229 (D.C. Cir. 1991), in which the

Court of Appeals for the District of Columbia Circuit refused to extend the scope of "indirectly"

to prohibitions restricting travel to Cuba.  Of course, this decision is not binding in this Circuit.

Still, it is distinguishable from the present case.  In *Walsh*, the plaintiff unsuccessfully argued

that regulations effectively barring travel to Cuba constituted an indirect regulation of

informational materials and were therefore *ultra vires*, given that the regulations prohibited

plaintiff from traveling to Cuba to arrange for the import of political posters.  *Id.* at 1230-31.  As

the District Court for the District of Columbia observed in *TikTok Inc.*, the *Walsh* court:

> afford[ed] deference to an agency assessment that "[s]uch travel was considered
> too *tangential* to the actual physical importation and exportation of informational
> materials to fall within the language of [§ 1702(b)(3)]."  Here, by contrast, the
> relationship between the Secretary's prohibitions and the informational materials
> U.S. users post on TikTok is neither "tangential" nor generic.  TikTok exists to
> facilitate communication and the Secretary's prohibitions aim to stop it.

2020 WL 5763634, at *6 n.1 (quoting *Walsh*, 927 F.3d at 1231, 1233).[6]

It is the case that the line demarcating an "indirect regulation" from a merely "tangential"

effect may not always be clear.  This case, however, does not present a line-drawing problem.

Although the Commerce Identification nominally carves out an exception for "the exchange

---

[6] The Government's cite to *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986) is similarly misplaced.  It suggests
that this case stands for the proposition that content-neutral regulations – like, so the Government contends, the
Commerce Identification – do not implicate First Amendment concerns, and therefore cannot offend IEEPA's
informational materials exception.  But *Arcara* stands only for the well-established proposition that generally
applicable laws do not violate the First Amendment.  *Id.* at 705-06 (finding government shutdown of an adult
bookstore pursuant to generally applicable law barring solicitation of prostitution did not offend First Amendment).
The Commerce Identification, however, is clearly not a "generally applicable" regulation.  Rather, its prohibitions
expressly apply only to certain specified transactions involving the TikTok mobile app.  Further, while the Court
does not reach the constitutional issues presented by this case, even if the Commerce Identification were a content-
neutral regulation, this would not render it immune from First Amendment scrutiny.  *See, e.g.*, *City of Ladue v.
Gilleo*, 512 U.S. 43, 55 (1994) ("Although prohibitions foreclosing entire media may be completely free of content
or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent – by eliminating a
common means of speaking, such measures can suppress too much speech.").

between or among TikTok mobile application users of personal or business information using the

TikTok application," in reality the Identification will have the effect of stopping over 100 million

existing U.S. users from continuing to use the TikTok app as of November 12.  This in turn will

have the effect of preventing these users from exchanging informational materials created and

posted on the app with each other and with over 600 million international TikTok users.  The

effect the Commerce Identification will have on the exchange of informational materials is in no

way tangential.[7]  *See id.*

In its final stand, the Government cites to *Amirnazmi*, in which the Third Circuit gave

deference to the Treasury Department's Office of Foreign Asset Control's ("OFAC")

interpretation of the informational materials exception to exclude "transactions related to

information or informational materials not fully created and in existence at the date of the

transactions."  *See* 31 C.F.R. § 560.210(c)(2).  According to the Government, because the "vast

majority of videos created on TikTok do not previously exist" prior to users' engagement with

the app, these too may be permissibly regulated under IEEPA.  In disputing whether the content

created by TikTok users does in fact fall into § 560.210(c)(2) – a provision drafted by a different

---

[7] The Government offers a few more arguments in support of its position.  It suggests that a finding that the Commerce Identification indirectly regulates informational materials in violation of IEEPA would "render toothless a hallmark of IEEPA authority, asset freezing."  Not so.  While IEEPA does grant the President authority to freeze assets, this authority is limited by the exceptions articulated in § 1702(b), including the informational materials exception.  *See* 50 U.S.C. § 1702(b)(1)-(4).  Asset freezing is only rendered toothless to the extent specified by Congress, that is, to the extent it directly or indirectly regulates or prohibits the importation or exportation of informational materials.  *See id.* § 1702(b)(3).  Like the regulation at issue in *Walsh*, an asset freezing order could conceivably burden the exchange of informational materials so tangentially as to not fall within the purview of § 1702(b)(3), but these are not the facts presently before this Court.

The Government also maintains that "Congress must have intended for IEEPA to permit the President to regulate internet companies and data platforms like TikTok," because Congress, under 50 U.S.C. § 1708, has permitted use of IEEPA to "block and prohibit all transactions in all property and interests" of persons and entities who knowingly "engage[] in . . . economic or industrial espionage in cyberspace, of technologies or proprietary information developed by United States persons."  *Id.* § 1708(b)(1), (b)(2).  But even were this provision relevant to the present matter, the Government again ignores the fact that any actions taken pursuant to § 1708 must still comply with the informational materials exception.

federal agency in the context of a distinct regulatory regime – the parties beckon the Court into a technical and metaphysical debate over whether TikTok content "exists" prior to a user's engagement with the app.  Both sides miss the mark.

To see why, a closer look at the *Amirnazmi* decision is necessary.  In *Amirnazmi*, the Third Circuit reviewed the validity of a specific provision contained in the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. pt. 560, promulgated by OFAC.  The ITSR generally prohibit individuals in the United States from exporting goods and services intended for Iran or its government, or importing such goods and services from Iran, without first obtaining a license from OFAC.  *See id.* § 560.201, 560.204.  These regulations implement an executive order issued by President Clinton, pursuant to his authority under IEEPA.  *See Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 916 (D.C. Cir. 2017).  Consistent with IEEPA's informational materials exception, the ITSR expressly provide that "[t]he prohibitions contained in this part do not apply to the importation from any country and the exportation to any country of information or informational materials . . . whether commercial or otherwise, regardless of format or medium of transmission."  31 C.F.R. § 560.210(c)(1).

The ITSR also contain, however, a provision not in IEEPA:  The regulations "do[] not exempt from regulation or authorize transactions related to information or informational materials not fully created and in existence at the date of the transactions."  *Id.* § 560.210(c)(2).  The provision provides further detail on its scope:

> Transactions that are prohibited . . . include, but are not limited to, payment of advances for information and informational materials not yet created and completed (with the exception of prepaid subscriptions for widely circulated magazines and other periodical publications), and provision of services to market, produce or co-produce, create or assist in the creation of information and informational materials.

*Id.*  At issue in *Amirnazmi* was whether OFAC's interpretation of IEEPA's informational materials exception to exclude these "not yet created" materials was consistent with Congress's intent in enacting the Berman Amendment.  As the Third Circuit observed, "Congress's paramount concern" in enacting and expanding the Berman Amendment was to "facilitat[e] transactions and activities incident to the flow of informational materials," in order "to ensure the robust exchange of informational materials."  *Amirnazmi*, 645 F.3d at 586, 587.  The Third Circuit interpreted the "not fully created and in existence" language in § 560.210(c)(1) as drawing a distinction "between informational materials that are widely circulated in a standardized format and those that are bespoke."  *Id.* at 586.  In other words,

> Whereas OFAC may not regulate the sale or transfer of prefabricated or mass-produced informational materials, custom-made materials crafted to suit the unique specifications of a particular purchaser are not sacrosanct.  This distinction is sensible, and it reflects a permissible implementation of the statutory exemption in light of IEEPA's competing imperatives (i.e. restricting material support for hostile regimes while encouraging the robust interchange of information).

*Id.* at 587.

Though the parties here focus on whether TikTok videos are, or can be, "fully created and in existence" prior to a user's engagement with the app, the *Amirnazmi* court was instead focused on congressional intent, that is, *why* Congress chose to protect the exchange of informational materials from the President's otherwise broad IEEPA authority in the first place.  While the exchange of "custom-made materials crafted to suit the unique specifications of a particular purchaser" may be permissibly regulated, given the limited effect such transactions have on the "robust exchange of informational materials," "mass-produced informational materials" distributed to a wide audience may not be regulated pursuant to the informational materials exception.  *See id.*  In this case, regardless of whether TikTok users' content "exists" prior to engagement with the app, the Commerce Identification's November 12 prohibitions will

have the effect of shutting down, within the United States, a platform for expressive activity used by approximately 700 million individuals globally.  Over 100 million of these TikTok users are within the United States, and at least 50 million of these U.S. users use the app on a daily basis. The Commerce Identification presents a threat to the "robust exchange of informational materials," and therefore comes within the scope of the informational materials exception.

The Government urges that a ruling finding the Commerce Identification violative of IEEPA will create an "IEEPA-free zone," unduly restricting the President's ability to respond to national security threats.  But Congress itself, in enacting the Berman Amendment, created an "IEEPA-free zone," excluding, as relevant here, the indirect regulation of informational materials from the President's otherwise broad emergency powers.  Because the Commerce Identification constitutes, at minimum, an indirect regulation on the importation and exportation of these materials, Plaintiffs have shown that they are likely to succeed in their argument that the Commerce Identification is *ultra vires* under IEEPA's informational materials exception.

### B.  Irreparable Harm

In addition to a likelihood of success on the merits, Plaintiffs have demonstrated a clear likelihood of irreparable harm from the Commerce Identification's November 12 prohibitions going into effect.  *Winter*, 555 U.S. at 21 ("A plaintiff seeking a preliminary injunction must establish . . . that he is likely to suffer irreparable harm in the absence of preliminary relief."). Plaintiffs have established themselves as significant influencers based on their ability to engage large audiences on the TikTok platform.  If the Commerce Identification goes into effect, Plaintiffs will lose the ability to engage with their millions of followers on TikTok, and the related brand sponsorships.  According to Plaintiffs, each has tried and failed to establish a following and work as an influencer on competitive platforms.  Shuttering TikTok would in fact shut down Plaintiffs' influencing activities.  This harm is not merely possible, but certain to

occur after November 12.  *Id.* at 22 (issuing preliminary relief "based only on a possibility of

irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary

remedy that may be awarded only upon a clear showing that the plaintiff is entitled to such

relief"); *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 262 (3d Cir. 2020) ("The harm

must be 'likely' to occur 'in the absence of an injunction.'" (quoting *Ferring Pharms., Inc. v.*

*Watson Pharms., Inc.*, 765 F.3d 205, 217 n.11 (3d Cir. 2014))).

Financial harm is generally not irreparable where it can be remedied with damages.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974).  But that is not this case.  Here, Plaintiffs have

brought suit under the APA, and the APA does not provide for monetary relief.  5 U.S.C. § 702

(waiving sovereign immunity only for equitable relief); *see California v. Azar*, 911 F.3d 558, 581

(9th Cir. 2018) (stating that economic harm caused by federal agency action "is irreparable . . .

because the [plaintiffs] will not be able to recover monetary damages"); *Odebrecht Const., Inc. v.*

*Sec'y, Fla. Dep't of Transp*., 715 F.3d 1268, 1289 (11th Cir. 2013) (collecting cases

demonstrating that "[i]n the context of preliminary injunctions, numerous courts have held that

the inability to recover monetary damages because of sovereign immunity renders the harm

suffered irreparable"); *Altice USA, Inc. v. N.J. Bd. of Pub. Utils.*, 2020 WL 359398, at *9 (D.N.J.

Jan. 22, 2020), *reconsideration denied,* 2020 WL 1151045 (D.N.J. Mar. 10, 2020) ("Because

[sovereign immunity] prohibits Altice from recouping its compliance expenses . . . Altice's

financial consequences are unredressable, and the harm Altice faces is irreparable.").  Indeed, the

parties agreed at oral argument that none of Plaintiffs' claims against the Government, statutory

or otherwise, would support an award of monetary damages.  "The irreparable harm requirement

is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot

adequately be compensated after the fact by monetary damages."  *Adams v. Freedom Forge*

*Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000) (citations omitted).  Plaintiffs' significant and

unrecoverable economic loss caused by the shutdown of the TikTok platform is an irreparable

harm for the purposes of preliminary injunctive relief.[8]

### C.  Balance of the Equities and Public Interest

Finally, the balance of the equities and the public interest both favor an injunction.  "The

comparison of harm to the Government as opposed to the harm to Petitioners turns most on

matters of public interest because these considerations 'merge when the Government is the

opposing party.'"  *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 332 (3d Cir. 2020) (quoting

*Nken*, 556 U.S. at 435).  As the Government notes, "[t]he interest in preserving national security

is 'an urgent objective of the highest order.'"  *Trump v. Int'l Refugee Assistance Project*, 137 S.

Ct. 2080, 2088 (2017) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010)).

The Government contends that the national security interests identified in the TikTok Executive

Order and the Commerce Identification outweigh the harm Plaintiffs will suffer absent injunctive

relief.  But Congress has already performed a balancing act, and has determined that the

President's ability to exercise his IEEPA authority to respond to a national emergency does not

extend to actions that directly or indirectly regulate the importation or exportation of

informational materials.  *See* 50 U.S.C. § 1702(b)(3); H.R. Conf. Rep. No. 103-482, at 239

(1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 483 ("[N]o embargo may prohibit or restrict

directly or indirectly the import or export of information that is protected under the First

Amendment to the U.S. Constitution.").  Granting an injunction to prevent a violation of

IEEPA's informational materials exception would be consistent with this congressional

---

[8] Because Plaintiffs demonstrate irreparable harm on the basis of their *ultra vires* claim, there is no need to reach Plaintiffs' argument that they will suffer irreparable harm based on the deprivation of their First Amendment rights. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."); *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013) (same).

determination.

Moreover, the Government's own descriptions of the national security threat posed by the TikTok app are phrased in the hypothetical.  The Government notes that TikTok's parent company "ByteDance has significant and close ties to the CCP which *could potentially* be leveraged to further [the CCP's] agenda."  It states that one of the risks posed by TikTok "is the *possibility* that the PRC government *could* . . . compel TikTok to provide systemic access to U.S. user's sensitive personal information."  The Court cannot say the risk presented by the Government outweighs the public interest in enjoining the Commerce Identification, when Plaintiffs have established a clear likelihood that the Identification's prohibitions contravene IEEPA.  *See TikTok Inc.*, 2020 WL 5763634, at *9 ("[T]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'" (quoting *R.I.L-R v. Johnson*, 80 F. Supp.3d 164, 191 (D.D.C. 2015))).  An injunction will correspondingly protect the public interest embodied in IEEPA's informational materials exception: "the robust interchange of information."  *See Amirnazmi*, 645 F.3d at 587.  The balance of the equities and the public interest favor injunctive relief.

## IV.    SCOPE OF RELIEF

"In shaping equity decrees, the trial court is vested with broad discretionary power." *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (plurality opinion).  That is because crafting equitable remedies is an inexact science; instead, "equitable remedies are a special blend of what is necessary, what is fair, and what is workable."  *Id.*  The Supreme Court articulated the relevant standard for determining the proper scope of a preliminary injunction in *Califano v. Yamasaki*, 422 U.S. 682 (1979), stating that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Id.* at 702.  To strike this

balance, the remedy selected ought to be "tailored to cure the condition that offends the [law]." *Milliken v. Bradley*, 433 U.S. 267, 282 (1977) (internal quotations marks and citation omitted).

This Court recently applied the *Califano* framework in the context of an APA violation in *Pennsylvania v. Trump*, 351 F. Supp.3d 791, 830-35 (E.D. Pa. 2019), *rev'd on other grounds by Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020).  In short, because APA violations are national in character, such violations "'ordinar[ily]' demand[] a national remedy."  *Id.* at 831 (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)).  Yet, an APA violation is not a silver bullet that entitles a plaintiff to a nationwide injunction in every instance.  The court still must "balance the competing principles of providing complete relief to meritorious plaintiffs against a defendant's right to be free from overly burdensome injunctions."  *Id.*  Moreover, the Supreme Court has warned that overbroad injunctions may have adverse effects, including foreclosing adjudication of the challenged action by different courts and under different factual circumstances, and promoting forum shopping.  *Id.* at 832.  Accordingly, "[t]he upshot is that striking the appropriate balance between providing complete relief to meritorious plaintiffs, on the one hand, and protecting defendants from overly burdensome injunctions, on the other, is necessarily a difficult line-drawing exercise, even in APA cases."  *Id.*

Here, Plaintiffs urge that, like in *Pennsylvania v. Trump*, a nationwide injunction is appropriate to remedy a statutory violation that is national in character and necessary to provide Plaintiffs with complete relief.  The Government, on the other hand, points out that only three individual TikTok users have brought suit, and argues that any remedy should be limited to these named Plaintiffs and narrowly aimed at redressing whatever legal violation is established.

Undertaking the fact-dependent inquiry in this case, a nationwide injunction is

appropriate.  First, such a remedy is the proper means to provide complete relief to Plaintiffs.

Plaintiffs reside in three different states and have followers throughout the United States.  In

order to provide Plaintiffs complete relief, the TikTok app would, at minimum, need to remain

available not only to Plaintiffs, but also to their millions of followers.  The Court must consider

what remedy is workable, and "drafting – much less enforcing – a preliminary injunction that

runs only" to only the three named Plaintiffs "is nigh impossible."  *Id.*  The parties at oral

argument were unable to explain how the various services providers whose transactions are

affected by the Commerce Identification could tailor the ban so that the specified users were

unaffected.  Service providers provide support to the TikTok app itself, not to individual TikTok

users.  Even if ordered to do so, there is no indication that service providers are able to: (1)

identify which TikTok app users follow the Plaintiffs; (2) ensure that these applications are

properly serviced and functioning; and (3) comply with the Commerce Identification with

respect to the remaining TikTok users within the United States.  Moreover, such a remedy would

still be underinclusive, as Plaintiffs' would be prevented from reaching new followers.

Second, while it does not automatically entitle Plaintiffs to such relief, the national scope

of an APA violation is indicative that broad relief may be appropriate.  Where, as here, the

offending agency action is a broadly applicable action that violates the APA, "a remedy 'tailored

to cure the condition that offends [the law]' may be correspondingly broad."  *Id.* at 831 (citation

omitted).  And as this Court has explained, "it is far from clear how burdensome a nation-wide

injunction would be on Defendants, given that when 'agency regulations are unlawful, the

ordinary result is that the rules are vacated – not that their application to the individual

petitioners is proscribed.'" *Id.* at 834 (quoting *Nat'l Min. Ass'n*, 145 F.3d at 1409).

Finally, the Supreme Court's concern that nationwide injunctions might "foreclos[e]

adjudication by a number of different courts," *Califano*, 442 U.S. at 701-02, is not necessarily a concern here, as there is already litigation seeking to enjoin enforcement of the Commerce Identification pending in several other jurisdictions.  *See TikTok Inc. v. Trump*, No. 20-cv-02658 (D.D.C. Sept. 18, 2020); *Ryan v. Trump*, No. 20-cv-05948 (N.D. Cal. Aug. 24, 2020); *see also U.S. WeChat Users Alliance v. Trump*, No. 20-cv-05910 (N.D. Cal. Aug. 21, 2020) (challenging prohibitions similar to those in the Commerce Identification, targeting the WeChat application). This decision is unlikely to prematurely stifle litigation in these forums which have before them factually distinct, albeit contextually related, cases.

In sum, a nationwide injunction is warranted.

## V.    BOND

Under Federal Rule of Civil Procedure 65, a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  That said, "there may be instances in which a strict reading of [Rule 65(c)] is not appropriate." *Elliott v. Kiesewetter*, 98 F.3d 47, 59 (3d Cir. 1996).  To determine whether Rule 65's bond requirement may be waived, a court should "consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant."  *Id.* (quoting *Temple*, 941 F.2d at 219).  The Government does not suggest that it will suffer monetary harm stemming from this preliminary injunction, and imposition of anything greater than a nominal bond could constitute a substantial hardship for Plaintiffs.  Moreover, as noted, Plaintiffs seek to further the public interest by enjoining unlawful agency action. Accordingly, the bond requirement is waived.

## VI.     CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction shall be granted as to the Commerce Identification, which shall be preliminarily enjoined.

An appropriate order follows.


**October 30, 2020**                                            **BY THE COURT:**


/s/Wendy Beetlestone, J.


_____
**WENDY BEETLESTONE, J.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DOUGLAS MARLAND, COSETTE RINAB, and ALEC CHAMBERS,** Plaintiffs, | **CIVIL ACTION** |
| **v.** | |
| **DONALD J. TRUMP, in his official capacity as President of the United States; WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce; and U.S. DEPARTMENT OF COMMERCE,** Defendants. | **NO. 20-4597** |

# O R D E R

**AND NOW**, this 30th day of October, 2020, upon consideration of Plaintiffs' Motion for a Preliminary Injunction (ECF No. 25), Defendants' response thereto (ECF No. 26), the Administrative Record (ECF Nos. 27, 28, & 29), Plaintiffs' Reply in Support of their Motion (ECF No. 30), and following a Hearing on Plaintiffs' Motion on October 28, 2020, **IT IS ORDERED** that the Motion is **GRANTED**.

It is **FURTHER ORDERED** that Defendants Wilbur L. Ross, Jr., as Secretary of the United States Department Commerce, the United States Department of Commerce, and their officers, agents, servants, employees, attorneys, designees, and subordinates, as well as any person acting in concert or participation with them, are hereby **ENJOINED** from enforcing the "Identification of Prohibited Transactions to Implement Executive Order 13942 and Address the Threat Posed by TikTok and the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain, 85 Fed. Reg. 60,061 (Sept. 24, 2020) ("the Commerce Identification").

It is **FURTHER ORDERED** that the injunction shall take effect immediately and remain

in effect during the duration of this action and through final judgment, absent reversal or

amendment by appellate order.

The Court has considered the issue of security pursuant to Federal Rule of Civil

Procedure Rule 65(c) and determines that Defendants will not suffer any financial loss requiring

that Plaintiffs post a security bond.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**